David Eugene MATTHEWS, Petitioner

v.

Thomas L. SIMPSON, Warden,
Respondent.

Civil Action No. 3:99CV–P91–H.

United States District Court,
W.D. Kentucky,
at Louisville.

March 17, 2009.

**964**

Alan M. Freedman, Midwest Center for Justice, Ltd., Evanston, IL, Susan M.J. Martin, East Brunswick, NJ, for Petitioner.

Connie V. Malone, Kentucky Justice & Public Safety Cabinet, Ian G. Sonego, Kentucky Attorney General, Matthew R. Krygiel, Kentucky Attorney General, Frankfort, KY, Stephen P. Durham, Jefferson County Attorney, Louisville, KY, for Respondent.

## MEMORANDUM OPINION

JOHN G. HEYBURN, II, District Judge.

In October, 1982, the Commonwealth of Kentucky (the "Commonwealth") opened its case in Jefferson Circuit Court against Petitioner David Matthews on charges of murder and burglary. The jury eventually convicted Matthews on both charges and on November 17, 1982, the trial court imposed the death sentence. Though much has transpired in the succeeding twenty-six plus years, the Court must now decide whether Matthews' trial, conviction, and sentence on the murder charge passes constitutional muster or whether Matthews is entitled to a writ of habeas corpus.[1]

Since the petition was filed here, parties have engaged in every manner of discovery, motion practice and appeals. The Magistrate Judge devoted considerable time and effort to this matter. He thoroughly and dispassionately analyzed the issues raised. The Court appreciates his effort and guidance. He has issued Findings of Fact and Conclusions of Law, recommending that Matthews' petition for writ of habeas corpus be denied in all respects, except for two. He recommended granting the writ as to (1) the trial court's failure to grant a directed verdict on the murder counts because the Commonwealth did not present evidence of the absence of extreme emotional disturbance

---

1. On appeal from the trial court, the Kentucky Supreme Court affirmed Matthew's conviction and sentence. *Matthews v. Commonwealth,* 709 S.W.2d 414 (Ky.1985), *cert. denied* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986). Then, on December 9, 1986, Matthews filed his motion to vacate judgment pursuant to Rule 11.42 of the Kentucky Rules of Criminal Procedure ("RCr 11.42"). After a series of events in state court, the Kentucky Supreme Court denied Matthews RCr11.42 motion. *Matthews v. Commonwealth,* Case No. 96–SC–805–MR (Ky. Nov. 20, 1997), *cert. denied* 525 U.S. 860, 119 S.Ct. 146, 142 L.Ed.2d 118 (1998). Matthews filed his federal habeas petition in the spring of 1999. In August of that year, he filed a motion for discovery related to records concerning his mental health treatment while incarcerated in the Jefferson County Jail. He also filed a motion for an evidentiary hearing on four issues, including ineffective assistance of appellate counsel. The Court conducted a hearing only on the ineffective assistance of appellate counsel issue in July of 2000. On April 20, 2000, however, Matthews filed another RCr 11.42 motion in Jefferson Circuit Court. This motion asserted new claims. On August 1, 2001, the Court dismissed Matthews habeas petition without prejudice for failure to exhaust his state claims, but later issued a certificate of appealability in light of *Palmer v. Carlton,* 276 F.3d 777 (6th Cir.2002). Matthews appealed to the Sixth Circuit which remanded to this court for further consideration in light of *Palmer.* In the interim, the Kentucky Supreme Court denied Matthews' RCr 11.42 motion. Thus, upon remand, Matthews had exhausted all of his state claims. The Court conducted another set of evidentiary hearings in March and July of 2006. After these hearings, the parties submitted post-hearing memoranda, which have led to this opinion.

("EED") as required by the then applicable Kentucky law; and (2) ineffective assistance of appellate counsel because that counsel failed to argue that the term "extreme emotional disturbance" should have been, but was not, defined in the jury instructions in either the guilt or penalty phases of Matthews' trial. As a consequence, he recommended vacating Matthews' death sentence and his convictions for the murders of Marlene Matthews and Magdalene Cruse.

Each side has now filed lengthy objections and responses, which in all substantial respects repeat arguments that the Magistrate had considered. Petitioner identified four major objections to the Magistrate's report while Respondent identified two. It is not necessary to restate the analysis in those instances where the Court substantially agrees with the Magistrate's analysis and completely with his result. The Court approaches these issues without partisanship on the death penalty debate. On the two issues where the Magistrate Judge recommended granting the writ, however, this Court has arrived at a different view.

The Court does not pretend to offer the last word, only to explain as clearly as possible its reasons for denying the writ. What is required constitutionally are fair procedures and evidence sufficient to warrant the trial court's sanction. For the reasons that follow, the Court believes that, irrespective of one's views of the underlying sanction, the Kentucky courts have met these basic requirements of constitutional fairness and justice.

## I.

The Court can resolve Petitioner's objections in a relatively straightforward manner. In order to qualify for habeas relief, Petitioner's claims must meet the requirements of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996.

*See Dennis v. Mitchell,* 354 F.3d 511, 517 (6th Cir.2003) (holding that petitions filed after the effective date of AEDPA, such as the petition here, are reviewed under AEDPA). As the Magistrate correctly pointed out, under the AEDPA, Matthews is only eligible for habeas relief based on claims adjudicated in state court if the adjudication of his claims in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United states" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Petitioner says that trial counsel was ineffective in his investigation, preparation and presentation of the penalty phase evidence. The Magistrate carefully considered each of these issues. The Court cannot find that Petitioner's response has either exposed any mistakes in that analysis or has raised any new issues that the Magistrate has not already considered. The Court will adopt the Magistrate's report and recommendation on this issue.

Petitioner says that the Commonwealth denigrated his EED defense to the extent that it denied him due process. The Magistrate considered this issue and explained the significant differences between the conduct that might constitute such a denial of due process as in *Gall v. Parker,* 231 F.3d 265 (6th Cir.2000) ("*Gall II*"), and that here. Petitioner has not raised any issues not already considered. This Court agrees with the Magistrate's analysis and will adopt his report and recommendation on this issue.

Petitioner objects to the finding that the exclusion of certain additional EED evidence was not a violation of his rights under the Sixth, Eighth and Fourteenth

Amendments. Once again, the Court finds no grounds for differing with the Magistrate's analysis. Moreover, the Court does not perceive any claim under the Eighth Amendment and does not see that Petitioner has raised any new issues which the Magistrate has not already considered. The Court will adopt the Magistrate's report and recommendation on this issue.

Finally, Petitioner reiterates his argument that Kentucky's murder statute is unconstitutionally vague because neither the statute nor the judge's instructions sufficiently define EED. This is a purely legal issue with which the Magistrate has dealt correctly. Petitioner's objections raise no new issues not already thoroughly considered. The Court will adopt the Magistrate's report and recommendation on this issue as well.

## II.

The Magistrate concluded that because the Commonwealth failed to offer direct evidence of EED in its own case, existing Kentucky law required the trial court to sustain Petitioner's motion for directed verdict of acquittal.[2] This is a difficult issue mostly because the constitutional and procedural issues have become so confused. This Court concludes that the failure to grant acquittal of the murder charges at the close of the Commonwealth's case does not constitute a violation of Petitioner's federal due process rights. Moreover, the evidence presented in the entire case was sufficient for a reasonable jury to have concluded beyond a reasonable doubt that EED was absent from these circumstances. This evidentiary conclusion is consistent with the jury's actual finding some twenty-seven years ago and the subsequent review of the Kentucky Supreme Court.

The challenge here is to analyze constitutional principles in light of procedural reality. To adequately understand Petitioner's claims regarding the absence of EED, the Court discusses three foundational points. Subsection A examines the role of EED in the Kentucky murder statute at the time of Petitioner's trial; Subsection B examines the state law requirements for persuasion and production of EED evidence; and Subsection C examines the procedural context in which the trial evidence must be presented and its sufficiency evaluated. Except for perhaps the last issue this Court and the Magistrate Judge are in general agreement.

## A.

In 1975, Kentucky revised its penal code, adopting a murder definition derived from the Model Penal Code. The new statutory definition stated, that a person is guilty of murder when:

> With intent to cause the death of another person, he causes the death of such person or of a third person; *except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance* for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime

Ky.Rev.Stat. § 507.020(1)(a) (emphasis added). This language departed from the common law concept of mitigation, where

---

**2.** It is not precisely clear whether Petitioner would require a directed verdict at the close of the Commonwealth's case in chief or at the conclusion of all the evidence. In either event this Court's analysis reaches the same result.

the killing was committed in the sudden "heat of passion" upon "provocation," and instead adopted EED as a mitigating factor in homicide trials. *See generally Gall v. Commonwealth*, 607 S.W.2d 97, 108 (Ky. 1980) (*"Gall I"*) (tracing the history of Kentucky's murder statute). This statutory revision set in motion decades of confusion that would ultimately ensnare the Commonwealth's prosecution of David Matthews.

Between 1978 and 1985, the Supreme Court of Kentucky decided a number of death penalty cases concerning the role of EED under the new Kentucky statute. During this time, the court emphatically characterized the absence of EED as an element of the crime of murder. As it said, "the statute makes the [a]bsence of 'extreme emotional disturbance' an essential element of the offense of murder." *Bartrug v. Commonwealth*, 568 S.W.2d 925, 926 (Ky.1978); *see also Edmonds v. Commonwealth*, 586 S.W.2d 24, 27 (Ky. 1979) ("A failure to act under the influence of extreme emotional disturbance is an element of the offense of murder."); *Henley v. Commonwealth*, 621 S.W.2d 906, 908 (Ky.1981) ("The absence of 'extreme emotional disturbance' is an essential element of the offense of murder ....") (citing *Bartrug*, 568 S.W.2d at 926).

In 1985, the Kentucky Supreme Court changed its view and said that the absence of EED should not be an actual element of the crime of murder. *Wellman v. Commonwealth*, 694 S.W.2d 696 (Ky.1985). It wrote:

> We are continually beset with arguments founded upon "extreme emotional disturbance" despite the articulation of its meaning and impact in *Gall v. Commonwealth*, Ky., 607 S.W.2d 97, 108–109 (1980). It is our opinion that the principal cause of this problem is the failure of this court, in *Gall*, to specifically overrule those portions of *Ratliff, Bartrug*

> and *Edmonds, supra*, which declare that the absence of extreme emotional distress is an essential element of the crime of murder and require the Commonwealth to prove such absence, even in those cases where there is no evidence whatever indicating emotional disturbance. To the extent that such cases declare absence of extreme emotional distress to be an element of the crime of murder, they are expressly overruled. The presence or absence of extreme emotional distress is a matter of evidence, not an element of the crime. They are a matter of the circumstances of each homicide, and there is certainly no obligation to prove the absence of something which was never there.

*Id.* at 697 (emphasis in original). As a matter of constitutional law, the Kentucky Supreme Court acted well within its prerogative to change state law procedures. One must understand the practical and procedural consequences of this doctrinal change from a trial prospective. Only then may one understand whether Kentucky courts impermissibly reviewed the Matthews trial under the post–1985 law. It is not always easy to keep those concepts separated.

■ The Court is not the first tasked explaining the role of EED in early 1980's murder cases. In the year 2000, the Sixth Circuit examined the law of EED closely in another habeas case. *See Gall II*, 231 F.3d at 288–90. It found that the absence of EED was an element of murder after the 1980 *Gall I* state court decision and remained so until the *Wellman* decision in 1985. *Id.* The analysis in *Gall II* is sound and this Court should follow it. Knowing that the absence of EED is an element of the crime of murder, and understanding how a trial court should evaluate the evidence of it, are two different matters. The next section explains this.

### B.

Kentucky law establishes the who, what, when and how of producing and evaluating trial evidence regarding EED. Two related propositions were undeniably clear at the time of the Matthews trial and sentencing in 1982. First, the burden of persuasion as to the absence of EED lies with the Commonwealth. Second, the burden of production as to the absence of EED lies on the defendant. These two propositions are entirely consistent with the absence of EED as an element of murder in Kentucky.

Beginning in 1978, the Supreme Court of Kentucky specified that the burden of persuasion lay with the Commonwealth. *See Ratliff v. Commonwealth,* 567 S.W.2d 307, 309 (Ky.1978) ("In the case presently before us, the prosecution carried the burden to satisfy the jury of the absence of extreme emotional disturbance as statutorily defined."); *Bartrug v. Commonwealth,* 568 S.W.2d at 926 ("The legislature clearly intended the prosecution to bear the risk of non-persuasion on the element of mitigation.") (citing *Ratliff,* 567 S.W.2d 307 (Ky.1978)); *Gall I,* 607 S.W.2d at 109, fn. 5 ("On all of these issues, when raised by the evidence, the Commonwealth has the burden of proof beyond a reasonable doubt."); *Henley v. Commonwealth,* 621 S.W.2d at 908 ("The absence of 'extreme emotional disturbance' is an essential element of the offense of murder, and the legislature intended the Commonwealth to bear the risk of nonpersuasion on this element of mitigation.") (citing *Bartrug,* 568 S.W.2d 925 (Ky. 1978)). The Commonwealth's burden of persuasion as to the "absence of EED" flows naturally from its designation as an element of the crime of murder.

While the Commonwealth bears the burden of persuasion, the Supreme Court of Kentucky placed the burden of production upon each defendant. It said so most clearly two years prior to Matthews' trial:

> That is not to say that once the issue [of the absence of EED] is raised (by evidence sufficient to ground a reasonable doubt) the Commonwealth must meet it with countervailing evidence. Unless the evidence raising the issue is of such probative force that otherwise the defendant would be entitled as a matter of law to an acquittal on the higher charge (murder), the prosecution is not required to come forth with negating evidence in order to sustain its burden of proof. Cf. *Brown v. Commonwealth,* Ky., 555 S.W.2d 252, 257, fn. 6 (1977).

*Gall I,* 607 S.W.2d at 109 (emphasis added). This language clarifies that the Commonwealth has no absolute duty to produce evidence as to the absence of EED. As a matter of trial procedure, it must do so only where the defendant has produced evidence suggesting the presence of EED. Given the nature of the element (that is, proving a negative), this procedural construction actually makes considerable sense.

There are practical and constitutional consequences of these two propositions. When all the proof is complete, the Commonwealth must have evidence in the record from which a jury could conclude beyond reasonable doubt as to the absence of EED. Now this Court must determine whether the trial court's procedure for evaluating the Matthews' trial evidence was constitutionally proper.

### C.

The Constitution requires that the burden of proof requirements under Kentucky law not infringe any of a defendant's rights. Applying that general concept here, this Court must harmonize *Gall II* and other relevant authority with the particular circumstances in the Matthews trial.

In *Gall II*, the Sixth Circuit took a historical look at Kentucky law and explained what it means to be an element of a crime, and why it matters. *See Gall II*, 231 F.3d 265, 288–290 (6th Cir.2000). The Supreme Court had said, "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Sixth Circuit took this to mean that the Commonwealth must prove every element of the crime beyond a reasonable doubt. *See e.g. Gall II*, 231 F.3d at 286. Evaluating all the evidence in Gall's trial, it held that the Commonwealth had not carried its burden to prove the absence of EED at the trial level. *Gall II*, 231 F.3d at 287–88. This particular factual result is not important for our purposes.[3]

The important legal issue here is that the Gall trial court had shifted the burden of proof to the defendant for an element of the crime.[4] The trial court did this by requiring the defendant to produce evidence that would sustain an acquittal on the murder charge. The Sixth Circuit found that this change in Kentucky law

that placed an unconstitutional burden on the defendant Gall. As it said, the *Hankerson* "requirement of 'some evidence' is far less onerous than the high burden of proof Kentucky placed on defendants in *Gall I*." *Gall II*, 231 F.3d at 296.

Petitioner raises a related but different claim here. He says that the trial court violated those safeguards by refusing to grant him a directed verdict. To understand this issue requires understanding the proper court procedures. Because the Sixth Circuit resolved the *Gall* appeal upon the failure of the evidence as a whole, it had no need to consider the precise procedure that a trial court should follow to ensure defendants their constitutional safeguards. This Court will now do so.

The proper procedure appears as follows. First, the Commonwealth should make its case in chief, introducing evidence regarding the elements of the crime. At this time, the Commonwealth may, but is not required to, introduce evidence regarding the absence of EED. *See Gall I*, 607 S.W.2d at 109; *Hankerson*, 432 U.S. at 237 n. 3, 97 S.Ct. 2339. After the close of the Commonwealth's case, a defendant may put forth a defense if he chooses. In doing so, a defendant may present evidence that

---

3. The evidence of EED in *Gall* is much stronger than that in Matthews. Any comparison of the two results is not meaningful for our purposes. As the *Gall II* court said, the evidence produced by the Commonwealth "was so lacking that no rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *Gall II*, 231 F.3d at 287–88. Unlike the situation in the Gall trial, the Matthews record does contain evidence supporting absence of EED. The important aspect of *Gall II* is its requirement that the trial court properly evaluate all the evidence.

4. To be clear, it is not unconstitutional for a state to require the defendant produce some evidence in order to raise the issue of EED. *See Hankerson v. North Carolina*, 432 U.S.

233, 237 n. 3, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (holding that it is not unconstitutional for states to require "the criminal defendant to present at least some evidence to raise a factual issue with respect to heat of passion or self-defense."). What is unconstitutional is to require more than "at least some evidence" on the part of the defendant. *Gall II*, 231 F.3d at 296. The Sixth Circuit found the language quoted from *Gall I* above problematic, especially the statement that "[u]nless the evidence raising the issue is of such probative force that otherwise the defendant would be entitled as a matter of law to an acquittal on the higher charge (murder), the prosecution is not required to come forth with negating evidence in order to sustain its burden of proof." *Gall I*, 607 S.W.2d at 109.

at the time of the crime he acted under EED. *See Gall I,* 607 S.W.2d at 109; *Hankerson,* 432 U.S. at 237 n. 3, 97 S.Ct. 2339. If a defendant first presents evidence suggesting the presence of EED, the Commonwealth must be able to point to evidence suggesting an absence of EED in order to survive defendant's motion for a directed verdict on the charge of murder. *See Gall II,* 231 F.3d at 298; *Hankerson,* 432 U.S. at 237 n. 3, 97 S.Ct. 2339. To do this, the Commonwealth may point either to inferences from evidence elicited from the defendant's witnesses or from its own.

Given this procedure, Matthews was not entitled to a directed verdict on the charge of murder at the close of the Commonwealth's case and it is wrong to suggest that the trial court violated his constitutional rights by failing to so rule at that point in the trial. Rather, a trial court should evaluate the evidence only at the close of all the proof. A defendant is entitled to a directed verdict then if he has introduced evidence suggesting that he acted under the influence of EED and the Commonwealth cannot point to evidence from which a reasonable jury could conclude otherwise beyond a reasonable doubt. Thus, the trial court here followed the proper trial procedures and did not violate Matthews' constitutional protections by denying his motion at the close of the Commonwealth's case.

### III.

Now the Court arrives at the point of evaluating whether the evidence at the close of trial required a directed verdict of acquittal on the EED issue. AEDPA permits a grant of habeas relief only where the state court reached a decision, "con-

trary to, or [that] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In this context, the AEDPA standard permits relief only if the trial court and the Kentucky Supreme Court unreasonably applied the *Winship* standard, i.e. shifted the burden to prove the absence of EED on to Matthews, in denying the motion for acquittal. The trial court and Kentucky Supreme Court both believed that the trial record contained sufficient evidence upon which a reasonable jury could convict Matthews, and thus the motion for acquittal was properly denied. It is upon this issue that this Court differs most clearly from the Magistrate Judge.

In these circumstances, the trial court's denial of the motion for a verdict of acquittal would be contrary to clearly established Federal law only if a reasonable jury could not have found from the evidence the absence of EED. If that were true, then the trial court would have impermissibly shifted the burden onto the defendant to prove the presence of EED when it denied his motion. If, however, a reasonable jury could have concluded from the evidence that the defendant acted in the absence of EED, the trial court properly denied defendant's motion. The question then is whether the evidence as a whole permits the necessary inferences that Matthews acted in the absence of EED.[5]

### A.

The Kentucky Supreme Court has already analyzed the inferences permitted from Matthews' own witnesses or the

---

**5.** Under AEDPA a federal court shall presume the correctness of the factual findings of a state court, unless the applicant rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here there is no clear and convincing evidence that Mat-

thews was acting under the influence of EED. The Court is not reviewing whether or not Matthews acted under the influence of EED, rather it is merely reviewing whether the trial court unconstitutionally shifted the burden to prove an element of the crime onto Matthews.

Commonwealth's questioning of them. It wrote:

> Another of appellant's arguments in connection with the findings of intentional murder is that the evidence was insufficient to prove absence of emotional disturbance.
>
> While it is certainly true that appellant tried hard to make a case for application of the qualifying phrase, "acting under the influence of extreme emotional disturbance" as set out in KRS 507.020(1)(a), by presenting extensive evidence of preexisting serious domestic problems and through the testimony of a psychiatrist, it is equally true that the evidence regarding appellant's conduct before, during and after the crimes was more than sufficient to support the jury's findings of capital murder. It is not necessary for the Commonwealth to produce direct evidence, by confession or otherwise, of absence of extreme emotional disturbance. *See Gall v. Commonwealth,* Ky., 607 S.W.2d 97, 107 (1980).
>
> The proof that appellant was acting under the influence of extreme emotional disturbance was far from overwhelming. In addition to the circumstances of the crime, the proof was that when he returned to his mother's house after the crime, about 6:00 to 6:30 a.m., he took steps to hide the gun and clean his clothes. Shortly thereafter, he gave a false statement to the police.

*Matthews v. Commonwealth,* 709 S.W.2d 414, 420–421 (Ky.1985). For these reasons, it concluded that the Commonwealth had met its burden of persuasion. This does not conclude this Court's inquiry. Notwithstanding the Kentucky Supreme Court's reasonable analysis, this Court must make its own assessment.

## B.

The Court will focus on several key areas of the evidence.

A central dispute about the trial evidence concerns the impact of Dr. Chutkow's expert testimony. At trial, he testified that Matthews was affected by EED when he committed the murders. The Commonwealth did not present its own expert witness. However, the absence of an expert for the Commonwealth certainly does not decide this issue. *See Hayes v. Commonwealth,* 625 S.W.2d 583, 586 (Ky. 1981) (holding that the cross-examination of a defense expert may sufficiently raise a factual issue regarding EED). A jury is free to reject expert testimony. Indeed, EED is not a mental disorder that even requires expert testimony to establish it.[6]

The Commonwealth cross-examined Dr. Chutkow and there is ample reason in the evidence for the jury to have rejected his conclusions. For instance, the jurors heard that Matthews went to great lengths to procure the murder weapon by borrowing money from his girlfriend and falsely claiming that he needed to purchase it for his mother's protection and by arranging for the purchase of the gun from a neighborhood dealer at the dealer's bar. They also heard evidence of Matthews' conversations with his oldest brother. All of this evidence certainly permitted an inference as to Matthews' premeditation and his mind set prior to his upcoming crime, the very antithesis of EED.

The method of committing this crime would suggest to reasonable jurors some quiet contemplation and thought on Matthews' part. After Matthews broke into the house, he spent several hours before finally finishing his crime spree. After the

---

**6.** A mental disorder "may constitute a reasonable 'explanation or excuse'" for the presence of EED. *Gall I,* 607 S.W.2d at 109. The presence or absence of EED may be found regardless of whether the defendant suffers from a mental disorder.

crimes, he had discussions with his mother that suggest deliberation and understanding of the surrounding events. The same can be said regarding his conversations with authorities after his arrest. Moreover, the absence of EED could be inferred from the careful steps that Matthews took to conceal his crimes during and after their commission. Though this evidence is circumstantial, the Sixth Circuit has said, the jury may examine the evidence of the defendant's conduct and "infer what he thought and what he intended to do from what he did and failed to do—the quintessential jury responsibility in a circumstantial-evidence case." *DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir.1998).

■ The evidence presents an even more precise evidentiary question. Did the jury have evidence from which to infer the absence of EED at the time of the crime? The Commonwealth and defense presented evidence regarding Petitioner's conduct before, during, and after the crime. A jury may consider such evidence to determine a defendant's mental state at the time of the crime. *See Jackson v. Virginia*, 443 U.S. 307, 325, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Court agrees that having evidence of Matthews' mental state before and immediately after the crimes allows the jury a reasonable basis for inference about his mental state while committing the crime. This is logical, sensible and fair. If this were not true, then this jury could never find the absence of EED, because in this case, as in many others, no witnesses to the crime remain alive, other than Matthews himself.

### C.

No one disputes that Matthews presented some evidence of EED. No doubt, a person could look at this evidence and agree with it. But that evidence was not so compelling to require a jury to do so. Thus, after the close of the evidence, it was for the jury to decide whether Matthews acted under the influence of EED. The cumulative effect of the evidence demonstrates that the trial court did not err when it denied Matthews' motion for a directed verdict and allowed the jury to do its duty.

To require the Commonwealth to introduce evidence of the absence of EED in its own case would be contrary to Kentucky law as it existed in 1982, or at any time after 1976. What is required is that at the conclusion of the evidence, a reasonable jury be able to find beyond a reasonable doubt the absence of EED. This Court concludes that substantial evidence in this case allowed reasonable jurors to do so. Thus, as a matter of evidence, the Kentucky Supreme Court correctly analyzed the sufficiency of the proof as submitted in the Matthews' trial. The Court finds no constitutional basis for disregarding the import of that evidence.

### IV.

■ Petitioner's last argument is that Matthew's appellate counsel failed to argue that Kentucky change its law to require a definition of EED in the jury instructions. Had Matthews' appellate counsel argued for a change of Kentucky law, his current counsel postulates, he might have been successful. Thus, failure to do so, constitutes ineffective assistance of counsel. This conclusion depends upon the logic that had Matthews raised the issue, the Supreme Court of Kentucky would have changed its state law earlier than it actually did in *McClellan v. Commonwealth*, 715 S.W.2d 464 (Ky.1986). The Kentucky Supreme Court declined the opportunity to change the law presented in other cases about the same time.[7] Regardless, this Court disagrees that this is

7. The Magistrate found the fact that other attorneys had raised the issue relevant in de-

proper grounds for a writ of habeas corpus in these circumstances. The reasons for this rule are quite sound.

At the time Matthews argued his case on appeal, the Supreme Court of Kentucky did not require a definition of EED in trial instructions. *See Edmonds v. Commonwealth,* 586 S.W.2d at 27. Therefore, the Matthew's trial court's handling of the instructions was indisputably correct under then existing Kentucky law. In 1986, the Supreme Court reversed itself, holding that a definition was required. It did not make application of the new rule retroactive, however. *See Smith v. Commonwealth,* 734 S.W.2d 437, 449 (Ky.1987).[8] Thus, the only route for Matthews to have been successful was if his case, rather than *McClellan,* had been the case that changed Kentucky law.

Appellate counsel is judged by the same effectiveness standard as trial counsel. *See Bransford v. Brown,* 806 F.2d 83, 86 (6th Cir.1986). For an ineffective assistance of counsel claim to succeed petitioner must show two things. First, "that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

The Court does not believe that appellate counsel can be said to have fallen below an objective standards of reasonableness because he decided against arguing an issue upon which Kentucky law had been settled or at least stable for seven years.[9] The Court can find no support for the idea that counsel must foresee changes in the law and argue settled issues or open themselves to a claim of ineffective assistance. To hold otherwise would mean that for habeas corpus purposes every change in the law has a retroactive effective, regardless of state or federal holdings to the contrary. Thus petitioner fails to satisfy the first prong of the *Strickland* test.

For similar reasons, the Sixth Circuit has previously addressed an ineffective assistance of counsel claim where appellate counsel failed to anticipate a change in the law. *Lott v. Coyle,* 261 F.3d 594, 609 (6th Cir.2001) (citing *Alcorn v. Smith,* 781 F.2d 58, 62 (6th Cir.1986)). In *Lott,* the issue arose because it was unclear under Ohio law whether strict compliance, as opposed to substantial compliance, was required to execute a valid jury waiver. *Id.* Lott did not strictly comply with the waiver requirements. *Id.* at 606. Lott's attorney did not argue that strict compliance was necessary on appeal, but three years later the Ohio Supreme Court ruled that strict compliance was required. *Id.* at 609. The Sixth Circuit held that this was not ineffective assistance of counsel. *Id.*

In the *Lott* case, the law was confused, some Ohio courts required strict compliance while others did not. *Id.* In the

termining that the issue was "significantly obvious." However, this fact cuts both ways. It may make the issue of the lack of a definition of EED significantly obvious, but it also means the Kentucky Supreme Court had heard arguments regarding the issue and despite this did not require a definition of EED. Thus while the issue may be significantly obvious, it may be just as obvious that the Kentucky Supreme Court had no interest in changing the law.

8. Since the application of the definition of EED is prospective, it is not reversible error to fail to define EED prior to *McClellan* in 1986. *Id.*

9. From a constitutional viewpoint, the precise state of certainty about Kentucky law should not be an issue. In fact, the law about definitions was clear, though some disagreed and some argued against it.

instant case, however, Kentucky law was settled rather than confused. No EED definition was required in the jury instructions. *See Edmonds v. Commonwealth*, 586 S.W.2d at 27. If the failure to argue a confused point of law, which has precedent on both sides, does not qualify as ineffective assistance of counsel, then the failure to argue against a reasonably settled issue of law surely does not qualify.

Finally, it is not gross incompetence to fail to predict that the Kentucky Supreme Court might change its existing views. Looking at all of the ongoing cases at the time of Matthews' appeal, it is impossible to logically believe that reversal of the EED definition rule was "reasonably probable." It is mere speculation to suggest that appellate counsel could have convinced Kentucky's highest court to act earlier than it actually did. Thus, Petitioner fails to meet the second prong of the *Strickland* test.

For all these reasons, this Court concludes that Matthews' former appellate counsel were not grossly incompetent when they neglected to argue for a change in Kentucky law.

### V.

As to all other matters contained in the Magistrate's report and recommendation, this Court will adopt the analysis contained in the Magistrate's report and the conclusion that none are sufficient to justify issuance of a writ of habeas corpus.

The Court will enter an order consistent with this Memorandum Opinion.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION

JAMES D. MOYER, United States Magistrate Judge.

### I. INTRODUCTION

On June 29, 1981, the petitioner, David Eugene Matthews, was arrested and charged with murder and burglary in connection with the deaths of his wife, Mary "Marlene" Matthews, and his mother-in-law, Magdalene Cruse. He was tried before a Jefferson Circuit Court jury in Louisville, Kentucky, on October 5–8, 1982, convicted on all counts, and sentenced to death. The evidence adduced by the Commonwealth at trial was substantial, and it is quite clear to this court that Matthews perpetrated the acts for which he stood trial. It is equally clear, however, that two of Matthews' many challenges to the constitutionality of his convictions and sentence present problems of such a constitutional magnitude that this court must recommend issuing the requested writ of habeas corpus. These two issues are: 1) the trial court's failure to grant a directed verdict on the murder counts where the Commonwealth did not prove the absence of extreme emotional disturbance beyond a reasonable doubt, as required by the then-applicable Kentucky murder statute; and 2) appellate counsel's failure to argue on direct appeal that the term "extreme emotional disturbance" should have been, but was not, defined in the jury instructions in either the guilt or penalty phase of Matthews' trial.

An outline of the court's analysis is as follows:

I. INTRODUCTION ................................................ 974

II. FINDINGS OF FACT .......................................... 976
 A. Proof at Trial ......................................... 976
 B. Direct Appeal ......................................... 977
 C. State Postconviction Proceedings .................. 978

 D. Federal Postconviction Proceedings ...................................978

III. CONCLUSIONS OF LAW..............................................981
 A. Standard of Review ............................................981
 B. Burden Shifting of Extreme Emotional Disturbance.......................985
 C. Failure to Define Extreme Emotional Disturbance .....................993
 D. Ineffective Assistance of Counsel ......................................997
 1. Failing to investigate, prepare, and present evidence at guilt and
 penalty phases.................................................998
 a. Mental illness in Matthews' family....................1010
 b. Matthews' mental and physical history ............................1011
 c. Matthews' alcohol and drug abuse ....................1012
 d. Alcoholism in Matthews' family and family background.............1012
 2. Use of an expert to establish EED .................................1016
 a. Selection of Dr. Chutkow.........................1017
 b. Preparation of Dr. Chutkow ........................1018
 c. Utilization of Dr. Chutkow .........................1020
 3. Counsel failed to strike Juror Kavich for cause.........................1024
 4. Counsel failed to request and tender adequate intoxication
 instructions .................................................1026
 5. Failure to object to Commonwealth's misstatements of law regarding
 EED during closing arguments ...................................1027
 6. Failure to place excluded evidence into the trial record by avowal....1028
 7. Failure to request an admonition on the sex abuse and burglary
 warrants.....................................................1030
 8. Ineffective assistance of appellate counsel ...........................1032
 a. Trial court's failure to define EED ..............................1033
 b. Remaining ineffective-assistance-of-appellate-counsel claims .......1036
 E. Testimony–Related Issues ...........................................1039
 1. Excluded evidence ..............................................1039
 2. Included evidence ...............................................1042
 a. Burglary warrant ...............................1043
 b. Sex abuse warrant ..............................1045
 c. Tape recorded confession .........................1046
 d. Communications with Dr. Chutkow ............................1047
 F. Burglary Conviction and Sentence ...................................1048
 G. Double Counting of Burglary.........................................1052
 H. Introduction of Sentencing into the Guilt Phase............................1053
 I. Alleged Capital Sentencing Instruction Errors ...........................1055
 1. Procedurally defaulted claims.......................................1055
 2. Remaining assignments of error ...................................1055
 a. Sentence less than death .............................1055
 b. No instruction was given on statutory mitigating circumstances....1057
 c. No instruction was given on applicable mitigation evidence .........1058
 d. The penalty phase verdict forms were impermissibly weighted in
 favor of death .........................................1059
 J. Jury Selection......................................................1059
 1. Inadequate examination of the venire panel...........................1059
 2. Venireman Eaton ..............................................1061
 3. Venireman Furlong ............................................1062
 K. Jury Deliberation Related Issues .....................................1063
 1. Jury considered parole...........................................1063
 2. The trial court's refusal to sequester the jury .........................1066
 L. Use of "recommend" diminished jury's role at sentencing ..................1068
 M. Prosecutorial Misconduct ...........................................1072
 1. Strikes on the death-hesitant but death-qualified jurors ...............1072
 2. Examination of witnesses .......................................1073
 a. Lawrence Cruse ...............................1073
 b. Carol Engle ..................................1074

 c. Dr. Chutkow ............................................... 1074
 i. Sex abuse and burglary warrants .......................... 1075
 ii. Dr. Chutkow's investigation ............................... 1075
 iii. Prosecutor's statement that Matthews "kicked down the
 door" ............................................... 1075
 iv. Sexual intercourse with Marlene Matthews ................. 1076
 3. Guilt phase closing arguments .................................... 1077
 a. Sexual relations ........................................ 1077
 b. Dr. Chutkow and extreme emotional disturbance .................. 1078
 c. Intoxication ............................................ 1078
 d. Reasonable person standard .................................. 1080
 e. Denigration of defense ...................................... 1080
 f. Empty chair reference ...................................... 1083
 4. Closing argument at sentencing ..................................... 1083
 N. Refusal to Transcribe Grand Jury Proceedings ........................... 1086
 O. Right of Access to Court Records Relating to Proportionality Review ........ 1086
 P. Jefferson County Jail Mental Health Records ........................... 1088
 Q. Length of Confinement is Unconstitutional ............................. 1092

IV. CERTIFICATE OF APPEALABILITY .................................... 1093

V. RECOMMENDATION ............................................... 1094

## II. FINDINGS OF FACT

### A. Proof at Trial

1) The facts underlying Matthews' convictions are fully recounted in the Kentucky Supreme Court's decision on direct appeal. *Matthews v. Commonwealth,* 709 S.W.2d 414 (Ky.1985) (hereinafter *"Matthews I"*). This court presumes the state court's findings of fact to be correct. *See* 28 U.S.C. § 2254(e)(1). The Kentucky Supreme Court recited the facts underlying Matthews' convictions as follows:

Matthews and his wife, Marlene, had been married for about two and a half years before the murders. During the last year their marriage had undergone repeated periods of separation, during which Matthews lived with his mother. These separations were marked by extreme hostility, and Marlene often swore out criminal warrants against her husband for harassment.

In the five week period immediately before the murders occurred, Marlene had procured two separate warrants against Matthews. The first charged him with sexual abuse of his step-daughter, Marlene's six year old daughter. The second charged him with burglary by breaking into Marlene's residence. Matthews had been arrested on the first warrant and released under a court order forbidding him further contact with Marlene. He was not served with the burglary warrant until after the crimes at issue had occurred.

During the early morning hours of June 29, 1981, the victims were murdered in separate rooms at the home occupied by Marlene and her daughter. The house was rented from Marlene's family. Both victims were shot with a .22 caliber revolver fired from no more than eighteen inches away. Apparently Marlene died almost immediately. Marlene's father, Lawrence Cruse, came over the next morning and discovered her mother still alive, but mortally wounded. She had been shot in the head. He also found his daughter who had been shot twice, once in the chest and once in the back. Cruse found the side door screen had been cut and the glass broken, and a pocketknife on the steps.

[Matthews] did not testify at trial. The evidence that he had broken into the house and that he was responsible for

the shootings, however, was both overwhelming and uncontradicted. Defense counsel conceded from the outset of the trial that [Matthews] killed the two victims. His defense consisted of presenting evidence that he was acting under the influence of extreme emotional disturbance at the time, so that it was manslaughter, not murder.

To establish extreme emotional disturbance, appellant relied on the combined effect of testimony from a number of people about the long history of significant marital strife. Appellant also introduced testimony from a psychiatrist [Dr. Lee Chutkow] to show that, at the time of the homicides, he was suffering from an adjustment disorder, designated "a temporary emotional and behavioral disturbance" causing temporary impairment of judgment, poor self-control and diminished awareness.

In the account of the events on the night of the murder given by the appellant to the psychiatrist, the appellant said that he broke into his wife's home at about 1:00 or 2:00 a.m. He found his mother-in-law in bed and shot her. She was left mortally wounded. He then went into the next room, had sexual relations one or two times with his wife, stayed with her until about 6:00 a.m., and shot and killed her. He shot his wife twice because he thought he had missed the first time.

*Matthews I*, 709 S.W.2d at 417.

2) Matthews was tried in Jefferson Circuit Court in October 1982. *See* St. Ct. Rec., Trial Testimony and Proceedings, Vol. I–VII.[1] The jury found him guilty of the murder and burglary charges, TE VII at 679–80, and fixed his sentence at death for the murders, *id.* at 735–38. On November 17, 1982, the trial court entered final judgment and imposed his sentence. St. Ct. Rec., Tr. Ct. Rec., Vol. II at 285–88.[2]

## B. Direct Appeal

3) Matthews raised thirty-seven separate assignments of error on direct appeal. *Matthews I*, 709 S.W.2d at 417. Though the Kentucky Supreme Court "considered all of the[ ] issues" raised in the appeal, it provided a substantive analysis of only eight claims.[3] *Id.* at 417–18.

4) On September 26, 1985, (rehearing denied May 22, 1986), the Kentucky Supreme Court unanimously affirmed Matthews' convictions and sentence and denied

---

1. The trial testimony will be cited as "TE —— at ——." For example, if the cited testimony appears in volume I at pages 1–5, the citation will be "TE I at 1–5." This format is substantially similar to that used by the parties in their briefs.

2. The trial court record will be cited as "TR —— at ——." For example, if the document appears in volume I at pages 1–5, the citation will be "TR I at 1–5."

3. Those claims are:
 1) Evidence of the burglary warrant and the sexual abuse warrant taken out before the murders occurred should not have been admitted.
 2) The appellant's presentation of evidence of domestic conflict occurring before the murders took place was unduly limited.

3) Testimony admitted on cross examination of appellant's psychiatrist violated the psychiatrist/patient privilege.
4) The evidence did not sustain using the burglary charge as an aggravating factor justifying the death penalty.
5) The evidence did not sustain using multiple murder as an aggravating factor justifying the death penalty, and the jury's findings were insufficient on this point.
6) The use of the word "recommend" in the death penalty in the court's instructions was error.
7) The trial court failed to adequately instruct the jury when the jury inquired about parole.
8) The trial judge used improper and erroneous considerations in imposing sentence.
*Id.*

his request for rehearing. *Id.* at 424. On October 6, 1986, the United States Supreme Court denied Matthews' petition for a writ of certiorari. *Matthews v. Kentucky,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986).

## C. State Postconviction Proceedings

5) On December 9, 1986, Matthews filed his original motion to vacate judgment pursuant to Rule 11.42 of the Kentucky Rules of Criminal Procedure ("RCr 11.42"). TR III at 390–97. The motion lay dormant until June of 1990 when the Commonwealth filed a supplemental response. *Id.* at 414–24. On August 10, 1990, Judge Shobe, the original trial judge, overruled the RCr 11.42 motion. *Id.* at 425.

6) Matthews thereafter filed a motion for enlargement of time for seeking reconsideration of that decision and to file an appeal to the Kentucky Supreme Court. *Id.* at 436–39. On October 1, 1990, Matthews filed a motion to amend his previously denied RCr 11.42 motion, a motion to reconsider the court's denial of his RCr 11.42 motion, and a motion to hold the previously denied RCr 11.42 motion in abeyance. TR IV at 456–85. On December 23, 1991, Judge Shobe entered an order that vacated the judgment imposing Matthews' death sentence. TR V at 702–03. Judge Shobe found that Matthews was entitled to a new sentencing proceeding because the trial court used the word "recommend" when instructing the jury during the penalty phase of Matthews' trial. *Id.* The Commonwealth sought reconsideration of that order, but on February 18, 1992, the trial court denied the motion.[4] *Id.* at 744–45.

7) On February 24, 1992, the Commonwealth filed an original action in the Kentucky Supreme Court, seeking an order setting aside the trial court's December 23, 1991, order. *Id.* at 747–52. On December 17, 1992, the Kentucky Supreme Court held that Judge Shobe's order was void and reinstated the original judgment and sentence. TR VI at 764–70, 775. On November 23, 1994, the Kentucky Supreme Court remanded the matter to Jefferson Circuit Court for immediate ruling on a pending motion for reconsideration of its order denying Matthews' petition for rehearing. *Id.* at 776. On July 29, 1996, the circuit court denied the motion, leaving in place the August 10, 1990, decision overruling Matthews' RCr 11.42 motion. *Id.* at 882–90.

8) Matthews appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. On November 27, 1997, in an unpublished decision, the Kentucky Supreme Court affirmed the trial court's decision to deny Matthews relief under RCr 11.42. *Matthews v. Commonwealth,* Case No. 96–SC–805–MR (Ky. Nov. 20, 1997) (hereinafter *"Matthews II "*), DN 32, at app. On March 19, 1998, the Kentucky Supreme Court denied Matthews' motion for a rehearing, and on October 5, 1998, the United States Supreme Court denied his petition for a writ of certiorari. *Matthews v. Kentucky,* 525 U.S. 860, 119 S.Ct. 146, 142 L.Ed.2d 118 (1998).

## D. Federal Postconviction Proceedings

9) On October 5, 1998, Matthews filed a miscellaneous action in the district court in which he sought *pauper* status, appointment of counsel, a stay of execution, and an extension of time within which to file his federal habeas corpus petition. *Matthews v. Parker,* Misc. Action No. 3:98MC–18–H. The district court granted his motions and directed him to file his habeas corpus petition by February 12, 1999, which he did. DN 23 & 25.[5] The district

---

4. Due to Judge Shobe's retirement, the matter was submitted to Judge Conliffe.

5. The petition is 297 pages in length, not including several hundred additional pages of

court entered an order directing the clerk to effect service of the petition on respondent and the Attorney General for the Commonwealth of Kentucky, directing respondent to file an answer to the petition within twenty days from the entry of the order, and referring this action to the undersigned for a report and recommendation.[6] DN 26. Respondent filed a motion for enlargement of time in which to file an answer, DN 27, which this court granted, setting May 11, 1999, as the new answer date, DN 28.

10) On May 7, 1999, almost three months after filing his first petition, but before respondent's answer was filed, Matthews filed a first amended petition for writ of habeas corpus pursuant to FED. R.CIV.P. 15. DN 31.[7] In the amended petition Matthews added three broad claims for relief not previously raised in any litigation: 1) claims concerning the alleged suppression of information relating to Matthews' detention in the Jefferson County jail; 2) claims premised on the application of the Kentucky Racial Justice Act; and 3) an argument that confinement under a sentence of death renders capital punishment disproportionate to the crime of murder. *Id.*

11) Respondent filed an answer to the original petition with an accompanying memorandum of law on May 11, 1999. DN

32 & 33. By order entered June 18, 1999, this court directed the clerk to effect service of the first amended petition for writ of habeas corpus on respondent and the Kentucky Attorney General. DN 38. The order further directed respondent to file an answer to the first amended petition within twenty days from entry of the order. *Id.* Respondent filed an answer and accompanying memorandum of law on July 7, 1999. DN 42 & 43. This court granted Matthews' request to file a reply brief and traverse, DN 47, which Matthews filed on August 2, 1999.[8] DN 48.

12) On August 31, 1999, Matthews filed a motion for discovery. DN 53. Matthews requested an order requiring the Commonwealth to produce any records related to Matthews' mental health treatment while incarcerated in the Jefferson County jail, all grand jury records related to Matthews, all exculpatory evidence related to Matthews' case, all data kept by the Kentucky Supreme Court pursuant to KY.REV.STAT. § 532.075(6), and an assortment of other records related to racial animus in the imposition of the death penalty in Kentucky. *Id.* This court granted Matthews' request for discovery related to records concerning his detention in the Jefferson County jail. DN 69. Respondent complied with the court's order by producing a handful of documents, some of

---

6. After Matthews filed his petition, the district court closed the miscellaneous action and directed that all future filings should be filed as part of this action. DN 26.

7. This amendment is forty-five pages in length, not including several hundred pages of attachments.

8. The traverse and reply are 152 pages. Thus, the petition, supplement, and traverse total almost five hundred pages. Additionally, the parties have since filed several hundred pages of supplemental briefs. In total, the substantive briefing in this matter is approaching well over a thousand pages.

attachments. DN 23 & 25. In addition to the claims discussed in this report and recommendation, the petition raises a number of "issues directly overruled by established case law" that Matthews asserts he included in case they were ever reversed at some future date. Pet. at 267–95, DN 23. Those "issues" are not discussed in this report and recommendation because they have not been properly presented to this court as claims presently entitling Matthews to relief under 28 U.S.C. § 2254. Matthews also subsequently withdrew a small portion of the claims contained in his original petition, DN 216, and therefore, those claims are also not discussed in this report and recommendation.

which related to the mental health treatment Matthews received during his pretrial detention. DN 70.

13) Matthews also filed a motion for an evidentiary hearing. DN 52. He sought an evidentiary hearing on four issues: 1) ineffective assistance of counsel at the guilt phase; 2) ineffective assistance of counsel at the penalty phase; 3) claims arising out of the suppression of material held by the Jefferson County jail; and 4) ineffective assistance of appellate counsel. *Id.* This court granted Matthews' request for an evidentiary hearing on the ineffective assistance of appellate counsel claim, DN 94, but denied a hearing on the remaining three issues, DN 87. This court conducted an evidentiary hearing on the ineffective assistance of appellate counsel claims on July 7 and 25, 2000. DN 122 & 126.[9] After the hearing, the parties submitted additional briefing on the ineffective assistance of appellate counsel issue. DN 130, 132–33.

14) On April 20, 2000, Matthews filed in Jefferson Circuit Court a "Motion Pursuant to RCr 11.42 to Vacate, Set Aside or Correct his Sentence, or, alternatively, Motion for Relief From Final Judgment Pursuant to CR 60.02." DN 91, attach. 1. This motion asserted the three "new" claims raised one year before in Matthews'

first amended petition for writ of habeas corpus. *Id.* Matthews then filed a motion in this court on April 27, 2000, requesting the court to stay these proceedings and hold them in abeyance pending resolution of his recently filed state court motion. *Id.* Matthews filed a renewed motion to stay on December 5, 2000. DN 141. In his renewed motion, Matthews explained that on July 19, 2000, the Jefferson Circuit Court entered an order denying Matthews' RCr 11.42 motion, and that Matthews had appealed that decision to the Kentucky Court of Appeals,[10] where the matter was then pending.[11] *Id.* Matthews again requested that this court stay these habeas proceedings pending resolution of his appeal in Kentucky state court. *Id.*

15) Based on the state of the law at the time, the undersigned recommended that the motion to stay be denied and Matthews' case be dismissed without prejudice. DN 157. On August 1, 2001, the district court entered an order adopting the report and recommendation and dismissing this action without prejudice for failure to exhaust all of the presented claims in state court. DN 170.[12] The district court later granted a certificate of appealability to Matthews on the issue of whether its decision to deny Matthews' motion to stay his petition pending exhaustion of his state remedies was correct. DN 185.[13]

9. In conjunction with the evidentiary hearing, the court also granted Matthews' motion for the court to take judicial notice of six appellate briefs filed by counsel in other cases around the time of Matthews' direct appeal. DN 132.

10. Matthews did not appeal the denial of his claims under Kentucky's Racial Justice Act, and therefore, has abandoned them in this habeas action. DN 155.

11. The Kentucky Court of Appeals subsequently transferred the appeal to the Kentucky Supreme Court. DN 145.

12. In adopting the recommendation, the district court found that dismissal of the petition

was appropriate and opined that neither the applicable statutes nor case law permitted the court to stay Matthews' mixed petition while he exhausted his state remedies. *Id.*

13. This decision was based in large part on an appellate court decision that was rendered following the dismissal of Matthews' petition, *Palmer v. Carlton*, 276 F.3d 777 (6th Cir. 2002), in which the Sixth Circuit suggested *in dicta* that when a lower court is presented with a mixed petition, it should dismiss the unexhausted claims and stay the petition while the petitioner exhausts the remaining claims at the state court level.

16) On January 17, 2002, in an unpublished opinion, the Kentucky Supreme Court entered an order affirming the Jefferson Circuit Court's denial of Matthews' RCr 11.42 motion. *See Matthews v. Commonwealth,* 2000–SC–1134–TG (Ky. Jan. 17, 2002) (hereinafter *"Matthews III"*), DN 183, attach 2.

17) On April 17, 2002, Matthews filed a motion with the Sixth Circuit seeking a remand to the district court for consideration of his now fully exhausted and briefed habeas petition. DN 188. On October 24, 2003, the Sixth Circuit granted the motion to remand the case to the district court and instructed the district court to review its prior order of dismissal in light of *Palmer* and other recent decisions from the Sixth Circuit. *Id.* After doing so, the district court vacated its prior order of dismissal. DN 196. Because Matthews had exhausted his state court remedies in the interim, the district court ordered this case restored to the court's active docket, and again referred this matter to the undersigned for a report and recommendation. DN 190, 196.

18) Following remand, this court concluded that reconsideration of Matthews' request for an evidentiary hearing on his ineffective-assistance-of-counsel claims at the guilt and penalty phases of Matthews' trial was necessary. DN 204. After a review of the record, this court concluded that, by no fault of Matthews, the factual basis of these claims was not developed in state court. *Id.* Accordingly, this court partially vacated its March 29, 2000, decision denying Matthews' motion for a hearing on his ineffective-assistance-of-counsel

claims, DN 87, and granted Matthews an evidentiary hearing regarding those claims. DN 204.

19) An evidentiary hearing was held on March 2 & 3 and July 19, 2006. At the hearing, Matthews presented his direct proof through eleven sworn affidavits from various family members and friends.[14] DN 236. The Commonwealth was then given an opportunity to cross-examine the witnesses live on the stand, and Matthews was given an opportunity for re-direct.[15] *Id.* When the hearing resumed on July 19, 2006, Matthews presented expert testimony from Dr. Robert Lee Smith regarding Matthews' mental health diagnosis at the time of his trial. DN 241. The court also received into evidence the deposition transcripts of David Busse and Christopher Rivers, Matthews' trial counsel,[16] DN 233, and the mental health records of Matthews' maternal aunt, Mary Louise Zocklein. After the hearing, the parties submitted final post-hearing memoranda as ordered by the court. DN 243 & 244.

20) This matter is now ripe for a decision on the claims presented in Matthews' petition and amended petition.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

1) Since Matthews filed his petition for writ of habeas corpus on February 12, 1999, DN 23, review in this case is governed by Chapter 153 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996. *Dennis v. Mitchell,* 354 F.3d 511, 517 (6th Cir.2003); *Lindh v.*

---

**14.** These individuals are: 1) Rita Baete; 2) Linda Matthews; 3) Jerry Matthews; 4) Anna Rose Seward; 5) Beverly Ann Higdon; 6) Barbara Kaegin; 7) Brenda S. Mattingly; 8) Anthony Wayne Matthews; 9) Judy Kaye Carrier; 10) Nada Jean Nowlin; and 11) Margaret Laverne Matthews.

**15.** Ms. Carrier, Ms. Nowlin, and Mrs. Margaret Matthews were not present at the hearing, and therefore, were not subject to cross-examination.

**16.** The depositions were taken on February 10, 2006, and March 21, 2006.

*Murphy,* 521 U.S. 320, 327–29, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The fact that Matthews was convicted before the AEDPA's enactment does not alter this conclusion. *Williams v. Bagley,* 380 F.3d 932, 942–43 (6th Cir.2004).

2) Matthews' argument that application of the AEDPA to his case would violate the Ex Post Facto Clause of the United States Constitution has no merit. The Sixth Circuit rejected an identical argument in *Seymour v. Walker,* 224 F.3d 542, 560 (6th Cir.2000), explaining that because the AEDPA " 'neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided a greater punishment, nor changed the proof necessary to convict,' its application ... does not violate the Ex Post Facto Clause." *Id.* (quoting *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)).

■ 3) Equally without merit is Matthews' claim that application of the AEDPA would violate the Suspension Clause of the United States Constitution. The Suspension Clause provides that "the Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." U.S. CONST. art. I, § 9, cl. 2. The United States Supreme Court has found that habeas legislation violates the Suspension Clause only when it unreasonably "renders the habeas remedy 'inadequate or ineffective' to test the legality of detention." *Miller v. Marr,* 141 F.3d 976, 977 (10th Cir.1998) (quoting *Swain v. Pressley,* 430 U.S. 372, 381, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977), and *United States v. Hayman,* 342 U.S. 205, 223, 72 S.Ct. 263, 96 L.Ed. 232 (1952)). While the AEDPA certainly established new guidelines for habeas cases, it did not "suspend" the right of a prisoner to seek habeas relief contrary to article I, § 9, clause 2 of the Constitution. *See, e.g., Felker v. Tur-*

*pin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). The AEDPA leaves habeas petitioners with a reasonable opportunity to have their claims heard on the merits. Accordingly, the AEDPA does not unconstitutionally suspend the writ of habeas corpus.

4) Under the AEDPA,

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.

5) The United States Supreme Court has interpreted the provisions regarding a state court decision that is "contrary to" or an "unreasonable application of" clearly established federal law. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams,* the Court determined that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Id.* at 405, 120 S.Ct. 1495. Under this standard, an unreasonable application is an objectively unreasonable application of the federal law set forth in decisions of the United States Supreme Court. A state court's ruling violates the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407, 120 S.Ct. 1495. An unreasonable application can also occur where "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* Unreasonableness is an objective standard, and the fact that another court has applied the law in the same manner is not dispositive. *Id.* at 409–10, 120 S.Ct. 1495. "Unreasonable" is distinct from "incorrect;" even if a state court incorrectly applies a rule of law, that error will not warrant habeas relief unless the application was objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). The Sixth Circuit has stated that "the district court could find the state court determinations unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect,' " and its error " 'would not be debatable among reasonable jurists.' " *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir.1996), *overruled in part on other grounds, Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)).

6) Under the AEDPA, "clearly established federal law" means "holdings, as opposed to the dicta of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412, 120 S.Ct. 1495. " 'As is dictated by the statute, [reviewing courts] may not look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.' " *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir.2004) (quoting *Doan v. Brigano*, 237 F.3d 722, 729 (6th Cir.2001), abrogated on other grounds by *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Reviewing courts may consider such lower federal court decisions, however, to the extent that such decisions reflect review and interpretation of " 'relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court case law.' " *Id.* (quoting *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir.2003)). Reviewing courts are "also bound by any prior Sixth Circuit decisions concluding that federal law on a particular issue has been 'clearly established' by certain holdings of the Supreme Court." *Id.* (citing Rule 206(c) of the Sixth Circuit Rules).

7) Even where the state court decision does not specifically cite to relevant federal case law, the deferential AEDPA review standard applies. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*per curiam*) (holding that the state court is not required to cite United States Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). However, the deferential standard of the AEDPA does not apply where the state court has not adjudicated the merits of the particular claim. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003) ("Where as here, the state court did not assess the merits of

a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.") (citing *Wiggins,* 539 U.S. at 537–38, 123 S.Ct. 2527)). In that instance, the claim is reviewed *de novo. Id.*

8) To the extent that a habeas petitioner challenges the factual findings of the state court, § 2254(e)(1) provides that "determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

■ 9) A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b) & (c). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on his or her claims. *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994); *Manning v. Alexander,* 912 F.2d 878, 881 (6th Cir. 1990). If the petitioner still has a remedy in the state courts in which the state court would have the opportunity to rule on the federal constitutional claims in petitioner's case, exhaustion has not occurred. *Rust,* 17 F.3d at 160. At the current juncture, the court sees no apparent exhaustion problems with the petition and amended petition in this case and does not engage in a *sua sponte* analysis of exhaustion where respondent has failed to raise it.

■ 10) Habeas petitioners face an additional hurdle before federal courts may review a question of federal law decided by a state court. As applied in the habeas context, the doctrine of procedural default prevents federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement. In *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the United States Supreme Court

held that, for purposes of comity, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." Additionally, the Supreme Court held in *Coleman v. Thompson,* 501 U.S. 722, 749, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), that:

> [If a] state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

The Sixth Circuit has adopted a four-part test for determining whether a claim has been procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule ... Second, the court must decide whether the state courts actually enforced the state procedural sanction ... Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim ... [Fourth,] the petitioner must demonstrate under [*Wainwright v.*] *Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) that there was "cause" for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Caver v. Straub,* 349 F.3d 340, 346 (6th Cir.2003) (quoting *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986)). Respondent asserts that this court must not review

some of the claims Matthews raises in the petition and amended petition because they are procedurally defaulted. The court will address each individual allegation of procedural default when it analyzes Matthews' distinct claims for relief.

■ 11) Finally, the court notes that in *Teague v. Lane*, 489 U.S. 288, 311–13, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the plurality barred the application of new procedural rulings in the collateral review of convictions that became final before those rulings were announced. A conviction becomes final for the purposes of *Teague* when "the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Beard v. Banks*, 542 U.S. 406, 411, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (internal quotation marks omitted)). The *Teague* opinion, however, delineated two exceptions. The first, which is not pertinent to this controversy, is that "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague*, 489 U.S. at 311, 109 S.Ct. 1060 (internal citations omitted). The second exception is for "new 'watershed rules of criminal procedure' that are necessary to the fundamental fairness of the criminal proceeding" and improve the accuracy of the criminal process. *Gaines v. Kelly*, 202 F.3d 598, 604 (2d Cir.2000) (quoting *Sawyer v. Smith*, 497 U.S. 227, 241–42, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. 1060)).

12) With these guiding principles in mind, the court will now turn to the individual claims asserted by Matthews in his petition and amended petition.

## B. Burden Shifting Extreme Emotional Disturbance [17]

13) Matthews argues that under Sixth Circuit and Supreme Court precedent the Kentucky Supreme Court erred in holding that the Commonwealth did not need to prove the absence of extreme emotional disturbance ("EED") in convicting him of capital murder. DN 142 at 8–10. In considering this issue, it is important to understand the evolution of Kentucky law regarding whether one of the elements of murder is the absence of EED. A chronology of the pertinent Kentucky case law regarding EED is set forth below.

14) Prior to 1975, Kentucky's murder statute, KY.REV.STAT. ANN. § 435.010, provided only that "'[a]ny person who commits wilful murder shall be punished by confinement in the penitentiary for life, or by death.'" KY.REV.STAT. ANN. § 507.020 Kentucky Crime Commission/LRC Commentary (1974). "With no legislative effort to further define murder, the Court of Appeals, of necessity, had described the types of conduct included in this offense. In satisfying this need the Court created three distinct categories of murder for Kentucky: intentional murder, negligent murder, and felony murder." *Id.* In 1975, Kentucky enacted a new murder statute modeled on the Model Penal Code, which made substantial changes to each of the categories of murder. *Id.* Under that statute, a person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person or of a third person; *except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance* for which there was a reasonable explanation or excuse, the reasonableness of which is to be

---

**17.** This claim is set forth at Pet. at 246–49, DN 23.

determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime....

KY.REV.STAT. ANN. § 507.020(1)(a) (emphasis added).

15) The Kentucky Supreme Court first considered the role of EED in the new murder statute in 1978. *See Ratliff v. Commonwealth,* 567 S.W.2d 307, 309 (Ky. 1978), *overruled by Wellman v. Commonwealth,* 694 S.W.2d 696 (Ky.1985). The issue in Ratliff was whether the prosecution had carried its burden to convince the jury of the absence of EED where the defendant, who suffered from paranoid schizophrenia, fatally shot a store clerk without provocation because the defendant was under the delusion that the clerk, among others, was conspiring against her. *Id.* The Kentucky Supreme Court found that the prosecution had carried its burden of establishing the absence of EED, but reversed the murder conviction and ordered a new trial on another ground. Soon thereafter, in a criminal appeal considering the propriety of jury instructions regarding manslaughter, the Kentucky Supreme Court stated that, in drafting the murder statute, the Kentucky legislature clearly intended for the prosecution to bear the risk of non-persuasion on the absence-of-EED element. *Bartrug v. Commonwealth,* 568 S.W.2d 925, 926 (Ky. 1978), *overruled by Wellman, supra.*

16) The next year, in 1979, the Kentucky Supreme Court reversed a murder conviction because the jury instruction failed to inform the jury that it must find the absence of EED to convict on the offense of murder. *Edmonds v. Commonwealth,* 586 S.W.2d 24, 27 (Ky.1979), *overruled by Wellman, supra.* However, a year later, in *Smith v. Commonwealth,* 599 S.W.2d 900, 905 (Ky.1980), a murder-for-hire case, the Kentucky Supreme Court held that the failure to instruct the jury that it must find that the defendant was not acting under the influence of EED to convict for murder was not error because absolutely no evidence of EED had been presented by the defendant.[18] *Id.* at 905.

17) A few months later, the Kentucky Supreme Court decided *Gall v. Commonwealth,* 607 S.W.2d 97 (Ky.1980) (hereinafter referred to as *Gall I*), *overruled on other grounds by Payne v. Commonwealth,* 623 S.W.2d 867 (Ky.1981). In *Gall I,* Gall argued, among other things, that the Commonwealth had not produced any evidence that he did not act under the influence of EED and, therefore, the evidence was insufficient to support the trial court's murder instruction. *Gall I,* 607 S.W.2d at 107. There was no evidence at trial to suggest that Gall was acting under the influence of EED or that circumstances existed at the time of the killing to provoke such a disturbance, except for the evidence that Gall offered to show that he suffered from a mental illness—chronic paranoid schizophrenia—which was characterized as an extreme emotional disturbance.[19] *Id.* at 109. The Kentucky Su-

---

**18.** The defendant in that case had agreed to act as executioner in a plot instigated by the victim's wife in exchange for the victim's six guns. *Id.* at 902. The conviction was reversed on another assignment of error. *See id.* at 904.

**19.** Section 507.020(1)(a)'s description of EED was borrowed from Section 210.3(1)(b) of the

Model Penal Code, which adopted "the common-law concept of 'provocation,' *i.e.,* the requirement of an initiating event, though the provocation need not have been perpetrated by the victim of the homicide." *Fields v. Commonwealth,* 44 S.W.3d 355, 357–58 (Ky. 2001) (citing *Model Penal Code and Commentaries,* Pt. II, § 210.3, Comment 5, at 60–61 (A.L.I. 1980)). "The additional requirement

preme Court held that the prosecution was not required to come forth with negating evidence regarding EED unless the evidence was of such probative force that the defendant would be entitled to acquittal of murder as a matter of law. *Id.*

18) Such was the state of the law when Matthews committed the murders in June 1981. Subsequent to those murders, the Kentucky Supreme Court decided three more cases construing the murder statute. The first was *Henley v. Commonwealth,* 621 S.W.2d 906 (Ky.1981). In *Henley,* the Kentucky Supreme Court opined that, although the absence of EED was an essential element of murder, an instruction setting out the mitigating circumstance of EED did not have to be given unless some evidence raised a reasonable doubt whether the defendant was guilty of murder or manslaughter. *Henley,* 621 S.W.2d at 907–08. In *Henley,* the defendant had been drinking, but was not drunk, when he went to his mother-in-law's house to pick up his wife and children. *Id.* at 908. The defendant blamed his mother-in-law when his wife refused to accompany him at that time because he had been drinking. The defendant went to his truck, which was parked 25 feet away; got his automatic rifle; returned to the house; beat in the door; and shot his mother-in-law 13 times. *Id.* The defendant then drove himself to the police station and turned himself in, stating that if he had more bullets, he would have shot the victim more times. Nothing in the record suggested any history of physical or mental illness. *Id.* The

*Henley* court distinguished itself from other cases where an EED instruction had been warranted because in those cases there was some evidence of EED.[20] *Id.* at 909.

19) Next, the Kentucky Supreme Court decided *Hayes v. Commonwealth,* 625 S.W.2d 583 (Ky.1981). In that case, the defendant admitted shooting the victim, but the evidence strongly indicated that the defendant had a chronic mental illness, and an expert witness testified that the defendant suffered from paranoid schizophrenia. *Hayes,* 625 S.W.2d at 585. The Kentucky Supreme Court reversed the murder conviction because of a jury instruction involving whether conviction was appropriate if the defendant was acting wantonly. *Id.* However, the *Hayes* court, relying on *Gall I,* also briefly considered whether the evidence of EED was so probative that the defendant should have been acquitted; the court held that it was not. *Id.* at 585–86.

20) In *Moore v. Commonwealth,* 634 S.W.2d 426, 433 (Ky.1982), the Kentucky Supreme Court rejected the defendant's argument that the absence of EED was an essential element and that the trial court's refusal to include that instruction was reversible error. The Kentucky Supreme Court followed *Henley* 's holding that an instruction concerning EED is not necessary unless something in the evidence is sufficient to raise a reasonable doubt whether the defendant is guilty of murder or manslaughter. *Moore,* 634 S.W.2d at

that there be 'a reasonable explanation or excuse' is a derivative of the common-law requirement that the provocation be 'adequate.' " *Id.* (citing R. Lawson and W. Fortune, *Kentucky Criminal Law* § 8–3(b)(3), at 342 (LEXIS 1998)). Although the common-law concept of "sudden heat of passion" was premised solely upon an objective evaluation of the adequacy of the provocation, the description of EED in the statute recites a sub-

jective test: the reasonableness is determined from the viewpoint of " 'a person in the defendant's situation under the circumstances *as the defendant believed them to be.*' " *Id.* (emphasis in original).

**20.** Obviously, the mere consumption of alcohol does not, in the view of Kentucky's highest court, constitute EED.

433. Because not a shred of evidence indicated that the defendant was operating under EED, no instruction was warranted. *Id.* Similarly, in *Carwile v. Commonwealth*, 656 S.W.2d 722, 723 (Ky.1983), relying on *Gall I* and *Henley,* the Kentucky Supreme Court held that the jury instruction on murder need not require the jury to find that the defendant was not acting under EED unless the evidence suggested that the defendant might have been.

21) Approximately three months before the Kentucky Supreme Court issued its decision in Matthews' appeal, the Kentucky Supreme Court decided *Wellman.* In that case, the Kentucky Supreme Court rejected Wellman's argument that the Commonwealth had failed to put on evidence of the absence of EED as arguably required by *Ratliff* and *Edmonds. Wellman,* 694 S.W.2d at 697. The *Wellman* court bemoaned the fact that it was "continually beset with arguments founded upon 'extreme emotional disturbance' despite the articulation of its meaning and impact in *Gall [I]." Id.* at 697. The Kentucky Supreme Court opined that the reason for this problem was the failure of *Gall I* to overrule explicitly the portions of *Ratliff, Bartrug,* and *Edmonds,* which declared that the absence of EED is an essential element of the crime of murder and required "the Commonwealth to prove such absence, even in those cases where there is no evidence whatever indicating emotional disturbance." *Id.* Therefore, the *Wellman* court held that, to the extent that those cases declared the absence of EED to be an element of the crime of murder, they were overruled, stating that "[t]he presence or absence of extreme emotional distress is a matter of evidence, not an element of the crime. They are a matter of the circumstances of each homicide, and there is certainly no obligation to prove the absence of something which was never there." *Id.*

22) In his direct appeal before the Kentucky Supreme Court, Matthews raised the argument that the Commonwealth failed to prove the lack of EED element of murder.[21] St. Ct. Rec., Direct Appeal Plead., Appellant's Br. at 97–101.[22] The Kentucky Supreme Court held that the trial court's instructions regarding EED were adequate and that the evidence supported the jury's finding of intentional murder. *Matthews I,* 709 S.W.2d at 421. In so holding, the Kentucky Supreme Court concluded that "[i]t [wa]s not necessary for the Commonwealth to produce direct evidence, by confession or otherwise, of absence of extreme emotional disturbance." *Id.* (citing *Gall I,* 607 S.W.2d at 107).

23) In his § 2254 petition to this court, Matthews argued that he was entitled to a directed verdict on the murder charges because the Commonwealth failed to prove the absence of EED. Pet. at 242–44, DN 23. He argued that, pursuant to KY.REV. STAT. ANN. § 507.020(1)(a), once he presented EED as his defense at trial, the failure to act under the influence of EED became an element of the criminal offense of murder that the prosecution had to prove beyond a reasonable doubt. *Id.* at 242–43. Because the Commonwealth did not present any evidence to counter his EED defense, Matthews argued, manslaughter is

---

**21.** Matthews had preserved this issue for appeal. At the close of the case-in-chief, Matthews' counsel moved for a directed verdict based on the prosecution's failure to prove the absence of EED. TE V at 508. The trial court overruled that motion. *Id.* Matthews' counsel renewed the motion at the close of all of the evidence. *Id.* at 619. The motion was again denied. *Id.* at 619–20.

**22.** Hereinafter, Matthews' direct appeal brief will be cited as "Direct Appeal Plead., Appellant's Br. at ——."

the only crime for which he could have been convicted. *Id.* at 243.

24) Then, in 2000, the Sixth Circuit decided *Gall v. Parker*, 231 F.3d 265 (6th Cir.2000) (hereinafter referred to as *Gall II* ), reversing the district court's denial of Gall's § 2254 petition and remanding for a conditional grant of the writ on the EED issue, among other things. The Sixth Circuit noted that, under established Supreme Court precedent, the prosecution must prove every element of the charged offense beyond a reasonable doubt to satisfy the Due Process Clause. *Id.* at 286 (citing *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). The Sixth Circuit further noted that *"Winship* is violated when the state has shifted the burden of proof for an ingredient that it has defined as an element of the crime, or for a defense that negates a required element." *Id.* at 287.

25) The Sixth Circuit noted that under the Supreme Court's *Winship–Mullaney* [23] framework, "due process is only satisfied if the prosecution proves every element of a charged offense beyond a reasonable doubt." *Id.* at 286. Thus, observed the Sixth Circuit, it was necessary to determine if a "given ingredient is an element of the criminal offense." *Id.* at 287. Next, it must be determined if the Commonwealth shifted the burden of proof for that ingredient. *Id.* Applying *Winship* and *Mullaney*, the Sixth Circuit found that, for purposes of Gall's trial and appeal, the absence of EED was an element of the charge of murder under Kentucky law. *Id.* at 288. Therefore, because Gall had made a sufficient showing of EED, which the Commonwealth failed to rebut, the Kentucky Supreme Court's upholding of Gall's conviction was based on an impermissible reading of the murder statute in light of *Winship*. *Id.* at 290–96.

26) The Sixth Circuit further determined that, "in 1981, the Kentucky Supreme Court still adhered to its earlier holding that the absence of EED was an 'essential' element of murder." [24] *Id.* at 297. It was not until the Kentucky Supreme Court's 1985 decision in *Wellman*, that prior cases holding that EED was an element of the crime were specifically overruled. *Id.* at 298.

27) Additionally, the Sixth Circuit concluded in *Gall II* that applying later Kentucky caselaw retroactively to Gall's habeas petition would violate the non-retroactivity principle of *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), which holds that state supreme courts are barred by the Due Process Clause from retroactively altering the definition of a crime. *Id.* at 305, 84 S.Ct. 1697. As the Sixth Circuit explained, under *Bouie*, due process is violated if the construction of the criminal act was unforeseeable by the defendant, it was applied to events occurring before the new interpretation was adopted, and the new interpretation disadvantages the defendant. *Id.* The Sixth Circuit held that *Bouie* would be violated by applying the Kentucky courts' new interpretation of the murder statute not to include the absence of EED as an element of the offense because the Kentucky courts' "new conception of EED ... changed the law in ways that were unforeseeable at the time of the acts Gall committed." *Id.* at 305–06, 84 S.Ct. 1697. Alternatively, the Sixth Circuit noted that "one could reason that the face of the statute was sufficiently unclear that at the time of Gall's crime, it could be interpreted either as establishing absence of EED as an element ... or as a defense or matter of evidence." *Id.* at 306, 84 S.Ct. 1697.

---

23. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

24. *Gall I* was decided by the Kentucky Supreme Court in 1980.

Thus, a court could rule that the statute was void for vagueness or could add a "clarifying gloss to that statute and apply it prospectively." *Id.* However, to apply that clarifying gloss retroactively would violate due process. *Id.* (citing, *inter alia, Lanzetta v. New Jersey,* 306 U.S. 451, 456–57, 59 S.Ct. 618, 83 L.Ed. 888 (1939)).

28) After the Sixth Circuit's *Gall II* decision, Matthews filed a supplemental brief to this court, arguing that, under the Sixth Circuit's decision in *Gall II,* and the Supreme Court precedents on which it relies, this court must find that the Kentucky Supreme Court committed reversible error when it held that it was not necessary for the Commonwealth to produce direct evidence of the absence of EED. DN 142 at 8. Matthews argues that the trial court impermissibly shifted the burden of proving EED to him when, in actuality, the Commonwealth had the burden of proving the absence of EED, yet presented no evidence to that effect. *Id.* at 8–10.

29) In response, the Commonwealth argues that the Sixth Circuit's *Gall II* decision is not precedential because the Sixth Circuit applied pre-AEDPA standards to *Gall II,* whereas Matthews' case is governed by the AEDPA. DN 146 at 3. The Commonwealth also appears to argue that the error in burden-shifting was only an incorrect application of state law and therefore would not meet the AEDPA's requirement that, for habeas relief, the state court must have unreasonably applied controlling United States Supreme Court precedent. *Id.* at 7.

30) In reply, Matthews argues that the Sixth Circuit's decision in *Gall II* and the Supreme Court decisions relied on by *Gall*

*II,* such as *Bowie,* control this case and that the Kentucky Supreme Court's decision was contrary to or was an unreasonable application of those precedents or was based on an " 'unreasonable determination of the facts' " in light of the evidence presented to the state court. DN 148 at 3. As explained below, this court must agree with Matthews on this point. *Gall II*'s analysis is dispositive, even under the more stringent post-AEDPA standard.[25]

31) Under the AEDPA, an application for a writ of habeas corpus shall be granted if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." § 2254(d)(1). Under the *Winship–Mullaney* framework, it must be determined whether the absence of EED was an element of the criminal offense and whether the Commonwealth shifted the burden of proof on that ingredient. *See Gall II,* 231 F.3d at 287. *Gall II* determined that, in 1981 (when Matthews committed the murders), the absence of EED was an essential element of murder in Kentucky. *Id.* at 297. At his trial, Matthews made a sufficient showing of EED at the trial. Dr. Chutkow, a clinical psychiatrist, testified that Matthews was operating under EED. TE VI at 567. On re-direct examination, counsel for the defense asked Dr. Chutkow whether he was "able to formulate an opinion as to whether at the time of the offenses on June the 29, 1981, what you have described [Matthews'] mental state [w]as amounted to an extreme emotional disturbance or not?" *Id.* Dr. Chutkow replied, "Yes. He was developing for several weeks, I believe, progressively, extreme

**25.** The fact that *Gall II* applied pre-AEDPA standards does not make it inapplicable to the instant case. *Cf. Bowling v. Parker,* 344 F.3d 487, 497, 501 n. 3 (6th Cir.2003) (although the AEDPA applied to Bowling's case, the

Sixth Circuit stated that *Gall II* did not control because it was factually distinguishable; the Sixth Circuit did not state that the fact that *Gall II* used pre-AEDPA standards made it inapplicable).

tension, irritability, and almost a kind of a fear of his late wife." *Id.*

32) The Commonwealth cross-examined Dr. Chutkow, but did not elicit any affirmative testimony that Matthews was not operating under EED at the time the murders were committed. In fact, on cross-examination, the Commonwealth asked whether Dr. Chutkow had testified that Matthews "was suffering from some extreme emotional disturbance at the time?" TE VI at 581. Dr. Chutkow replied, "Yes." *Id.* The Commonwealth then asked whether a person suffering from EED could have borrowed money, then purchased a gun two to three hours before the murders, and then kicked through a window to get into a house to kill two people. *Id.* at 581–82. Dr. Chutkow replied that such a person could. *Id.* at 582.

33) The Commonwealth did not put on its own expert witness to rebut Dr. Chutkow's testimony that Matthews was suffering from EED at the time of the murders. The Commonwealth did argue at closing that Matthews had reason to exaggerate his emotional distress at the time of the murders in his interview with Dr. Chutkow:

> Don't you think [Matthews] would exaggerate his fears about his wife, his mother-in-law, and all these other things about what other people might be doing to his mother? ... [B]ut that's the only defense he has, what the doctor has to say, and that's not to say the doctor gets on the stand and perjures himself ... He's telling you the truth ... [Matthews] has an adjustment disorder, but that's all; just an adjustment order. He's a little mixed up when he talks about being extreme emotional disturbance. His actions ... are extreme, not his emotional disorder.

TE VII at 674–75. Of course, this was only counsel's argument, not evidence. Furthermore, the prosecutor even admitted during closing that "[t]he only evidence we have of what happened there that night comes through the testimony of the psychiatrist as told to him by the defendant." *Id.* at 676.

34) The Supreme Court in *Bouie* held that, because the crime in that case was not enumerated in the statute or by judicial construction of the statute at the time of their conduct, the petitioners had been deprived of their due process rights. *Bouie*, 378 U.S. at 362–63, 84 S.Ct. 1697. Similarly, here, at the time of the conduct in question, Kentucky law required that the Commonwealth prove beyond a reasonable doubt the absence of EED in order to convict for murder. *See Gall II*, 231 F.3d at 297–98. The Commonwealth presented no evidence at all on this essential element of the crime as it was defined under state law in 1981. Therefore, under *Bouie*, Matthews' convictions for murder violated his due process rights because the Commonwealth did not prove the absence of EED.

35) The court takes note of the Sixth Circuit's unpublished decision in *Wellman v. Rees*, No. 86–5988, 1987 WL 38211 at *1 (6th Cir. Jun. 1, 1987) (*per curiam*), in which the Sixth Circuit considered and rejected Wellman's argument under *Bouie* that the Kentucky trial court had violated due process in submitting his case to the jury without instructing that the absence of EED was an element of the murder he was charged with committing.[26] As discussed *supra*, the Kentucky Supreme Court on direct appeal in Wellman's case held that Kentucky law no longer considered the absence of EED an element of murder. *Id.* Wellman argued that, by so holding in his direct appeal, the Kentucky

---

**26.** That murder occurred in 1983.

Supreme Court retroactively changed the law to eliminate an element of murder. *Id.* The Sixth Circuit held that, although certain Kentucky cases holding that the absence of EED was an element of murder were not specifically overruled until the Kentucky Supreme Court's *Wellman* decision, the fact that Kentucky no longer considered the absence of EED an element of murder was "plainly foreshadowed by *Gall [I]* and the other cases decided, *Henley* and *Hayes*, even though there was perhaps some imprecision in expression" and that "[c]ertainly after *Gall [I]*'s issuance, the final determination that applied with respect to Wellman's case was plainly foreshadowed." *Id.* at *2.

36) A discussion of this unpublished case is required. First, *Wellman* is not precedent. *See* 6TH CIR. R. 206(c); *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir.1996) (unpublished Sixth Circuit decisions "carry no precedential weight" and "have no binding effect on anyone other than the parties to the action"). Second, as discussed above, it is pellucid under *Gall II*, which is precedential, that the Kentucky courts impermissibly shifted the burden of proving EED in Matthews' case because, in 1981, when Matthews committed the murders, the Kentucky Supreme Court still held that the absence of EED was an element of murder. In *Matthews*, the Kentucky Supreme Court stated that its recent decision in *Wellman*[27] "clarif[ied]" that the absence of EED is not an element of the crime of murder that the Commonwealth must affirmatively prove. *Matthews*, 709 S.W.2d at 421. However, the Sixth Circuit

in *Gall II* held that it was not *until* the 1985 *Wellman* decision, which post-dated Matthews' conviction and the date of the murders by three years, that the Kentucky Supreme Court established that EED was not an element of murder. *Gall II*, 231 F.3d at 298.

37) The court notes that in his post-hearing memorandum, respondent appears to argue that *Bouie* does not apply since the Kentucky Supreme Court's construction of the murder statute did not "expand" the scope of the statute.[28] DN 244 at 2–3. Respondent cites to *Rogers v. Tennessee*, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), in which the Supreme Court upheld the state court's abolition of the common law rule that death must happen within a year and a day for a murder to occur. *Rogers* explained that language in *Bouie* suggesting that the Due Process Clause incorporates the specific prohibitions of the Ex Post Facto Clause was *dicta* but reaffirmed that its decision in *Bouie* was "rooted firmly in well established notions of *due process.*" *Rogers*, 532 U.S. at 459, 121 S.Ct. 1693. Nothing in *Rogers* changes this court's analysis or its obligation to apply *Gall II* in the present case.

38) In sum, given the state of the law in Kentucky at the time Matthews committed the murders, under *Winship* and *Mullaney*, the Kentucky Supreme Court's affirmance of Matthews' murder convictions was based on an impermissible reading of Kentucky's murder statute. *Winship*, 397 U.S. at 364, 90 S.Ct. 1068 (holding that

---

**27.** *Wellman* was decided by the Kentucky Supreme Court in 1985.

**28.** Respondent also argues in that post-hearing brief that Matthews did not raise a retroactivity due process claim in his petition or in the state court. DN 244 at 3–4. In fact, Matthews raised a due process challenge to the sufficiency of the evidence to convict him

in his petition and his direct appeal brief. Pet. at 247, DN 23 (citing *In re Winship*); Direct Appeal Plead., Appellant's Br. at 98 (same). Matthews' brief concerning *Gall II* was submitted at this court's direction. *See* DN140 (Court's order to the parties to submit briefs regarding the effect of, *inter alia, Gall II*).

"Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the [charged] crime"); *Mullaney*, 421 U.S. at 701–04, 95 S.Ct. 1881 (holding that where State requires defendant to prove the critical fact in dispute, the likelihood of an erroneous murder conviction increases in violation of Due Process Clause); *Gall II*, 231 F.3d at 287 (explaining that under *Winship* and *Mullaney*, the Due Process Clause is violated where the state shifts the burden of proving an element of the crime or a defense that negates a required element). The Kentucky Supreme Court's application of later Kentucky caselaw retroactively to Matthews' direct appeal violated the non-retroactivity principle expressed by the Supreme Court in *Bouie*. *See Bouie*, 378 U.S. at 363, 84 S.Ct. 1697 (holding that Due Process Clause violated where conviction was for a crime not enumerated in the statute at time of conduct); *Gall II*, 231 F.3d at 305 (explaining that, under *Bouie*, if a new interpretation of a statute by state courts was unforeseeable and applied to events before the interpretation's adoption to defendant's disadvantage, Due Process Clause has been violated). Thus, the Kentucky Supreme Court's decision in Matthews' case concerning the shifting of the burden regarding EED "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," and it is recommended that the writ should issue

and that Matthews' murder convictions be reversed for this reason. *See* § 2254(d)(1).

## C. Failure to Define Extreme Emotional Disturbance [29]

39) Matthews argues that, in violation of his constitutional rights, the trial court failed either to define the term "extreme emotional disturbance" or to declare unconstitutional KY.REV.STAT. §§ 507.020 [30] and 532.025 [31] for failing to define the term.[32] He argues that the trial court's failure to define EED at the guilt phase prevented the jury from properly considering the defense in violation of the Due Process Clause of the Fourteenth Amendment, Pet. at 123, DN 23 (citing *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (*per curiam*),[33] and *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)), and violated his Eighth and Fourteenth Amendment rights at the penalty phase. *Id.* (citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)). He asserts that his defense centered solely on EED, and his counsel presented ample evidence thereof and offered an instruction defining the term. *Id.* at 124. Yet, Matthews argues, although the jury could not have been expected to know what the term meant, the presence *vel non* of EED was exactly the issue it was expected to determine. *Id.* Because they had no guidance from the trial court, Matthews contends, the jurors most likely equated "EED" with

**29.** This claim is set forth at Pet. at 112–26, DN 23.

**30.** This statute sets out the offense of murder and makes it a capital offense.

**31.** This statute includes EED as a mitigating circumstance without defining the term. § 532.025(2)(b).

**32.** Matthews' trial counsel submitted a pre-trial motion to declare § 507.020 unconstitu-

tional for not defining EED and filed a post-trial motion for judgment notwithstanding the verdict based, in part, on the trial court's overruling of his motion regarding the lack of definition in the statute. TR I 96–97 (pre-trial motion), 265–70 (post-trial motion).

**33.** *Reversed on other grounds, Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

insanity and mental disease or illness. *Id.* at 125.

40) As support for this contention, Matthews points to the fact that the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994), freely uses the term "disturbance" in delineating the outward symptomology and conditions precedent to, among other things, manic episodes, bipolar disorder, and obsessive-compulsive disorder, and that the dictionary defines "'disturbed'" as "'showing symptoms of emotional illness.'" *Id.* Because the jurors easily could have believed that the term "emotional disturbance" meant "mental illness," Matthews asserts, they would not have considered Matthews' actual defense.

41) In 1986, after Matthews' direct appeal, and more than a decade after Kentucky's adoption of the murder statute, the Kentucky Supreme Court finally adopted a definition of EED. *McClellan v. Commonwealth,* 715 S.W.2d 464 (Ky.1986). Matthews first raised this argument approximately a year after the *McClellan* decision as issue number three of his postconviction appeal brief. St. Ct. Rec., RCr 11.42 Appeal Proc., Appellant's Br. at 38–40.[34] The Kentucky Supreme Court held the following with regard to this claim:

> Matthews next argues that extreme emotional disturbance was not defined in either the jury instructions or in KRS 507.020 and KRS 532.025. This argument was not raised on direct appeal and will not be considered at this time in an RCr 11.42 motion. In any event at the time Matthews was convicted in 1982, the requirement that extreme emotional disturbance should be defined pursuant to *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986), was

not in existence. This Court has determined that the application of the definition of EED established by *McClellan, supra,* is prospective and not retroactive. *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987).

*Matthews II* at 10.

42) Ordinarily, first, the court would determine if the Kentucky Supreme Court considered this claim to be procedurally defaulted, which it would appear to be. However, respondent does not argue that this claim was procedurally defaulted, addressing the argument on its merit instead. *See* Answer at 86, DN 33. Because respondent's "failure to raise the issue of procedural default can properly be considered an implicit waiver of that affirmative defense to the petition," the court finds that Matthews' apparent procedural default does not bar consideration of the merits of this claim. *Benoit v. Bock,* 237 F.Supp.2d 804, 807 (E.D.Mich.2003); *see also Baze v. Parker,* 371 F.3d 310, 320 (6th Cir.2004) (holding that where Commonwealth did not raise question of procedural default in its response brief to Baze's appeal, but rather opposed claim on the merits, Commonwealth waived the defense). Because the Kentucky Supreme Court considered the merits of this claim in the alternative, the court will apply the AEDPA standard of review to that alternative holding. *See Baze,* 371 F.3d at 320.

█ 43) The court recommends denying the writ on this claim for several reasons. In *Cage,* cited by Matthews, the Supreme Court stated that in state criminal trials the Due Process Clause protects against conviction except on proof of every element beyond a reasonable doubt. *Cage,* 498 U.S. at 39, 111 S.Ct. 328 (citing *Winship, supra* ). The issue in that case was

---

**34.** Hereinafter, Matthews' RCr 11.42 brief will be cited as "RCr 11.42 Appeal Proc., Appellant's Br. at ——."

whether the reasonable-doubt instruction given by the Louisiana trial court complied with *Winship*. *Id.* at 40, 111 S.Ct. 328. On direct appeal to the state supreme court in *Cage*, Cage argued that the reasonable-doubt instruction given to the jury was unconstitutional. *Id.* That instruction, among other things, had required that the jurors must have a " 'grave uncertainty' " to acquit. *Id.* The Louisiana Supreme Court rejected Cage's argument. *Id.* at 40–41, 111 S.Ct. 328. The United States Supreme Court reversed because a reasonable juror could have interpreted the instruction as based on a degree of proof below that required by the Due Process Clause. *Id.* at 41, 111 S.Ct. 328. In *Sullivan*, 508 U.S. at 277–82, 113 S.Ct. 2078, the United States Supreme Court reversed another Louisiana death penalty conviction because the jury instruction was essentially the same as that held to be unconstitutional in *Cage*.

44) Here, the trial court did not misstate what the jury was required to find. It merely refused to define the term in the statute further. Therefore, the court finds *Cage* and *Sullivan* distinguishable.[35]

45) The court also does not find that the trial court's failure (or refusal) to define EED equates with the Georgia statute at issue in *Godfrey*, which allowed the imposition of the death penalty where the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" but the jury was given no guidance as to those terms. The jury's instructions from the trial court merely reiterated the language of the stat-ute. *Godfrey*, 446 U.S. at 426, 100 S.Ct. 1759. The United States Supreme Court reversed in part because:

> A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman." Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of [the statute]'s terms. In fact, the jury's interpretation of [the statute] can only be the subject of sheer speculation.

*Id.* at 428–29, 100 S.Ct. 1759. After examining other Georgia cases in which the Georgia Supreme Court had upheld the imposition of the death penalty based on the pertinent statute and those in which it did not, the Court reversed Godfrey's death sentence because there was no principled way to distinguish *Godfrey* from cases in which the death penalty was not imposed. *Id.* at 433, 100 S.Ct. 1759.

46) Here, the Kentucky murder statute, which the jury had before it, stated:

> With intent to cause the death of another person, he causes the death of such person or of a third person; *except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance* for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the cir-

---

**35.** In so finding, the court is mindful that the Supreme Court has instructed that, on collateral review, the question is whether the instruction " 'by itself so infected the entire trial that the resulting conviction violates due process' " not whether " 'the instruction is undesirable, erroneous, or even 'universally condemned' " and that where, as here, no in-struction was given, the burden "is especially heavy." *Henderson v. Kibbe*, 431 U.S. 145, 154, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (citations omitted). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155, 97 S.Ct. 1730.

cumstances as the defendant believed them to be.

KY.REV.STAT. ANN. § 507.020(1)(a) (emphasis added). Thus, the Kentucky statute itself did, at least, explain that the reasonableness of the EED was to be determined from the defendant's viewpoint. Matthews' counsel's proffered jury instruction would have added little more to the jury's understanding of EED than the statute itself. That proffered instruction was: "*A person acts under extreme emotional disturbance when his passions are inflamed by any provocation, event or word which constitutes* a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." TR II at 226. (emphasis added). Only the italicized portion adds anything to the statutory language; the rest of the proffered definition mirrors the language of the statute.

47) Moreover, Matthews' proffered instruction did not comport with the definition eventually adopted by the Kentucky Supreme Court, to wit:

> Extreme emotional disturbance is *a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes.* It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan,* 715 S.W.2d at 468–69 (emphasis added). Thus, while Matthews wanted the jury to be instructed that EED occurs when passions are inflamed by any "provocation, event or word which constitutes a reasonable explanation or excuse," EED, as defined by the Kentucky Supreme Court requires "a temporary state of mind *so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance.*" Thus, the court finds *Godfrey* distinguishable from the instant case. *Cf. Proffitt v. Florida,* 428 U.S. 242, 257, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (rejecting argument that EED, which was a statutory mitigator in Florida, was too imprecise and beyond the capacity of a jury or judge to decide).

48) Perhaps more importantly to consideration of this issue, the Kentucky Supreme Court's denial of this claim on collateral review appears to be based on a determination of state law. The Kentucky Supreme Court rejected Matthews' claim based on its decision in *Smith.* In *Smith,* the Kentucky Supreme Court held that the definition of EED established by *McClellan* was to be prospective, not retroactive. *Smith,* 734 S.W.2d at 449. The Kentucky Supreme Court also opined, "The determination of the existence of extreme emotional disturbance is within the facts and circumstances of each particular case. We cannot fault the trial judge for declining to define it in this situation." *Id.*

49) "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Wainwright v. Stone,* 414 U.S. 21, 23–24, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973) (*per curiam* ) (hold-

ing that a state may make its own choice as to whether to apply retroactively new construction of a statute). Thus, in *Houston v. Dutton*, 50 F.3d 381, 384 (6th Cir. 1995), a death penalty case, the district court granted habeas relief in part on a new state court decision that evidence of repeated blows was no longer sufficient evidence alone from which to infer premeditation. The Sixth Circuit held that, because no state court had held that Houston's conviction must be overturned based on that intervening state court decision, even though Houston had so argued on application for state post-conviction relief, federal habeas relief on that ground was not available because "[n]o federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively." *Id.* at 385.

50) Although not considering this precise issue, the Sixth Circuit's *Gall II* decision also is instructive.[36] The Sixth Circuit opined that applying the new definition of EED made by the Kentucky Supreme Court in *McClellan* retroactively to *Gall II* would violate the Kentucky Supreme Court's decision in *Smith* that the definition of EED was to be applied prospectively only and that the Sixth Circuit "must defer to this state determination." *Gall II*, 231 F.3d at 303. The Sixth Circuit stated:

> The task of a habeas court under § 2254 is to assess the constitutionality of a state court conviction. Even with respect to questions of federal constitutional law, habeas review is constrained by robust principles of finality and non-

retroactivity. Principles of comity and finality equally command that a habeas court can not revisit a state court's interpretation of state law, and in particular, instruct that a habeas court accept the interpretation of state law by the highest state court on a petitioner's direct appeal.

*Gall II*, 231 F.3d at 303 (citation omitted). Thus, although the Kentucky Supreme Court eventually came to the conclusion that a definition of EED was necessary, the Kentucky Supreme Court explicitly has held that the definition is not to be applied retroactively. Given the Sixth Circuit's guidance in *Houston* and *Gall II*, the Kentucky Supreme Court's decision in *Matthews* not to apply the definition of EED retroactively is a state law decision to which this court must defer. *See Houston*, 50 F.3d at 385; *Gall II*, 231 F.3d at 303.

51) Therefore, the court finds that the Kentucky Supreme Court's alternative holding denying this claim was not an unreasonable application of clearly established federal law as determined by the Supreme Court, and the writ should be denied on this issue.

**D. Ineffective Assistance of Counsel**

52) Matthews raises numerous ineffective-assistance-of-counsel claims.[37] The court has considered the substance of each. With respect to Matthews' ineffective assistance of appellate counsel claim and his claims that his trial counsel did not properly investigate, prepare, and present evidence related to his extreme emotional disturbance defense in both the guilt and

---

**36.** The discussion in *Gall II* of whether *McClellan*'s definition of EED could be applied retroactively occurred in the portion of the majority's opinion rebutting the dissent's reliance on Kentucky Supreme Court decisions overruling clear precedent governing *Gall I*. *Gall II*, 231 F.3d at 303.

**37.** Matthews raised the ineffective assistance of trial counsel argument as issue number one of his postconviction appeal brief. RCr 11.42 Appeal Proc., Appellant's Br. at 8–36. Hereinafter, Matthews' RCr 11.42 brief will be cited as "RCr 11.42 Appeal Proc., Appellant's Br. at ——."

sentencing phases and mitigation evidence at the sentencing phase, the court conducted an evidentiary hearing. After reviewing the trial transcript, the state court briefs, the arguments presented in the federal habeas petition, and the testimony and evidence submitted during the evidentiary hearings, this court concludes that only one of Matthews' ineffective-assistance-of-counsel claims, his claim that his appellate counsel should have raised the trial court's failure to define the term "extreme emotional disturbance" in both the guilt and penalty phases of Matthews' trial, merits granting the requesting writ. With respect to the remaining claims, the court concludes that overall Matthews was effectively and well represented by his attorneys, and that any isolated deficiencies did not actually prejudice Matthews.

53) The Sixth Amendment guarantees a criminal defendant the assistance of an attorney whose performance ensures a fair trial and a reliable result. *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on an ineffective-assistance claim, a convicted defendant must prove that 1) counsel's performance was deficient, and 2) the deficiency was prejudicial to the defense. *Id.* at 687, 104 S.Ct. 2052. To satisfy the deficiency prong of the test, the defendant must prove that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). The reviewing court's assessment must consider the circumstances of the particular case at the time of the challenged conduct. *Id.* at 690, 104 S.Ct. 2052.

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–91, 76 S.Ct. 158.

54) "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691, 76 S.Ct. 158. The standard for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 76 S.Ct. 158. In the context of the imposition of the death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 76 S.Ct. 158.

55) The court will now turn to the ineffective-assistance-of-counsel claims advanced by Matthews.

### 1. Failing to investigate, prepare, and present evidence at guilt/penalty phases [38]

56) Matthews claims that his counsel's investigation and presentation of evidence

---

**38.** These claims are set forth at Pet. at 34–78, DN 23.

was deficient in five areas: 1) failing to discover evidence of the mental illness in Matthews' family; 2) failing to discover facts about Matthews' own mental[39] and physical health; 3) failing to investigate and present to the jury evidence of alcoholism in Matthews' family; 4) failing to uncover facts relating to Matthews' own alcohol and drug abuse, which indicated a possibility of brain damage; and 5) failing to discover and present a vast amount of non-statutory mitigating evidence relevant to Matthews' upbringing and character.

57) The Kentucky Supreme Court rejected Matthews' claim that his counsel's investigation and presentation of evidence amounted to ineffective assistance of counsel:

> The investigation by defense counsel and the presentation of mitigating evidence was sufficient because counsel presented more than ample evidence of intoxication, EED, and other mitigating evidence factors. The investigation of mitigation witnesses was within the realm of the reasonable professional judgment of an effective defense attorney.
>
> The testimony presented by Dr. Chutkow was adequate in regard to extreme emotional disturbance and intoxication theories. Much of the evidence that was omitted was hearsay, cumulative, conflicting, and in some cases harmful to the defense. There was sufficient evidence of Matthews' drinking, his volatile relationship with his wife and the fact that his arm injury substantially changed his outlook on life. Dr. Chutkow testified that Matthews was under the influence of extreme emotional disturbance at the time of the crimes, and that the combination of drinking alcohol and various other substances prior to

the shooting made Matthews intoxicated and reduced his self-control and judgment.

*Matthews II* at 6.

58) Capital defense counsel has an affirmative duty to pursue mitigation evidence and to conduct an appropriate investigation into potential mitigating factors:

> Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is "well-established." *Coleman v. Mitchell,* 268 F.3d 417, 449 (6th Cir.2001); *see also Austin v. Bell,* 126 F.3d 843, 848 (6th Cir.1997). The "prospect of being put to death unless counsel obtains and presents something in mitigation" magnifies counsel's responsibility to investigate. *Mapes v. Coyle,* 171 F.3d 408, 426 (6th Cir.1999). And notwithstanding the deference *Strickland* requires, neither this court nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation.
>
> · · ·
>
> "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id.* at 523, 123 S.Ct. 2527 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).... More recent ABA Guidelines, which the United States Supreme Court has recognized as reflecting prevailing professional norms, emphasize that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins,* 539 U.S. at

---

39. Matthews' claim that his counsel failed to discover he was taking Mellaril in prison will be discussed in a separate section of this Report and Recommendation. *See infra* Part III.O.

524, 123 S.Ct. 2527 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(C), p. 93 (1989) and adding emphasis).[40]

*Lundgren v. Mitchell,* 440 F.3d 754, 770–71 (6th Cir.2006) (quoting *Harries v. Bell,* 417 F.3d 631, 637–38 (6th Cir.2005)).

 59) Because this court granted an evidentiary hearing on this aspect of Matthews' ineffective-assistance-of-counsel claims, the court must determine whether the deference afforded to the state court's determinations under § 2254(d) applies or whether the court should conduct a *de novo* review of the claim. There is a split among the circuits on this issue. Citing *Miller v. Champion,* 161 F.3d 1249 (10th Cir.1998), Matthews argues that § 2254(d) deference no longer applies once a habeas petitioner receives an evidentiary hearing in federal court. In *Miller,* the appellate court remanded the petitioner's ineffective-assistance-of-counsel claim, since despite conducting an evidentiary hearing, the district court erroneously applied a deferential presumption of correctness to the state court findings. In doing so, the Tenth Circuit stated that the proper standard of review upon remand should be *de novo. See id.* at 1254 ("We note that because the state court did not hold any evidentiary hearing, we are in the same position to evaluate the factual record as it was. Accordingly, to the extent the state court's dismissal of Mr. Miller's petition was based on its own factual findings, we need not afford those findings any deference.").

60) Respondent notes that the Fifth and Seventh Circuits have rejected the *Miller*

approach and hold that § 2254(d) deference should apply even if the federal district court elects to conduct an evidentiary hearing. *See Valdez v. Cockrell,* 274 F.3d 941, 946–47 (5th Cir.2001) (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review"); *Pecoraro v. Walls,* 286 F.3d 439, 443 (7th Cir.2002) ("The Act authorizes us to upset such a conviction only if the state courts' adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . .', this standard is applicable even though the district judge held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication; that is true; but we do not see why it should alter the standard of federal review.' ").

61) The Sixth Circuit appears to side with the Fifth and Seventh Circuits. In *Johnson v. Luoma,* 425 F.3d 318, 323 (6th Cir.2005), the Sixth Circuit held that § 2254(d) deference applied to the petitioner's claim of juror bias notwithstanding the fact that the federal district court received new evidence during the habeas proceedings:

> Although Johnson cites authority in support of the proposition that no deference is due where new evidence is presented on federal habeas review, the decisions relied upon involve the failure of a prosecutor to disclose exculpatory evidence under *Brady,* not new evidence of alleged juror bias. *See Killian v. Poole,* 282 F.3d 1204, 1207–08 (9th Cir.2002);

---

**40.** The 1989 ABA guidelines are applicable notwithstanding the fact that Matthews' case was tried before they were adopted. *See Hamblin v. Mitchell,* 354 F.3d 482, 487 (6th Cir.2003) ("Although the instant case was tried before the 1989 ABA edition of the stan-

dards was published, the standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

*Monroe v. Angelone,* 323 F.3d 286, 297 (4th Cir.2003). Johnson has not set forth any authority to support the conclusion that such a rule exists in this circuit even with respect to new *Brady* material, much less with regard to juror bias. We therefore conclude that the traditional rule of deference discussed in *McAdoo* is appropriate in this case. *McAdoo v. Elo,* 365 F.3d 487, 493–94 (6th Cir.2004).

*Id.* at 324. Likewise, in *Williams v. Coyle,* 260 F.3d 684, 697–700 (6th Cir.2001), the Sixth Circuit held that the provisions of § 2254(d) would be applied to Williams' claims of ineffective assistance of counsel even though the United States District Court received additional evidence in the habeas proceedings pertaining to Williams' ineffective-assistance-of-counsel claims. *Id.* ("We will review Williams' jury instruction and ineffective-assistance-of-counsel claims under the standard set forth in § 2254(d)."); *see also James v. Brigano,* 470 F.3d 636, 641–43 (6th Cir.2006) (same). Based on its reviews of the current state of the law in the Sixth and other circuits, the court concludes that the § 2254(d) deference applies irrespective of the fact that the court granted an evidentiary hearing on these claims. Like the Seventh Circuit, this court concludes that while the evidence received in the evidentiary hearing bears on the reasonableness of the state courts' adjudication, the factual findings and conclusions of the state court are still entitled to deference under § 2254(d). *See Pecoraro,* 286 F.3d at 443.[41]

62) To assess Matthews' claim that his trial counsel did not properly investigate, prepare, and present evidence at his trial, it is necessary to review what counsel actually did to investigate and prepare for Matthews' trial and what evidence was presented in his defense in comparison to what Matthews claims should have been investigated and presented at his trial. Only then can the court properly assess the reasonableness of counsel's actions, and thus, the reasonableness of the Kentucky Supreme Court's decision to reject his claim. Because Matthews' trial counsel were deposed as part of the evidentiary hearing this court granted, the court has a wealth of information about counsel's pretrial activities, including portions of their pretrial records. A review of that information reveals that counsel's investigation was much more thorough than Matthews portrays in his petition and supplemental brief. The court's evidentiary hearing also shed light on what the additional witnesses identified by Matthews might have testified to on both direct and cross-examination had they been called to testify at trial by defense counsel.

### Counsels' pretrial investigation and preparation

63) Matthews' attorneys at trial were assistant public defenders David Busse and Christopher Rivers. At the time of trial, Mr. Busse had been licensed to practice law for six years, and Mr. Rivers had been licensed for three years. Busse Dep. at 13, 15; Rivers Dep. at 5–6.[42] Neither had tried a death penalty case before. Busse Dep. at 17; Rivers Dep. at 6. The two functioned as co-counsel, jointly formulating strategy throughout the case. Busse Dep. at 36–37; Rivers Dep. 7, 44. Mr. Busse believes that they had adequate resources and time to prepare the case for trial. Busse Dep. at 41–44. Mr. Rivers

---

**41.** Nevertheless, the court notes that it has also considered Matthews' claims under the *de novo* standard and concludes that its recommendation would be the same even under the more lenient standard.

**42.** The depositions and exhibits can be found at DN 238.

believes they had adequate time, but somewhat limited resources.[43] Rivers Dep. at 39. The Louisville Public Defenders Office had at that time a team of investigators that Mr. Busse and Mr. Rivers pulled from to interview witnesses prior to Matthews' trial. *See* Busse Dep. at 39. In addition to interviewing their client numerous times, Matthews' counsel contacted close to thirty individuals, including family members, friends, neighbors, co-workers, acquaintances, and crime scene responders and investigators.[44] Matthews' counsel also arranged for Matthews to be examined by two experts, Dr. Chutkow, a clinical psychiatrist, and Dr. Richard Edelson, a neuropsychologist.

64) The court will now briefly summarize the interviews and examinations as evidenced by counsel's pretrial files and deposition testimony relative to the thoroughness of their pretrial investigation.

65) Eddie Peltier, and his wife Elaine. Mr. Peltier was Matthews' long-time friend and "drinking buddy." Mr. Peltier and his wife Elaine spent the afternoon and early evening before the shootings with Matthews drinking at a local park. In addition to relaying those events to defense investigators, Mr. Peltier discussed Matthews' drinking habits in general. He stated that he and Matthews drank every time that they went out. Mr. Peltier said that when Matthews "drank he drank" and would "not stop until he was passed out." Mr. Peltier also relayed that when Matthews drank "he liked to fight . . . he would not take anything off of nobody." Mrs. Peltier elaborated as follows: "well when he would be drinking, well you know you would not want to say something to him that you didn't mean the way it was said because he always took it

the wrong way." Mr. Peltier also stated that he had witnessed Matthews hit Marlene on more than one occasion. *See* Rivers Dep., Ex. 5.

66) Carol Engle. Matthews had been seeing Ms. Engle socially for approximately a week before the events in question and, like Mr. and Mrs. Peltier, she had spent a considerable amount of time with Matthews the day and evening prior to the shootings. She also loaned Matthews the money for the gun he used to kill his wife and mother-in-law. Ms. Engle relayed to defense investigations her recollections of those events, especially her observations regarding Matthews' drinking and drug use. She stated that Matthews acted "different" on the night before the murders. *See* Rivers Dep., Ex. 5.

67) Lenny Perry. Mr. Perry lived with Matthews and his mother at the time of the shootings. He described to defense investigators what he remembered about the night before the shootings. He stated that he never saw Matthews take any pills on the night in question and that he was not too drunk. He said Matthews spent the evening sitting on the porch watching Marlene's parents' house. *See* Rivers Dep., Ex. 5.

68) Smoky Brown. Mr. Brown was Matthews' and his mother's next-door neighbor. He spent time with Matthews the night before the killings, taking Matthews to get some beer. Matthews also alleged that he took some of Mr. Brown's medications. Mr. Brown told investigators that he "did not know [Matthews] too well." He said that he was aware that Matthews worked and "had family problems." Occasionally Matthews would sit in the yard drinking a beer and Mr. Brown

---

**43.** However, Mr. Rivers did not provide any examples of how the limited nature of the resources available hindered their efforts to effectively represent Matthews.

**44.** Counsels' notes and transcripts from these interviews were introduced as deposition exhibits. *See* DN 238.

and Matthews would talk through the fence. However, Mr. Brown stated that they never discussed the nature of Matthews' family problems and he did not know Marlene. Mr. Brown denied giving Matthews any drugs. Defense investigators later obtained a list of Mr. Brown's medications from the Veteran's Administration Hospital in an attempt to substantiate Matthews' claim that he took some pills from Mr. Brown. *See* Rivers Dep., Ex. 5.

69) Mary Clark and her daughter Karen. Ms. Clark and her daughter Karen lived at 1839 Lytle street and were neighbors of Matthews and his mother. Ms. Clark stated that she had known Matthews all of his life. She further indicated that he drank beer and "was the same-drunk or sober." She stated that she was not aware of any problems between the Matthews family and the Cruse family. Neither woman knew anything about Marlene taunting Matthews, the gun, or whether Matthews was on drugs. *See* Rivers Dep., Ex. 1, Aug. 17, 1981 invest. report at 1–2.

70) Mrs. Roberts. Mrs. Roberts lived at 1841 Lytle Street and was another neighbor of Matthews and his mother. She stated, however, that she did not know Matthews and knew nothing about the gun or drugs. *See* Rivers Dep. Ex. 1, Aug. 17, 1981 invest. report at 2.

71) Glenn Murray Turner. Mr. Turner was the family attorney. He confirmed that Marlene often swore warrants out against Matthews and then assisted in bailing him out. *See* Rivers Dep. Ex. 3, attorney notes dated June 30, 1981.

72) Margaret "Laverne" Matthews. Ms. Matthews is Matthews' mother. She was interviewed by defense investigators several times and also met with Dr. Chutkow. She described the tension between the Cruse and Matthews families and the effect it had on Matthews. She also described the events that transpired after Matthews came home the morning of the shootings. Mrs. Matthews also admitted to defense investigators that she drank in the past stating, "God knows I have drank in my time you know, but I never bothered people, you know what I mean." Finally, she stated that after the shootings occurred she had to move away from Lytle Street because she feared for her safety. *See* Rivers Dep., Ex. 5.

73) Beverly Higdon. Ms. Higdon is Matthews' sister. She supplied information to the defense investigators about Matthews' background, including his education, relationship with his father, and positive relationship with her children. She also provided mental health information relative to herself. She indicated to investigators that she was hospitalized in 1980 for psychiatric treatment following the death of a child. She also indicated that Matthews had once worked double shifts so that he could buy his mother a washing machine. In April of 1982 defense counsel's notes reflect that she was asked to give some letters Matthews had written her to Dr. Chutkow for use in his examination. It is unclear whether she ever complied with this request. *See* Rivers Dep. Ex. 1, undated attorney notes; Rivers Dep. Ex. 3 at 4–5.

74) Jerry Matthews. Jerry Matthews is Matthews' brother. The investigators' notes indicate that he was contacted on July 8, 1981. At that time, he stated that Matthews was known to "play around with guns," had a lot of problems, was a "bad drunk," and had blackouts. He further indicated that he was raised by his grandmother, had three children of his own, and wanted to "stay out of it." *See* Rivers Dep., Ex. 3.

75) Darlene Gnau. Ms. Gnau may have been a friend or acquaintance of Marlene. She stated that she had known Matthews since the seventh grade. She stated that

Matthews called Marlene and harassed her. *See* Rivers Dep. Ex. 1, Aug. 17, 1981 invest, report at 2.

76) Ernie Kaelin. Mr. Kaelin was a former employer of Matthews. He stated that he was not aware of any harassing phone calls from Marlene to Matthews.[45] *See* Rivers Dep. Ex. 1, Aug. 17, 1981 invest. report at 2.

77) Sam Eaton, Jace Lanter, and Linda Morgan. These individuals were all neighbors of Marlene. Each denied knowing any of the people involved. *See* Rivers Dep. Ex. 1, Oct. 20, 1981 invest. report at 1–2.

78) Roger Wayne Matthews and his wife Norma Jean. Roger Matthews is Matthews' older brother. He stated that Matthews was not a predictable person and had always been that way. He further told investigators that Matthews had a "get even attitude" and was "always in trouble with the neighbors." He indicated that Matthews had some paranoia because any time someone would shoot a firecracker Matthews was "over the back fence." Roger Matthews also relayed that Matthews had guns in the past. *See* Rivers Dep. Ex. 1, Oct. 20, 1981 invest. report at 2–3.

79) Jim Hubbard and Anita Eve. Both of these individuals were dispatchers on the barge that Matthews used to work on and remembered Matthews. However, neither recalled Marlene calling and harassing Matthews when he was on the barge. Ms. Eve stated that any calls from Marlene were not harassing and were mostly necessitated because of conflicting information Matthews gave about his whereabouts. *See* Rivers Dep. Ex. 1, Nov. 5, 1981 invest. report at 1.

80) Bobby Master. Mr. Master was Marlene's ex-husband. He relayed that Marlene had taken out baseless warrants against him after he left her. He said that he did not really know Matthews because he had only met him a couple of times. Mr. Master said Marlene was a good mother and that she did not drink or take drugs when he was around her. *See* Rivers Dep., Ex. 5.

81) Edward Crook. Matthews stated that he obtained the gun from Mr. Crook. Mr. Crook, however, did not acknowledge knowing Matthews and denied ever selling him a gun. *See* Rivers Dep. Ex. 1, Nov. 30, 1981 invest. report at 1.

82) Lawrence Cruse, Larry Cruse, Sherry McMichael, and Raymond McMichael. All of these individuals were related to the victims. They stated that Matthews was crazy and violent, but not insane. They also stated that Matthews drank a case of beer a day, once smashed in Larry's windshield with a baseball bat while Larry was in the car, and beat Marlene. *See* Rivers Dep. Ex. 1, Oct. 20, 1981 invest. report at 1–2; Rivers Dep. at Ex. 4.

83) Brenda Harshfield and Tony Matthews. Ms. Harshfield is Matthews' ex-wife and Tony is their son. Ms. Harshfield's phone number is listed in defense counsel's notes as well as some information relevant to Matthews such as the fact that he lived with her for two years after their divorce. It is unclear from the notes, however, whether investigators actually spoke to Ms. Harshfield and Tony Matthews. *See* Rivers Dep. Ex. 3.

84) In addition to the individuals listed above, defense counsel also contacted several of the EMS responders. The sub-

**45.** Matthews claimed that during the course of their relationship Marlene would repeatedly call and harass him at work.

stance of those interviews was largely irrelevant.

85) Defense counsel also arranged for Matthews to be evaluated by two experts.

86) Dr. Lee Chutkow. Dr. Chutkow is a psychiatrist. TE VI at 544. He testified that he met with Matthews on July 29, July 30, August 4, August 6, and August 11 of 1981, and again on September 13, 1982, for a total of approximately five hours. *Id.* at 546. He first met with Matthews to determine whether he would be competent to cooperate with his attorneys and participate in trial. *Id.* at 547. Dr. Chutkow determined that Matthews was competent to stand trial. *Id.* Dr. Chutkow then reviewed Matthews' account and memory of the events in question and his feelings about it. *Id.* He also asked Matthews about his past history and his past relationships with his late wife and his family. *Id.* Dr. Chutkow also administered the Whitaker Index I of Schizophrenic Thinking test on Matthews and had him take the Minnesota Multiphasic Personality Inventory. *Id.* at 552–53. Dr. Chutkow also interviewed Matthews' mother in his office. *Id.* at 553. As a result of his examination, Dr. Chutkow diagnosed Matthews as suffering from an adjustment disorder and alcohol abuse. *Id.* at 558–59. The tests administered by Dr. Chutkow, however, "did not show any psychosis or anything near it." *Id.* at 560.

87) Dr. Richard Edelson. Because the results of defense counsel's pretrial examination revealed significant past drug and alcohol abuse, defense counsel requested funding for a neuropsychologist. Busse Dep. at 43–44. The request for funding was granted and defense counsel retained Dr. Edelson to determine whether Matthews had any organic brain damage, cognitive impairment, or other alcohol or drug residuals as a result of his past drug and alcohol use. *Id.* The results of the exams administered by Dr. Edelson were all negative. *Id.*

### Evidence presented at trial

88) The primary strategy employed by counsel during both the guilt and penalty phases of trial was to convince the jury that Matthews was suffering from extreme emotional disturbance at the time he killed his wife and mother-in-law. Rivers Dep. at 15; Busse Dep. at 44. The court will briefly summarize the testimony Matthews' counsel elicited pertinent to the defense of extreme emotional disturbance, as well as testimony related to other mitigating factors.

89) On cross-examination during the guilt phase:

a) Laverne Matthews testified about Matthews' and Marlene's martial difficulties and the manner in which the Cruse family harassed her. TE III at 293–300.

b) Roger Matthews testified that Matthews was drunk on the night in question and that this was not unusual for a Saturday night. TE IV at 326. He also testified that he suspected that Matthews had abused drugs in the past. *Id.* at 326–27. He testified that Matthews' behavior changed significantly after he injured his arm on a printing press several years before and that his drinking increased markedly after that accident. *Id.* at 327–28. He testified that he did not believe Matthews was "in his right mind" the night before the killings and that alcohol changed Matthews' personality. *Id.* at 329.

c) Carol Engle testified that Matthews was "not himself" the night prior to the shootings and that she had observed him taking drugs the night before. TE IV at 356–57.

d) Edie Peltier testified about Matthews' martial problems and that they caused him to drink more than he usually

did. TE VI at 372. He also testified that when Matthews drank he kept on drinking and that drinking affected Matthews' personality. *Id.* at 377.

90) On direct examination during the guilt phase:

a) Lenny Perry testified that Marlene and Matthews could not get along and that Marlene would taunt Matthews and his family from across the street. *Id.* at 513–14.

b) Dr. Chutkow testified about the effect Matthews' martial problems with Marlene had on his personality, that in the weeks prior to the shootings Matthews had been abusing drugs and alcohol, and that it was his medical opinion that at the time of the shootings Matthews was suffering from an adjustment disorder and alcohol abuse. TE VI at 554–59. He further testified that he believed Matthews was acting under extreme emotional disturbance when he shot his wife and mother-in-law. *Id.* at 567.

c) Glenn Turner, the Matthews' family attorney, testified that frequently Marlene would have Matthews arrested, then go to him, hire him to represent Matthews, post Matthews' bond, and give Turner the bond assignment. TE VI at 609.

d) Matthews' counsel also attempted to present the testimony of Bobby Master, Marlene's ex-husband. Defense counsel wanted him to testify that Marlene frequently swore out false warrants against him. However, the trial judge would not permit this testimony on the basis that it was irrelevant. TE VI at 540. Matthews' counsel presented the testimony by way of avowal.

91) During the penalty phase, defense counsel reminded the jury that they could consider all of the evidence previously admitted in the guilt phase, TE VII at 684, and introduced two penalty phase witnesses, Matthews' sister, Beverly Higdon, and his mother, Laverne Matthews.

a) Beverly Higdon testified that Matthews was a good son and brother and showed great affection for her children. She described that Matthews had once taken care of her children on the family's farm for a week and during that time he "cooked, he washed, he ironed, he fed the animals, he did everything necessary to do, and he done a hundred percent job." TE VII at 685–89.

b) Laverne Matthews testified that Matthews was the third of four children, that the family lived in housing projects for a short time, that Matthews' father abandoned the family when Matthews was two years old, that Matthews only completed the eighth grade, that he began working at age sixteen, and that he got married at age seventeen and had four children from that marriage. She further testified that Matthews was a good father and loved his children. She also testified about his martial problems with Marlene. TE VII at 691–99.

92) After the jury came back with a recommended sentence of death, at the November 15, 1982, sentencing hearing, Matthews' counsel presented a letter from Dr. Chutkow. Dr. Chutkow stated that in his opinion it was unlikely that Matthews would be subject to the stressors that led him to kill his wife and mother-in-law again, and therefore, unlikely that he would kill or injure anyone else. TE VII at 742. He believed that after a period of imprisonment Matthews could be rehabilitated to obey the law of his community and contribute to society. *Id.* Matthews' counsel also called Reverend Michael Cunningham, pastor of the Fellowship Baptist Church. *Id.* at 743. Mr. Cunningham testified that the death penalty was inconsistent with New Testament teachings and the Christian faith. *Id.* at 746–49.

### Additional witnesses Matthews argues should have been interviewed and called to testify

93) Rita Baete. Ms. Baete is Matthews' first maternal cousin. *See* DN 228, attach. 1. If contacted by defense counsel, Ms. Baete claimed that she would have testified regarding the extreme mental illness suffered by her mother, Matthews' maternal aunt, Mary Louise Zocklein, and the temperament of other family members. *Id.* She stated that her mother was hospitalized on at least six separate occasions for mental illness. *Id.* She also believes that several other family members have "short fuses" and display symptoms similar to her mother, including Laverne Matthews, Anna Rose Steward (another maternal aunt of Matthews), Roger Matthews, and Beverly Higdon. *Id.* She stated that Laverne Matthews is an alcoholic and that she was told by her mother that Laverne drank during her pregnancies. *Id.* She recalled seeing Laverne and Lenny Perry drunk on the street as a child. *Id.* She saw Matthews and his siblings occasionally while growing up at their grandmother's home where the Matthews children were living at the time. *Id.* She stated that Grandmother Beard acted like a mother to the Matthews children. *Id.* She did not recall Laverne Matthews being affectionate with the children. *Id.* She stated that Matthews' father was not considered a part of the family. *Id.* She stated that unlike the Matthews children she was raised in a Catholic family and encouraged to take part in neighborhood events. *Id.* She recalled that the Portland neighborhood was a rough neighborhood with lots of beer joints. *Id.* She remembered that Matthews began drinking at fifteen or sixteen years of age. *Id.* She thinks Matthews was a "mean drunk." *Id.* She believes Matthews' brother, Roger Matthews, was a "weird" child. *Id.* She was told by her mother that Roger Matthews was once placed in the mental hospital and when he was in the army was put in the stockade for threatening the life of President Johnson. *Id.* She remembered Matthews as "a good boy" and believes he sincerely cared for her grandmother and mother. *Id.* She stated that when Grandmother Beard was dying Matthews would come to visit her. *Id.* On cross-examination at the March 2006 evidentiary hearing, Ms. Baete stated that she never visited Matthews while he was in jail pending trial, did not offer to assist Matthews, and did not attend his trial. Mar. 2, 2006, Evid. Hrg. at 10–12. She also stated that Matthews was not among the family members that she believed had a "short fuse" or exhibited symptoms similar to her mother. *Id.* at 12–14. She also stated that her mother and father made a decision to distance themselves from the Matthews family when she was a child and that afterwards she only saw the Matthews children with their mother a couple of times a year. *Id.* at 16. She also admitted that she had no personal knowledge whether Matthews' mother drank when she was pregnant or about Roger Matthews' alleged threat to the president and mental illness. *Id.* at 17.

94) Jerry Matthews. Jerry Matthews is Matthews' older brother. *See* DN 228, attach. 4. In his affidavit, he stated that his parents were divorced when he was five. *Id.* He indicated that the family lived in the Parkdale Housing Projects and then later moved to Portland. *Id.* He stated that his mother was a binge drinker and would leave the children alone at home for several hours a day. *Id.* He stated that sometimes his mother would use the rent money for alcohol and that his Grandmother Beard would have to pay the rent. *Id.* When he was thirteen he moved away from his mother and in with his Grandmother Beard. *Id.* He believes that his other brother, Roger Matthews, has mental problems. *Id.* He also believes that his

mother has mental problems and that Matthews' "problems with women" were caused by his mother. *Id.* He stated that after he got married he intentionally distanced himself from the family. *Id.* He stated that after Matthews injured his arm he changed, drinking more and becoming a "rouser." *Id.* On cross-examination at the evidentiary hearing, Jerry Matthews admitted that he never visited Matthews in prison or offered to help out with his defense. Mar. 2, 2006, Evid. Hrg. at 36. He also acknowledged that the telephone number listed in defense counsel's pretrial notes was his in 1981. *Id.* at 35. He stated that he did not specifically recall talking to defense investigators at the time, but that it would not surprise him if he had told them that he wanted to stay out of it at the time. *Id.* at 36–37. He also stated that the Sewards and his grandparents were positive influences in the Matthews children's lives. *Id.* at 41, 44.

95) Linda Matthews. Linda Matthews, Matthews' sister-in-law, is married to Jerry Matthews. *See* DN 228, attach. 5. She stated that Matthews was very affectionate with her children. *Id.* She also stated that Laverne Matthews was a binge drinker who manipulated her children, especially Matthews. *Id.* She believes that if Matthews had a different mother the homicides would never have happened. *Id.* She stated that social interaction with the rest of the Matthews family was limited because of Laverne Matthews and that she and her husband have spent the last thirty years trying to distance themselves from the family. *Id.* On cross-examination, Linda Matthews admitted that she did not offer to assist in Matthews' defense or attend his trial. Mar. 2, 2006, Evid. Hrg. at 22–23. She also acknowledged that the phone number listed in defense counsel's pretrial notes belonged to her and her husband at the time. *Id.* at 23.

96) Anna Rose Seward. Ms. Seward is Mathews' maternal aunt. *See* DN 228, attach. 6. She stated in her affidavit that Laverne Matthews always struggled financially and never had enough money. *Id.* She also stated that after Laverne moved into the projects she began to have a serious problem with drinking and would drink all day while the children were at school. *Id.* She stated that the Matthews children frequently stayed with her and her husband. She stated that Laverne encouraged the children to discipline one another and that Roger once beat Beverly very badly. *Id.* She believes that Laverne aggravated the situation between Marlene and Matthews. *Id.* She stated that Matthews was a hard worker who loved his mother very much. *Id.* She believes that depression runs in the family. *Id.* On cross-examination, Ms. Seward testified that despite Laverne's drinking "her house was always clean and her children were always fed." Mar. 2, 2006, Evid. Hrg. at 53–54. She also stated that she never tried to obtain custody of the Matthews children or report Laverne for child abuse or neglect because she "didn't think it was that bad. She wasn't mistreating them. She was a good mother." *Id.* at 54–56.

97) Beverly Ann Higdon. Ms. Higdon is Matthews' sister. *See* DN 228, attach. 2. She testified at the penalty phase of his trial. *Id.* However, she stated in her affidavit that she could have provided additional information about the family's background and mental health history had she been asked at the time. *Id.* Ms. Higdon stated that her father abandoned the family when Matthews was approximately two-years old, was a vagrant, an alcoholic, and died in 1971 in the backseat of an abandoned car. *Id.* She further stated that there is a history of alcoholism in the Matthews family, which includes herself, her mother, father, maternal grandfather, maternal uncle, and brothers. *Id.* She also

stated that there is a history of mental illness in her family. *Id.* She stated that her maternal uncle William Beard, her Grandfather Beard's maternal sister, and Matthews' son, Timothy Ray Matthews, all committed suicide. *Id.* Ms. Higdon also stated that she was hospitalized in 1980 at Our Lady of Peace and treated for Depressive Neurosis as well as habitual excessive drinking. *Id.* Ms. Higdon also stated that her brother Roger Matthews was in trouble a lot during his youth and once beat her very badly. *Id.* She also described that Matthews and Marlene had a troubled marriage. *Id.* On cross-examination, Ms. Higdon admitted that her hospitalization was related to the death of a child seventeen months earlier. Mar. 2, 2006, Evid. Hrg. at 63.

98) Barbara Kaegin. Ms. Kaegin was a neighbor of the Matthews family and babysat the Matthews children for approximately two years when they were small. *See* DN 228, attach. 3. She stated that during the year or two before the murders Matthews "drank all of the time" and once tried to obtain a Valium from her. *Id.* She also stated that Laverne Matthews also drank all of the time and the Cruse and Matthews families did not get along. *Id.* She stated that Marlene and the rest of the Cruse family would harass Matthews and his mother. *Id.* On cross-examination, Ms. Kaegin stated that "Laverne's been a good mother all her life to those kids. They never wanted for nothing." Mar. 2, 2006, Evid. Hrg. at 69.

99) Brenda Mattingly. Ms. Mattingly is Matthews' first cousin. *See* DN 228, attach. 7. Her mother is Anna Rose Steward. *Id.* She stated that Laverne Matthews was "greedy" and was always asking other family members for money. *Id.* She also stated that Laverne drank heavily. *Id.* She stated that Matthews and his siblings often visited her home when she was a child and in the summers would stay for weeks. *Id.* She stated that she was raised in the Catholic church, but the Matthews children were not. *Id.* She stated that as an adult Matthews was good father and a hard worker. *Id.* On cross-examination, Ms. Mattingly testified that her father was a sort of a father figure to Matthews and a positive influence. Mar. 2, 2006, Evid. Hrg. at 77.

100) Anthony Wayne Matthews. Anthony Matthews is Matthews' son and was thirteen years old at the time of his father's trial in 1982. *See* DN 228, attach. 8. He denied that on the night prior to the murders Matthews pulled out a knife in front of Roger Matthews and said "someone's going to fall" as Roger testified to at trial. *Id.* He also stated that Marlene was manipulative to his father and verbally abusive to him. *Id.* He further described the good relationship he had with his father as a child. *Id.* On cross-examination, Mr. Matthews admitted that he was not involved in the conversation between his father and uncle on the night prior to the shootings. Mar. 4, 2006 Evid. Hrg. at 10. He also testified that he attended his father's trial, but that he had to be removed from the court room several times by sheriffs because he "was crying, breaking down." *Id.* at 9.

101) In addition to the witnesses listed above who testified at the evidentiary hearing, Matthews also submitted the affidavits of three additional individuals who were unavailable to testify at the hearing, and therefore, were not subject to cross-examination: Judy Kaye Carrier, Laverne Matthews, and Nada Jean Nowlin.

102) Judy Kaye Carrier. Ms. Carrier is Matthews' former girlfriend and the mother of one of his children. She provided information about Matthews' drinking and drug use. She stated that he would drink all day and would not stop until he passed out. She also remembered seeing Mat-

thews take pills. She stated that she lived on Lytle Street for a time and observed Matthews and Marlene arguing and yelling. She said Matthews once told her that the only reason he married Marlene was because she "got him drunk" and forced him to marry her. She also said that after she and Mathews broke up he once slapped her very hard for no reason as she was walking down the street and then "began laughing like a crazy man." *See* DN 228, attach. 9.

103) Laverne Matthews (David's mother). Mrs. Matthews' affidavit mostly concerns details about her son's relationship with Marlene and the problems they had in their marriage. She also described how the Cruse family harassed her after Matthews and Marlene separated. She further stated that Matthews' father was a drunk and that her children were scared of him when they were young. *See* DN 228, attach. 11 & 12.

104) Nada Jean Nowlin. Ms. Nowlin was dating Anthony Matthews at the time of the shootings. She was approximately fifteen years old at the time of trial. Her affidavit explains that Matthews drank a lot, had problems with Marlene, was a good father, and seemed different (fidgety) when she visited him in jail. *See* DN 228, attach. 10.

105) In addition to the deficiencies in lay witness testimony, Matthews also argues that Dr. Chutkow improperly diagnosed him. At the evidentiary hearing in July 2006, Matthews called Dr. Robert Smith to testify on his behalf. Dr. Smith was retained by Matthews to provide an opinion on: 1) whether his mental health diagnosis at the time of the crimes in question rendered by Dr. Chutkow was reliable using acceptable standards of diagnosis in 1981 and '82 by a qualified mental health professional; and 2) what would be a reliable mental health diagnosis at the time of the crimes using acceptable

standards of diagnosis in 1981 and '82 by a qualified mental health professional. July 21, 2006, Evid. Hrg. at 5. Dr. Smith testified that he believes that Dr. Chutkow's diagnosis was not reliable. *Id.* at 16. The primary reason Dr. Smith gave for the unreliability is the lack of family information available to Dr. Chutkow at the time of his diagnosis. *Id.* Dr. Smith believes that Matthews should have been diagnosed as alcohol dependent and as suffering from narcissistic personality disorder. *Id.* at 26.

106) Using the above summary as a guide, the court will now evaluate each of the five claimed areas of deficiency in counsel's investigation and presentation of evidence.

### a. Mental illness in Matthews' family

107) Matthews claims that his counsel were deficient in failing to uncover and present evidence related to a disturbing amount of mental illness in the Matthews family. Counsel's investigation, however, appears to have entailed gathering mental health information about Matthews and his mother and siblings. The additional evidence Matthews claims should have been introduced was either not available at the time of trial or irrelevant to Matthews.

108) At the direction of defense counsel, Dr. Chutkow questioned Matthews about his own mental history. TE VI at 547. Matthews denied ever having been hospitalized, but reported being depressed after his divorce from his first wife. *Id.* at 564. This information was introduced at trial. *Id.* As for Matthews' direct relatives, counsel's investigation did not reveal that either Matthews' mother or two brothers were ever hospitalized for mental illness. Counsel's investigation did reveal that Matthews' sister, Beverly Higdon, was briefly hospitalized and treated for mental problems for three weeks in 1980. This hospitalization was a direct result of her

inability to cope with the death of a child after a long illness. This fact, however, was not introduced during Matthews' trial. It is not uncommon for a parent to have mental and emotional difficulties after the death of a child. While this evidence might have evoked sympathy for Matthews' sister, it would not have aided in Matthews' defense. Because this evidence was irrelevant, counsel was not deficient in failing to introduce it.

109) The only other evidence of documented mental illness in the Matthews family involved the hospitalization of Matthews' maternal aunt, Mary Louise Zocklein. Trial counsel apparently did not discover this fact during their investigation. Given the lack of documented mental illness in Matthews and his immediate relatives, the court does not necessarily find that counsel's failure to probe deeper into the family tree was *per se* deficient. The court dares to speculate that virtually every family has some relative that suffers from some form of mental illness. It is a pattern of documented mental illness closely related to the defendant's behavior, a pattern that was lacking in Matthews' case at the time, that supports a mitigation case. The mere identification of a single relative with documented mental illness does not make a mitigation case.

110) In any event, even if the court assumes that Matthews' counsel was deficient in failing to discover Mrs. Zocklein's mental history, the deficiency did not prejudice Matthews. There was no evidence presented that Mrs. Zocklein's illness affected Matthews or that he even spent any time around her as a child. Moreover, when referring to other family members who showed similar personality traits to Mrs. Zocklein, her daughter, Mrs. Baete, did not include Matthews on the list. This opinion would be consistent with the evaluations of Dr. Chutkow, Dr. Edelson, and Dr. Smith, none of whom diagnosed Mat-

thews with any psychosis, organic brain impairment, or associated symptoms. Moreover, despite having the opportunity to do so in these proceedings, Matthews has failed to link his behavior with his maternal's aunt mental illness. As such, the court finds that even if deficient, counsel's failure to discover Mrs. Zocklein's mental illness did not prejudice Matthews. *See Harbison v. Bell,* 408 F.3d 823, 830 (6th Cir.2005) (holding that trial counsel's failure to introduce the fact that the petitioner's sister murdered her children and then committed suicide was not ineffective because there was no evidence presented during the habeas proceeding regarding how those events affected the petitioner).

111) Some of the affidavits presented by Matthews speculate that Roger Matthews and possibly other members of the Matthews family, including Matthews' mother may also be mentally unstable. For example, Roger Matthews was described as a "weird" child and other family members are listed as having "short fuses." These lay characterizations do not begin to approach reliable descriptions of mental illness. Matthews has failed to offer proof of actual, diagnosed mental illness in these individuals. Counsel cannot be faulted for failing to discover something that has not been proven to be a fact.

112) Finally, Matthews' argument about a history of suicide in his family is a red-herring. Mr. Beard committed suicide in 1992 and Timothy Matthews committed suicide in 1989. *See* DN 25, attach. 6A at 2. Thus, information about these two suicides would not have been available at the time of Matthews' trial in 1982, and it is impossible that counsel was deficient in failing to discover it.

### b. Matthews' mental and physical health

113) Matthews claims that counsel failed to obtain any of his prior medical records.

Aside from counsel's failure to obtain his mental health records from the jail, which will be discussed in a separate section, Matthews is apparently referring to the medical records related to his arm injury. The court is nothing less than perplexed regarding this claim. The court does not see how the medical records about his arm injury were relevant. Counsel did discover the arm injury and investigated its effect on Matthews. There was testimony from Roger Matthews about how the injury appeared to psychologically affect Matthews and that his drinking and drug abuse increased after the injury. TE IV at 326. Additionally, Dr. Chutkow was made aware of the injury. However, it was Dr. Chutkow's opinion that the arm injury did not contribute to Matthews' problems with Marlene. TE VI at 569. Because the medical records would have related only to the physical aspects of the injury and treatment, an injury counsel was already aware of, and not any mental impact, the court does not find that counsel's failure to request the medical records amounted to deficient conduct.

### c. Mathews' alcohol and drug abuse

114) Matthews claims that his counsel failed to investigate and comprehend his drug and alcohol abuse issues. This is simply not substantiated by the record. As recounted above, Matthews' counsel interviewed many witnesses. Most of these witnesses, including Ed die and Elaine Peltier, Jerry Matthews, Roger Matthews, Carol Engle, Smoky Brown, Mary Clark, Lawrence Cruse, Larry Cruse, Sherry McMichael, and Raymond McMichael, provided counsel with information regarding Matthews' drinking and drug usage. Matthews also conveyed some information to Dr. Chutkow about his drug and alcohol abuse. As a result of the information learned by defense counsel during their investigation, they requested funding for a neuropsychologist to determine whether Matthews had any organic brain damage,

cognitive impairment, or other alcohol or drug residuals as a result of his past drug and alcohol use. Busse Dep. at 43–44. The funding was granted, and counsel retained Dr. Edelson. *Id.* The results of the exams administered by Dr. Edelson were all negative. *Id.* The jury was also made aware that Matthews was a chronic alcohol and drug abuser through the testimony of witnesses like Dr. Chutkow, Roger Matthews, Ed die Peltier, and to a lesser extent Carol Engle. Overall, the court believes that counsel learned enough of Matthews' past drug and alcohol abuse to make informed decisions about case strategy (for example, to hire a neuropsychologist) and presented enough evidence to the jury about Matthews' drinking and drug use for it to properly consider the effect of such use during the guilt and mitigation phases of the trial. Counsel's investigation and presentation of evidence in this regard was not deficient.

### d. Alcoholism in Matthews' family and family background

115) Mathews claims that there was a wealth of information that he had a chaotic, dysfunctional childhood and family life (including possible sexual abuse), was neglected by his parents, and was brought up in a family replete with alcoholism that counsel should have investigated and presented to the jury.

116) As recounted above, counsel contacted a number of family members, friends, neighbors, and acquaintances of Matthews in preparation for trial. At the time of the investigation, there was a great uproar in the neighborhood about the shootings, so much so that Matthews' mother had to move away from her home on Lytle Street. Given this fact, it is not entirely surprising that many neighbors and co-workers denied knowing much about Matthews or that Jerry Matthews, his own brother, expressed a desire not to

become involved in the trial. This made counsel's job in attempting to discover helpful mitigation evidence more difficult. Of those who were willing to speak with investigators about Matthews, most (even close family members and friends) did not have entirely positive things to say. As explained by counsel during his deposition:

I told you about some of the risks of calling witnesses and what can happen. And that ends up being an attorney decision because with both of these families, the defendants, many of the witnesses were not fond of Mr. Matthews. And many of the witnesses in the victim's family, no one was fond of. It happened in Portland, Kentucky, in the west end, in the north part of the west end on the river in a white enclave in the west end, and the evidence came back of drinking in both families. I only bring this up these points, because any time you put a witness on from that situation, you're making a judgment call that you're exposing another part of your case to possible problems or benefits.

Busse Dep. at 63.

117) Thus, even some of Matthews' closest friends and relatives did not have entirely positive things to say about him. For example, Ed die Peltier, noted that Matthews had the tendency to be violent when drunk and had physically abused Marlene in the past. Given the less than stellar reports of Matthews' background and character that counsel discovered during their investigation, counsel appears to have made a strategic decision to limit the presentation of mitigation evidence during the penalty phase of the trial for possible fear of making Matthews look worse to the jury. The Supreme Court has found more limited investigations into a defendant's background justified where any evidence presented would have a "double edge." *Wiggins*, 539 U.S. at 535, 123 S.Ct. 2527 (citing *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Darden*

*v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). The Sixth Circuit also recently recognized that counsel's "strategic decision to limit testimony about [defendant]'s past in order to prevent 'opening-the-door' to evidence of [defendant]'s criminal background" supported "the reasonableness of the Ohio Court of Appeals' determination regarding the performance of defense counsel." *Clark v. Mitchell*, 425 F.3d 270, 286 n. 6 (6th Cir. 2005).

118) Given the lack of positive mitigation evidence unearthed by counsel in its initial investigation and the likelihood that the testimony of Matthews' friends and family would have done more harm than good, counsel's decision to limit its mitigation evidence primarily to extreme emotional disturbance was a sound one. *Cf. Strickland*, 466 U.S. at 672–74, 699–701, 104 S.Ct. 2052 (finding to be reasonable trial strategy counsel's decision to present only Strickland's plea colloquy at sentencing in order to hide damaging evidence of Strickland's criminal history while at the same time emphasizing his remorse and acceptance of responsibility).

119) Even if counsel's decision not to investigate further was unreasonable, however, the court cannot find that it was prejudicial, as many of the additional witnesses identified by Matthews could have also testified to facts that made Matthews appear worse to the jury. For example, both Jerry and Roger Matthews noted to defense investigators that Matthews had played with guns in the past, Ms. Carrier stated that Matthews once slapped her very hard for no reason as she was walking down the street and then "began laughing like a crazy man," and Rita Baete stated in her affidavit that Matthews was a "mean drunk" who was prone to violence when under the influence. This testimony might very well have served to undermine

Matthews' extreme emotional disturbance claim.

120) Instead of seeing the shootings as the product of a one-time reaction to a stressful set of events, the jury might have concluded that Matthews had long exhibited tendencies toward domestic abuse and other violence, especially when drinking. The Sixth Circuit recently found that there was no prejudice under similar circumstances. *See Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir.2006) (finding an absence of prejudice where "had the family members' testimony been admitted, the prosecutor would have been free to extract testimony of Carter's criminal history, his history of drug use and alcohol abuse, and his notoriously quick temper and violent character.... In short, the testimony of Carter's family members likely would have reinforced that he was a temperamental, violent person despite his relatively stable background."); *see also Burger*, 483 U.S. at 793, 107 S.Ct. 3114 (holding no ineffective assistance of counsel where the mitigation identified by the petitioner suggested "violent tendencies ... at odds with the defense's strategy of portraying petitioner's actions on the night of the murder" as the result of forces beyond his control).

121) It is also important to remember that counsel did discover and present some mitigation evidence during both the penalty and guilt phases of the trial. During the guilt phase, a number of witnesses testified concerning Matthews' drug and alcohol use, his chaotic relationship with Marlene, and his previous arm injury. During the penalty phase of the trial, Matthews' mother provided some information relative to his background. She testified that the family lived in the "projects" for a short time, that Matthews' father abandoned the family when Matthews was two, that Matthews only had an eighth-grade education, and that he had many difficulties with Marlene. His sister, Beverly Higdon, testified about his love for his children, that he was a hard worker, and described particular "good deeds" Matthews had done for her family. Thus, counsel did present evidence related to Matthews' alcohol and drug use and marital problems in the guilt phase and about his background in the penalty phase. Much of the additional evidence Matthews argues should have been introduced merely sought to elaborate on his impoverished background, absent father, drinking problems, and martial strife. However, "a petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative" to that already admitted. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n. 7 (11th Cir.2002).

122) Furthermore, while the additional witnesses identified by Matthews might have testified on direct that Matthews' mother was a neglectful alcoholic who contributed to her son's downfall, as shown by this court's evidentiary hearing, much of that testimony would have been discredited on cross-examination. On cross-examination, several of the witnesses testified that Laverne Matthews was a good mother, that her house was always clean, and that her children were well fed and did not want for anything. The evidence also established that while Laverne Matthews may have been an absent parent at times, other family members, including Matthews' maternal grandparents, the Beards, and his maternal aunt and uncle, the Sewards, stepped in to help out providing financial and emotional support to the family. Thus, while some of the additional witnesses identified by Matthews could have painted a more complete picture of Matthews' life for the jury, the court does not find that their testimony would have made it more probable that the jury would not have imposed the death penalty. *See*

*Carter,* 443 F.3d at 531 ("The testimony Carter's family members were prepared to give-other than that which would have been cumulative to Carter's own statement-can hardly be described as mitigating. In fact, the affidavits describe a relatively stable, although imperfect, family environment.").

123) Likewise, while additional evidence also could have been introduced about other family members' drinking, the court does not find that it would have been particularly helpful to Matthews. While there is evidence of alcohol abuse in the Matthews family, it does not appear that the Matthews children were neglected because of it. If one family member was unable to provide for the children, another always seemed to step in to help out. The jury was amply informed about Matthews' drug and alcohol use and apparently rejected it as a mitigator. The court does not find that additional evidence about alcohol use by other family members would have impacted the jury's decision, especially where Matthews could not show that his own long standing alcohol use caused him to suffer any organic brain damage.

124) Because of the serious nature of any alleged child abuse, the court will discuss separately Matthews' claim that his counsel were deficient in failing to discover that he may have been sexually abused as a child. During a 1994 interview with Dr. Smith, Matthews revealed that:

> [H]is first sexual experience was at age 10. He provided no further information regarding this first encounter, but stated that he became very sexually active after this experience. He had sexual relations with a number of different girls and was encouraged to do so by his brothers and older males within the neighborhood. At age 13, Matthews related that he became involved with a number of gay men, trading sex for money. He appeared very uncomforta-

ble with this disclosure and initially attempted to minimize its impact on him. He acknowledged, however, that this behavior continued for approximately two years.

DN 25, attach. 6A at 4. Dr. Smith opines that "this early account of sexual history, including homosexuality, strongly suggests that Mr. Matthews *may* have been sexually abused." *Id.* (emphasis added). What is lacking, however, is any statement by either Matthews, a family member, or a medical professional confirming that he was indeed sexually abused as a child. The court cannot find that counsel was deficient for failing to discover something that may never have occurred. *See Lovitt v. True,* 403 F.3d 171, 182 (4th Cir.2005) (holding that district court properly rejected ineffective-assistance-of-counsel claim where petitioner failed to present any evidence describing the nature or extent of sexual abuse allegedly inflicted on him).

125) Additionally, the court notes that counsel cannot be faulted for failing to discover Matthews' early prostitution. Counsel arranged for Matthews to meet with Dr. Chutkow. It is not entirely surprising that Matthews failed to discuss this aspect of his life with Dr. Chutkow, given the fact that he was reluctant to discuss it with Dr. Smith over ten years later in 1994 and downplayed its significance even then. Since no other family member identified by Matthews related any information about the prostitution in their affidavits, presumably Matthews effectively hid this fact of his life from everyone. Given that Matthews was the only person who knew this information, counsel cannot be faulted if Matthews possessed information that could have assisted Dr. Chutkow, but refused or was unwilling to discuss it at the time. *See Workman v. Bell,* 178 F.3d 759, 769–71 (6th Cir.1998) ("Furthermore, Workman himself had very little information to offer his trial counsel regarding his

family history. Counsel cannot be said to have been ineffective simply because Workman now offers evidence of mitigation."); *Sneed v. Johnson*, No. 1:04CV 588, 2007 WL 709778, 2007 U.S. Dist. LEXIS 15067 (E.D.Ohio Mar. 2, 2007) (holding that counsel were not ineffective for failing to discover alleged sexual abuse where they had petitioner examined by psychologists and petitioner failed to discuss this aspect of his life with them). The court cannot find that Matthews' counsel were deficient in failing to discover either the possibility that he might have been sexually abused as a child or that he prostituted himself out to gay men in the neighborhood as a teenager.

126) Finally, the court will address Matthews' claim that his counsel were ineffective for failing to call his minor son, Anthony Matthews, to testify in both the guilt and penalty phases of Matthews' trial. Matthews claims that his counsel should have called Anthony Matthews to refute Roger Matthews' testimony. Roger Matthews testified that on the night before the killings, an incident occurred in which Matthews waved a pocket knife in front of his son, saying "someone is going to fall." TE IV at 320–21. Anthony Matthews, now an adult, claims that he could have testified that this conversation between his uncle and father did not occur. The court will assume that counsel's failure to even interview Anthony Matthews was deficient. The court cannot find, however, that the deficiency prejudiced Matthews. First, on cross-examination during the evidentiary hearing, Anthony Matthews admitted that he did not take part in the conversation between his uncle and his father and that the conversation was not directed at him. Second, Anthony Matthews stated that while he attended Matthews' trial he had to be removed from the courtroom several times by sheriffs because he broke down crying. This casts serious doubt on whether, as a thirteen-year old boy, Anthony Matthews would have had the composure to testify at the trial. Even if he had been able to maintain his composure enough to testify, the jury likely would not have given him much credibility, seeing him only as a scared child determined to say anything to save his father from a life in prison or death. Third, given Eddie Peltier's testimony that Matthews was known to carry a pocket knife, TE IV at 381, and the fact that Matthews admitted the killings, and that a knife was discovered at the scene, the court does not find that Anthony Matthews' testimony would have resulted in a reasonable probability that the jury would have come back with a not-guilty verdict on the murder charges. As such, any claimed deficiency in counsel's failure to interview Anthony Matthews was not prejudicial.

127) In summary, the court concludes that Matthews has not shown either that his trial counsel were ineffective for failing to investigate, prepare, and present evidence at the guilt/penalty phases of his trial, or that any claimed deficiency prejudiced him. Accordingly, this claim should be denied because the Kentucky Supreme Court's decision to reject it was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent.

### 2. Use of an expert to establish EED [46]

128) Matthews also claims that his counsel were deficient in selecting, preparing, and utilizing experts to testify on his behalf at trial. As indicated above, Matthews' counsel utilized two experts, Dr. Chutkow and Dr. Edelson. After interviewing Matthews several times, administering various psychological tests, and

---

**46.** This claim is set forth at Pet. at 78–87, DN 23.

speaking with Matthews' mother, Dr. Chutkow diagnosed Matthews as suffering from an adjustment disorder and temporary alcohol abuse. TE VI at 558–59. At trial, Dr. Chutkow explained his diagnosis to the jury and testified that it was his medical opinion that at the time of the shootings Matthews was acting under extreme emotional disturbance. *Id.* at 554–59. At the recommendation of Dr. Chutkow, Matthews was also evaluated by Dr. Edelson to determine whether he had suffered any organic brain impairment as a result of his history of heavy alcohol and drug use. Busse Dep. at 43–44. The results of those tests were negative, and therefore, Dr. Edelson was not called to testify on Matthews' behalf at trial. *Id.*

129) During the evidentiary hearing conducted by this court, Matthews called Dr. Smith, a psychologist, to testify on his behalf. Dr. Smith testified that he believes that Dr. Chutkow's diagnosis was not reliable. July 21, 2006, Evid. Hrg. at 16. The primary reason Dr. Smith gave for the unreliability is the lack of family information available to Dr. Chutkow at the time of his diagnosis. *Id.* Dr. Smith testified that there is a reasonable psychological certainty that at the time of the shootings Matthews suffered from two serious psychiatric disorders, which adversely affected his condition and contributed to his actions: alcohol dependence and narcissistic personality disorder. *Id.* at 20. According to Dr. Smith, his diagnosis of alcohol dependency and narcissistic personality disorder is far more serious than Dr. Chutkow's diagnosis of alcohol abuse and adjustment disorder. *Id.* at 41.

130) The Kentucky Supreme Court rejected Matthews' claim that counsel's retention and use of Dr. Chutkow was ineffective, holding:

> The testimony presented by Dr. Chutkow was adequate in regard to the extreme emotional disturbance and in-

toxication theories.... Dr. Chutkow testified that Matthews was under the influence of extreme emotional disturbance at the time of the crimes, and the combination of drinking alcohol and various other substances prior to the shooting made Matthews intoxicated and reduced his self-control and judgment.

*Matthews II* at 6.

131) The court begins its analysis of this claim by noting that the fact that Dr. Smith's diagnosis differs from Dr. Chutkow's diagnosis is not a determinative factor in the ineffective-assistance-of-counsel analysis. The question "is not whether all mental health experts would agree" on a particular diagnosis, but whether counsel's decision not to pursue further investigation was a reasonable strategic choice. *Lundgren,* 440 F.3d at 772; *Lorraine v. Coyle,* 291 F.3d 416, 436 (6th Cir.2002) ("It simply cannot be said that trial counsel's conduct fell below an objective standard of reasonableness under *Strickland* simply because the leads [of possible organic brain damage] led to nowhere."). Thus, the relevant question in this case is not whether Dr. Chutkow's diagnosis was accurate, but rather whether Matthews' counsel adequately selected, prepared, and utilized Dr. Chutkow.

#### a. Selection of Dr. Chutkow

132) "The Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available." *Lundgren,* 440 F.3d at 772. As the trial testimony indicated, from all outward appearances, Dr. Chutkow appeared to be an experienced and qualified psychiatrist. Nothing about his *curriculum vitae* suggests that Matthews' counsel were deficient in selecting Dr. Chutkow as an expert witness. *See Campbell v. Coyle,* 260 F.3d 531, 555 (6th Cir.2001) ("There is no

evidence that Dr. Chiappone was incompetent, or that Campbell's lawyers had any reason to question Chiappone's professional qualifications.").

### b. Preparation of Dr. Chutkow

133) While Matthews argues that his counsel failed in their affirmative duty to provide Dr. Chutkow with the information he needed to develop an accurate picture of Matthews' mental health, counsel's pretrial files belie this assertion. In a July 16, 1981, letter to Dr. Chutkow,[47] Mr. Busse provided Dr. Chutkow with the following information:

*Patient's Family*

David Matthews at that time [of the killings] was residing with his mother, a Mrs. Margaret Matthews (435 South 32nd Street, Ph. # 772–0047, or 774–2623. You might consider interviewing David's mother concerning David's background.

David also has a surviving sister, Beverly Higdon, who lives in Bardstown, Kentucky and can be reached at 1–348–2213.

David has a surviving brother, Jerry Matthews, of 1120 Euclid Avenue (634–1473) and a surviving aunt Mrs. Anna Rose Seward, of 3612 St. Edwards, Jeffersontown, Kentucky (267–6857).

Lastly, David has a previous wife, a Mrs. Brenda Harshfield, who lives on Utica Pike in New Albany, Indiana and can be reached at 948–6513.

. . .

*Prior Psychiatric History*

David has no history of psychiatric hospitalization, but he does have a substantial alcoholic history. David should be throughly examined as to his alcohol and drug intakes on 6/29, the date of the incident and its affect on his mental state.

David has stated that his mother Margaret Matthews has not been hospitalized for psychiatric problems, but ever since the death of a grandchild some three or four years ago, she has suffered some severe problems of adjustment.

. . .

David's mother has stated that he (David) was often taunted by his ex-wife who paraded around with other men in front of David or would purposefully not attend to their 18 month old child. David's mother has stated this type of behavior would strongly incense David.

July 16, 1981 Letter from Busse to Chutkow, TR IV at 531–35. Approximately a year later as the trial date was approaching, Mr. Busse again wrote Dr. Chutkow. June 25, 1982 letter from Busse to Chutkow. This time, Mr. Busse stated that he believed it would be useful for Dr. Chutkow to present the jury with a "developmental family history," and therefore, explained that he had asked Matthews' mother and sister to contact Dr. Chutkow to set up appointments to be interviewed. *Id.* In the same letter, Mr. Busse indicated that he believed that Dr. Chutkow should explore "whether David's insecurities and paranoias, if they are found to be present, relate to his acts of aggression." *Id.* Mr. Busse also requested Beverly Higdon to provide Dr. Chutkow with letters Matthews had written her while in prison. May 11, 1982 & June 9, 1982 letters from Busse to Higdon. Mr. Busse also provided Dr. Chutkow with the transcript of

---

**47.** The letters cited in this section are located in Matthews' counsel's pretrial investigatory files that the parties have submitted to the Court. During the July 2006 evidentiary hearing, counsel agreed that reliance on those files would be permissible even though certain portions may not have been referenced in trial counsel's depositions because the files were not turned over until after the depositions were taken. *See* July 21, 2006, Evid. Hrg. at 106.

defense counsel's interview with Carol Engle. Aug. 12, 1981 letter from Busse to Chutkow. Additionally, counsel made Matthews available to Dr. Chutkow several times for interviews and testing, and, at the suggestion of Dr. Chutkow, had Dr. Edelson test Matthews for any organic brain impairment.

134) This case is factually similar to *Campbell,* 260 F.3d at 531.[48] In *Campbell,* defense counsel presented psychological evidence during the mitigation phase of trial that the petitioner suffered from poly-substance abuse and had an antisocial personality disorder. *Id.* at 537–38. During state post-conviction proceedings, Campbell presented evidence that he may have also suffered from post traumatic stress disorder ("PTSD") as a result of being burned in a fire at age five. *Id.* at 546. Campbell's trial counsel, however, had not presented any evidence of PTSD to the jury during either phase of his trial. In fact, despite hiring a mitigation specialist and clinical psychologist, Campbell's trial counsel remained unaware that their client might have also suffered from PTSD. *Id.* Campbell claimed that his trial attorneys' failure to discover his alleged PTSD compromised his Sixth Amendment rights at both phases of his trial. During the habeas proceedings, Campbell presented affidavits from two mental health professionals that stated that the trial psychologist should have focused more on Campbell's family history and interactions, which would have revealed that he possessed many of the symptoms of PTSD. In rejecting Campbell's ineffective-assistance-of-counsel claim, the Sixth Circuit held that "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Id.* (citing *White v. McAninch,* 235 F.3d 988, 995 (6th Cir. 2000)). The Sixth Circuit then determined

that it was not objectively unreasonable for Campbell's trial counsel to rely on the psychologist they obtained for use at trial:

> Even though Dr. Chiappone as a trained psychologist failed to detect any evidence of PTSD, [petitioner] asks us to declare that his counsel's independent failure to make the same diagnosis is an objectively unreasonable mistake, depriving him of his Sixth Amendment right to the effective assistance of counsel. There is no evidence that Dr. Chiappone was incompetent, or that [petitioner's] lawyers had any reason to question Chiappone's professional qualifications.

> We conclude, therefore, that it was objectively reasonable for [petitioner's] trial counsel to rely upon Dr. Chiappone's diagnosis and, further, trial counsel's failure to independently diagnose PTSD was not unreasonable.

*Id.* at 555.

135) This holding is fatal to Matthews' claim. As with trial counsel in *Campbell,* Matthews' trial counsel reasonably relied on Dr. Chutkow, who diagnosed Matthews as suffering from an adjustment disorder and temporary alcohol abuse, rather than from narcissistic personality disorder and alcohol dependence. Matthews has not presented this court with any evidence that Matthews exhibited symptoms which should have caused his counsel to question the reliability of Dr. Chutkow's diagnosis. Counsel cannot be held responsible for procuring a second expert simply because one expert reached a result that Mathews now asserts is inaccurate. *See Horsley v. Alabama,* 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably almost twenty years later is irrelevant."); *Beans v. Black,* 757 F.2d 933, 936 (8th Cir.1985) (holding

---

**48.** *Campbell* was also a capital case.

that counsel's actions were not objectively unreasonable for failing to procure second expert on petitioner's competence when first expert found petitioner competent to stand trial). Furthermore, Matthews' counsel did engage another expert to examine Matthews for organic brain damage. It was reasonable for counsel to end their psychological inquiry with Dr. Chutkow's and Dr. Edelson's conclusions. *Clark,* 425 F.3d at 285–86 ("It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals."); *Lewis v. Alexander,* 11 F.3d 1349, 1353 (6th Cir.1993) (holding that an attorney's reliance on the evaluation of the defendant's medical records by a professional he knew and trusted was not a violation of the Sixth Amendment); *Sidebottom v. Delo,* 46 F.3d 744, 753 (8th Cir.1995) (finding that defense counsel did not render ineffective assistance by not seeking a "second opinion" where counsel reasonably relied on the results of a psychological examination); *Poyner v. Murray,* 964 F.2d 1404, 1419 (4th Cir.1992) ("The mere fact that ... counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance.").

136) Matthews relies heavily on *Caro v. Woodford,* 280 F.3d 1247 (9th Cir.2002), to support his claim that his counsel were defective in preparing Dr. Chutkow. *Caro,* however, is easily distinguishable from the present case. Throughout his life, Caro was exposed to remarkable levels of toxic pesticides and as a child was physically abused by both parents. However, while Caro's counsel was aware of these facts, "he neither investigated fully this history nor informed the experts who examined Caro of those facts that were known to him." *Id.* at 1255. Additionally, "he failed to seek out an expert to assess

the damage done by this poisoning of Caro's brain." *Id.*

137) Matthews' counsel's actions were markedly different. Matthews' counsel indicated to Dr. Chutkow that Matthews had a "substantial alcoholic history," that his mother had adjustment problems after the death of a grandchild, and that Matthews' wife's behavior incensed him; questioned how Matthews' "insecurities and paranoias" contributed to his aggression; provided Dr. Chutkow with the names and contact information for various family members; arranged for Dr. Chutkow to interview family members; and provided Dr. Chutkow with defense interview transcripts. Additionally, Matthews' counsel had him examined for organic brain damage. This is far more extensive investigation and examination than that performed by Caro's counsel. And, based on the circumstances, it appears to have been entirely reasonable.

**c. Utilization of Dr. Chutkow at trial**

138) Finally, Matthews asserts that his counsel were deficient because portions of Dr. Chutkow's testimony were damaging to Matthews' case. The Kentucky Supreme Court rejected this claim, holding:

Matthews next argues that counsel failed to properly prepare Dr. Chutkow and that the psychiatrist destroyed the case by repeating the inculpatory statements made by Matthews. The record demonstrates that counsel attempted to minimize the harmful effects which resulted from the testimony by the doctor because counsel had requested Dr. Chutkow not to bring his entire file to court when he testified, recognizing that it would be the subject of scrutiny by the prosecution. As noted by the Sixth Circuit in *McQueen v. Scroggy,* 99 F.3d 1302, 1303 (6th Cir.1996): "There is no basis for the proposition that when an expert gives less than favorable testimo-

ny, that eliciting the evidence is unconstitutionally ineffective." The contention by Matthews that his trial would have been different but for Dr. Chutkow's testimony is unconvincing. There was more than sufficient evidence to convict Matthews of the double murder and burglary without the testimony of the doctor.

*Matthews II* at 5–6.

139) The court does not dispute Matthews' claim that his case was harmed in many respects by Dr. Chutkow's testimony, particularly his comment that Matthews had not displayed any remorse for his actions. However, the fact that Dr. Chutkow made this statement does not mean that Matthews' counsel were deficient. As noted by the Kentucky Supreme Court, the Sixth Circuit rejected a similar argument in the *McQueen* case. The Sixth Circuit explained:

> Certainly an attorney looks for an expert who will best support his version of the facts. Nonetheless, that expert gives his testimony under oath and under penalty of perjury. McQueen cannot seriously suggest that an attorney must have an expert who will tailor his testimony, in the face of his honest opinion, to suit the defense. Nor can McQueen contend that an attorney is ineffective whenever he decides to call an expert whose opinion does not directly track, on each point, what the defense hoped to prove.

*McQueen v. Scroggy,* 99 F.3d 1302, 1313 (6th Cir.1996), *overruled on other grounds by In re Abdur'Rahman,* 392 F.3d 174 (6th Cir.2004) (en banc), *judgment vacated by Bell v. Abdur'Rahman,* 545 U.S. 1151, 125 S.Ct. 2991, 162 L.Ed.2d 909 (2005).

140) Both Mr. Rivers and Mr. Busse testified that it was difficult to find a psychiatrist who would be willing to testify at a death penalty case in Jefferson County in 1981 or 1982. Busse depo. at 110; Rivers depo. at 52–53. Dr. Chutkow was willing to do so and after his examination was willing to testify that Matthews was suffering from EED at the time of the offenses. Without such expert testimony, Matthews would have had no chance of prevailing on the EED defense. Thus, Dr. Chutkow's expert opinion was generally consistent with the defense strategy at trial. While Matthews claims that his counsel knew that Dr. Chutkow felt compelled to tell the jury that Matthews lacked remorse, Pet. at 83, DN 23, he has not cited anything to support this claim. Furthermore, Matthews' counsel did not directly ask Dr. Chutkow questions about Matthews' remorsefulness. Dr. Chutkow mentioned this fact in response to another question:

> Q: Well, would either his putting the gun away or being taken to Homicide later, the date after he was arrested, and giving a false statement, would either of those stand for the proposition that the diagnosis that you have given just completely doesn't exist?
>
> A: No, the diagnosis still exists, because he knew what the action was. His interpretation of his motives about the action or the need to do this or the purpose of doing it, I think was quite unrealistic, but he knew what he was doing, and this was wrong in a legal sense. I will adhere that in my interviews of David, he has not expressed to me any obvious guilt for what he had done about this. He did not feel any remorse or obvious guilt about it. If there has been any, I haven't seen it.

TE VI at 571–72.

141) Certainly, if the remorse was not there, Dr. Chutkow could not truthfully testify to the contrary. Moreover, although on its face damaging, a lack of remorse in many ways fits with Matthews' theory of the case. Because of his adjust-

ment disorder, Matthews believed that his actions were necessary. Thus, it is not surprising that Matthews did not feel remorse for actions he believed were justified at the time. It should further be noted that not even Dr. Smith was able to testify that Matthews feels remorse for the killings. Indeed, a lack of remorse is one of the characteristics of narcissistic personality disorder, the disorder Matthews now claims was the correct diagnosis. July 21, 2006, Evid. Hrg. at 67.

142) The other instances of damaging testimony by Dr. Chutkow about which Matthews complains occurred when Dr. Chutkow testified to Matthews' recollection of the events immediately preceding the killings. However, Dr. Chutkow had to interview Matthews about those events in order to make a diagnosis regarding whether Matthews was acting under EED at the time that he committed the acts, the determinative question under Kentucky law. Having relied on the interview in reaching his ultimate conclusion, Dr. Chutkow had no basis upon which to shield Matthews' version of the events when he testified at trial. Counsel was essentially faced with two choices, either omit Dr. Chutkow and abandon the EED strategy, or call him knowing that Matthews' version of the events did not paint an altogether flattering picture of their client. Given the overwhelming evidence of guilt against Matthews, if counsel wished to mount any credible case against the murder charges, they had to call Dr. Chutkow

and take their chances.[49] Counsel made a reasoned and informed decision given the choices they faced. Had Matthews' counsel elected not to call Dr. Chutkow, there is no doubt that his counsel would now stand accused of ineffective assistance of counsel for failing to present any expert. *See McQueen*, 99 F.3d at 1313.

143) The court notes that Matthews' case is easily distinguished from both *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), and *Magill v. Dugger*, 824 F.2d 879 (11th Cir.1987), which Matthews cites in support of his argument that his counsel were not adequately prepared to make a reasoned decision whether to call Dr. Chutkow at his trial.

144) In *Skaggs*, during the guilt phase of trial, defense counsel called Elya Bresler, who claimed to be a licensed clinical and forensic psychologist, to testify. "At trial, Bresler testified that Skaggs suffered from a 'depressive disorder' and 'paranoid personality disorder,' both of which would have affected Skaggs' ability to understand the criminality of his actions and to distinguish right from wrong. However, Bresler's testimony was rambling, confusing, and, at times, incoherent to the point of being comical." *Skaggs*, 235 F.3d at 264. Defense counsel elected not to call Bresler during the penalty phase because of his poor performance during the guilt phase. *Id.* The jury could not agree on a penalty, resulting in a mistrial. *Id.* The trial court then convened a second penalty phase jury. *Id.* During the second penalty phase

---

49. At the time of Matthews' trial, the absence of EED was an element of the crime of murder that the prosecution bore the burden of establishing. Nevertheless, in order to implicate that burden, some *prima facia* evidence of the existence of EED had to exist. *Edmonds*, 586 S.W.2d at 27 ("Failure to act under the influence of extreme emotional disturbance is an element of the offense of murder, and if the evidence affords any basis upon which the jury could entertain a reason-

able doubt as to whether appellant acted under the influence of extreme emotional disturbance, the absence of that element must be enumerated as a part of the instruction on murder."). Without Dr. Chutkow's testimony, Matthews had no real evidence of EED. Thus, without Dr. Chutkow, there would be no EED defense—a strategy which would likely have left Matthews in a very precarious position. Defense counsel had no path to follow which did not have risk.

hearing, defense counsel called Bresler, despite his earlier performance. *Id.* The Sixth Circuit held that defense counsel's decision to use Bresler in the guilt phase did not constitute ineffective assistance of counsel because they had no reason to suspect that he would perform the way he did. *Id.* at 268 ("Defense counsel's decision to hire Bresler for the guilt phase of the trial may not have been the best possible choice for Skaggs' defense, but in light of all the circumstances, we cannot say that the decision was an "error[ ] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." ") (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). However, the Sixth Circuit held that counsel's decision to use him in the second penalty phase hearing was ineffective given that they were on notice of the harmful and bizarre nature of his earlier testimony. *Id.* at 270, 104 S.Ct. 2052. This case is in no way similar.

145) In *Magill,* Hale Standi, then a part-time assistant public defender, was selected to defend Magill. *Magill,* 824 F.2d at 883. Standi was faulted by the Eleventh Circuit for calling a court-appointed psychiatrist during the penalty phase who testified that Magill was not under the influence of an extreme emotional or mental disturbance at the time of the crime. *Id.* at 889–90. During the habeas proceedings, this psychiatrist testified that he had never been interviewed by Stancil or even asked to formulate an opinion on the EED issue. *Id.* The Eleventh Circuit held that Stancil's failure to discover the psychiatrist's opinion prior to calling him to the stand was deficient. *Id.*

146) In contrast to *Skaggs* and *Magill,* Matthews' counsel worked with Dr. Chutkow for over a year and specifically asked him to render an opinion regarding whether Matthews was acting under EED at the time of the offenses. He rendered an opinion that Matthews was acting under EED, and Matthews has not provided this court with any evidence to support his contention that his counsel should have been on notice that Dr. Chutkow would perform poorly on the stand. Their decision to call him was reasoned in light of the fact that his overall conclusions and testimony supported the defense theory.

147) In sum, the court concludes that Matthews' counsel acted reasonably in selecting, preparing, and relying on Dr. Chutkow and Dr. Edelson.

148) Additionally, the court notes that even if counsel were deficient, it does not appear that the deficiency prejudiced Matthews. While Dr. Smith emphasized that Matthews was a drug and alcohol addict, not just a temporary abuser, this is largely a distinction without a difference under Kentucky law. The determinative question in the guilt phase was whether Matthews was legally intoxicated at the time of the offense. In Kentucky, being a drug addict is not itself a defense during the guilt phase of the trial. *Commonwealth v. Tate,* 893 S.W.2d 368 (Ky.1995). Further, Dr. Smith's diagnosis that Matthews was suffering from narcissistic personality disorder may not have been viewed entirely favorably by the jury. Many of the traits associated with that disorder are negative: a constant need for attention; overreaction or being enraged to any slight real, or imagined; grandiosity; lack of empathy; disregard for others; exploitativeness; a sense of entitlement; an inability to tolerate setbacks; difficulty working with others; holding the sensitivities and needs of others in contempt; and a lack of remorse. July 21, 2006, Evid. Hrg. at 67. Branding Matthews with these traits actually could have worked to his disadvantage.

149) Moreover, Dr. Chutkow's explanation of how Matthews' adjustment disorder and alcohol abuse contributed to the shoot-

ings is remarkably similar to Dr. Smith's explanation regarding how a person with narcissistic personality disorder behaves. This is particularly important in assessing the prejudice element because under Kentucky law the presence or severity of a mental disease or illness has no actual legal significance to the EED defense. *Wellman,* 694 S.W.2d at 697 ("The contention that mental illness and extreme emotional disturbance are one and the same is without merit."). Extreme emotional disturbance is established by proving that the defendant suffered from a "temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan,* 715 S.W.2d at 468.

150) Dr. Chutkow testified that at the time of the shootings Matthews was suffering from a distorted view of his wife and mother-in-law and was experiencing "progressively, extreme tension, irritability, and almost a kind of fear of his late wife" that along with the drugs and alcohol weakened his ability to control his emotions. TE VI at 562–69. Likewise, Dr. Smith testified that narcissists "can respond in a sudden rage and react and overact to a misperception of a situation without giving much time or consideration to their actions." July 21, 2006, Evid. Hrg. at 78–80. Even though the labels are different, the explanations given by Dr. Chutkow and Dr. Smith are quite similar. Thus, regardless of whether one labels Matthews as suffering from an adjustment disorder or narcissistic personality disorder, the determinative question is whether at the time of the shootings he was so overcome with emotion that he was unable to control his actions, a question Matthews' jury answered in the negative. The court

does not find that there is a reasonable probability that a diagnosis of narcissistic personality disorder would have altered the jury's finding on the EED question.

151) The Kentucky Supreme Court's decision to reject this claim was not an unreasonable application of clearly established federal law. As such, the writ should not issue on this basis.

### 3. Counsel failed to strike Juror Kavich for cause [50]

■■■ 152) Matthews argues that his counsel should have moved to strike Juror Francis Kavich for cause or used one of their peremptory strikes against him based on the unfavorable opinions he expressed about drug and alcohol abuse during *voir dire.* The relevant portion of the *voir dire* is set out below:

DEFENSE COUNSEL: Now, there will be evidence of alcohol and drug use in this case. Is there anyone here that believes that someone who is a heavy user of drugs and alcohol is a pretty worthless individual?

JUROR KAVICH: You mean at the time or later?

DEFENSE COUNSEL: Well, I'm asking you now, simply in general proposition, as someone who uses drugs or alcohol heavy, are they a pretty worthless individual?

JUROR KAVICH: At the time, yeah, I will say yes.

MR. RIVERS: Okay, yes, sir.

VENIREMAN DURHAM: What do you qualify? Don Durham. How do you qualify? How do you beat that?

DEFENSE COUNSEL: Well, I will leave that up to you at this point. Can you all agree that addiction to drugs and alcohol is a disease?

VENIREMEN: No response.

---

**50.** This claim is set forth at Pet. at 111–13, DN 23.

DEFENSE COUNSEL: Is there anyone who doesn't believe that?

VENIREMEN: No response.

DEFENSE COUNSEL: That believes that drug addiction or alcohol addiction is not in any sense of this case?

VENIREMEN: No response.

DEFENSE COUNSEL: Do you agree that a crime committed by someone who is under the influence of drugs and alcohol is more serious than if they hadn't been under that influence, using drugs and alcohol as an aggravating factor in a crime; is there anyone who believes that?

VENIREMEN RUSSELL: I believe that.

DEFENSE COUNSEL: Is there anyone else who believes that?

. . .

THE COURT: Well, Ladies and Gentlemen, if there is evidence with reference to what counsel is talking about, the Court, of course, will give you proper instructions regarding it, assuming that it reaches the stage where such instructions should be given. Will all of you agree to follow the Court's instructions?

VENIREMEN: No response.

THE COURT: Thank you.

TE II at 154–58. Matthews claims that Juror Kavich "strongly and unmistakably indicated that he would be unable to consider an intoxication defense or any mitigating evidence of drug and alcohol abuse" during *voir dire* and should have been stricken from the panel. Pet. at 112, DN 23.

153) In rejecting this claim the Kentucky Supreme Court held as follows:

Matthews contends that his counsel was ineffective because they failed to strike a juror for cause. An examination of the entire *voir dire* exchange indicates that it was within the purview of reasonable trial strategy to allow the juror in question to remain on the jury. It should be noted that the defense counsel did move to strike another juror for cause indicating that the decision not to strike this juror was trial strategy and not an oversight.

*Matthews II* at 8.

154) "An attorney's actions during *voir dire* are considered to be matters of trial strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir.2001) (internal citations omitted). Matthews' claim of ineffective assistance of counsel is that his counsel failed to strike a biased juror. "To maintain a claim that a biased juror prejudiced him, however, [Matthews] must show that the juror was actually biased against him." *Id.* (quoting *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir.1995)). In determining whether a juror is biased, the question "is plainly one of historical fact." *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). If "a juror [swore] that he could set aside any opinion he might hold and decide the case on the evidence, and [if] the juror's protestation of impartiality [should be] believed," then the juror is not considered biased. *Id.* A juror is considered to be biased if he cannot "conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

155) While Juror Kavich indicated a belief that people who abuse alcohol and drugs are pretty worthless at the time they are intoxicated, he never indicated that this belief would prevent him from following the trial court's instructions regarding the law. To the contrary, Juror Kavich indicated by his silence to the trial court's question that he would follow the law as instructed by the court. This fact

is fatal to Matthews' claim that his counsel should have stricken Juror Kavich for cause. *United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir.1995) (finding no juror bias where "every juror who served on the case indicated that he or she could, and would, make a verdict based solely on the evidence and instructions"). Additionally, despite his expressed views about people who abuse drugs and alcohol, Juror Kavich indicated agreement with the principle that drug and alcohol addiction is a disease. TE II at 155. Perhaps even more importantly, he raised his hand in the affirmative when counsel asked how many jurors believed that psychiatrists can bring more understanding to why people act in certain ways. *Id.* at 160. Given that Matthews' defense depended largely on the jury accepting Dr. Chutkow's testimony, it was reasonable for counsel to decide that Juror Kavich would be a fair juror despite his general beliefs about drug and alcohol abuse. In short, Matthews' counsel did not act unreasonably in electing not to strike Juror Kavich for cause. The Kentucky Supreme Court's decision to reject this claim was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent.

### 4. Counsel failed to request and tender adequate intoxication instructions [51]

156) Matthews argues that his counsel failed to request and tender a proper intoxication defense instruction during the guilt phase of the trial. Instruction No. 12 stated in relevant part, "although you might otherwise find the defendant guilty under instruction numbers 1, 3, 4, 5, 7, 8 or 9, if at the time ... [the defendant committed those offenses], the defendant was so intoxicated that he did not have a conscious intention to commit these crimes then you shall find him not guilty under these instructions." TR II at 252. Citing KY.REV.STAT. § 500.070, Matthews argues that respondent had the burden of proving the non-existence of intoxication beyond a reasonable doubt.[52] Accordingly, Matthews contends that his jury was not appropriately instructed that it was the Commonwealth's burden to prove the non-existence of the defense. He also appears to suggest that the intoxication defense should have been listed as a negative element of each of the intentional crimes instead of as a separate instruction. Thus, Matthews argues that his counsel were deficient in failing to request and tender an adequate intoxication defense instruction.

157) The Kentucky Supreme Court reviewed this claim on appeal from the denial of Matthews' RCr 11.42 motion. In rejecting the claim, the Kentucky Supreme Court held:

The intoxication instructions were proper. Merely because the intoxication instruction was not set out as an element of the crime does not make the jury

---

**51.** This claim is set forth at Pet. at 168–70, DN 23.

**52.** This statute provides:

500.070. Burden of proof—Defenses.
(1) The Commonwealth has the burden of proving every element of the case beyond a reasonable doubt, except as provided in subsection (3). This provision, however, does not require disproof of any element that is entitled a "defense," as that term is used in this code, unless the evidence tend-

ing to support the defense is of such probative force that in the absence of countervailing evidence the defendant would be entitled to a directed verdict of acquittal. (2) No court can require notice of a defense prior to trial time. (3) The defendant has the burden of proving an element of a case only if the statute which contains that element provides that the defendant may prove such element in exculpation of his conduct.
KY.REV.STAT. § 500.070.

instructions improper. *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668 (1994). There was no error on the part of the defense counsel in failing to raise an objection to the instruction.

*Matthews II* at 7.

158) At the time of Matthews' trial, the law in Kentucky was clear regarding how a trial court was to instruct a jury when intoxication was a possible defense. *See Brown v. Commonwealth*, 575 S.W.2d 451, 452 (Ky.1978). In *Brown*, the Kentucky Supreme Court held where the defendant produces evidence sufficient to require that the defense of voluntary intoxication be submitted to the jury, it must be accompanied by an instruction in substantially the following form:

> Although you might otherwise find the defendant guilty of murder under Instruction 1(b)(I) or first degree manslaughter under Instruction 2(b), if at the time he killed X (if he did so) he was so drunk that he did not have the intention of committing a crime, you shall find him not guilty under those instructions.

*Id.* The intoxication instruction given in Matthews' case models the instruction mandated by the Kentucky Supreme Court in *Brown*.[53] Matthews' counsel were not deficient in failing to request an instruction that differed from the instruction the Kentucky Supreme Court required at the time. The Kentucky Supreme Court's decision to reject this claim was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent.

## 5. Failure to object to Commonwealth's misstatements of law regarding EED during closing arguments[54]

159) Matthews' next complaint is that his trial counsel failed to object to the prosecutor's guilt-phase closing argument discussing extreme emotional disturbance. Matthews claims that in its closing argument, the Commonwealth misstated the law by interjecting an objective standard into the extreme emotional disturbance definition. In rejecting this claim, the Kentucky Supreme Court found that Matthews' counsel were not deficient because EED has both an objective and a subjective competent:

> Matthews asserts that the prosecution misstated the law of extreme emotional disturbance and that defense counsel should have objected. We disagree. The prosecutor did not misstate the law, he only observed that there is an objective element to the extreme emotional disturbance standard. The statements made by the prosecutor in closing argument relate to the first prong of the test which is an objective one and the prose-

---

53. Several years later, the Kentucky Supreme Court explained how the required instruction adequately places the burden of proof on the Commonwealth:

> Appellant asserts that since the Commonwealth has the burden to disprove the defense of intoxication ... the absence of intoxication should have been included as an element of the offense of murder. However, it is the presence of intent, not the absence of intoxication, that is the relevant element of the offense. If intoxication negates intent, it would be redundant to instruct the jury that the Commonwealth

must prove both intent and the absence of intoxication. The separate instruction on intoxication explains to the jury how that defense affects the element of intent. *Brown v. Commonwealth, supra*, 575 S.W.2d at 452. It is unnecessary to repeat that explanation in the instruction on the primary offense. *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 672 (1994).

*Slaven v. Commonwealth*, 962 S.W.2d 845, 857 (Ky.1997).

54. This claim is set forth at Pet. at 183–87, DN 23.

cutor argued that there was no reasonable emotional disturbance claimed by the accused.

*Matthews II* at 7. Indeed, in *Gall I*, the Kentucky Supreme Court recognized that the test for extreme emotional disturbance has both an objective and a subjective component:

> The test set forth is an objective one: Is there a 'reasonable explanation or excuse' for the mental or emotional disturbance? But, in making that determination, the triers of fact are required to place themselves in the actor's position as he believed it to be at the time of his act. This is intended to replace the common law requirement that the provocation must be of a nature calculated to inflame the passions of the ordinary reasonable man.

*Gall I,* 607 S.W.2d at 108 (quoting KY.REV. STAT. § 507.030, Commentary (1974)).

160) The test for extreme emotional disturbance under Kentucky law at the time of Matthews' trial was not purely subjective as Matthews argues. Accordingly, it was not improper for the Commonwealth to discuss or highlight the objective prong of the test in its closing argument. Likewise, it was not deficient for Matthews' counsel to fail to object to arguments that were legally accurate. The Kentucky Supreme Court's decision to reject this claim was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent.

### 6. Failure to place excluded evidence into the trial record by avowal [55]

161) Matthews argues that his counsel were deficient because they failed to place into evidence by way of avowal certain testimony from Eddie Peltier, Glenn Turner, and Laverne Matthews that the trial court excluded.

During defense counsel's direct examination of Eddie Peltier the following exchange took place:

Q: Being close friends of David's did you have occasion to be together with him and Marlene when they were on better terms?

A: Well, really, I have only been around David twice, because she didn't like me. She didn't want me to come around, because she said I took him out and got him drunk all of the time.

Q: Okay. When you did see them together, how did Marlene treat David?

A: Well, she didn't let him go nowhere, if that's what you mean. She pulled down the shade and locked the door just like a prisoner. She wouldn't answer the door, and she would come out and tell us to leave, he's not going nowhere.

Q: What sorts of things would she say to him?

MR. MORRIS [56]: Objection, Judge, without a more appropriate foundation for that question.

THE COURT: About when sir? He said he saw them together twice, so maybe we can find out when that was.

Q: Do you recall when it was since you saw them together?

THE COURT: About when sir? What year, what month, things of that nature?

THE WITNESS: This has been a couple of years ago.

MR. MORRIS: Objection, Judge.

THE WITNESS: When they was living around the corner from his mother in that little house there.

THE COURT: I suspect I will sustain the objection.

MR. MORRIS: Thank you, Judge. Will you admonish the Jury please?

---

**55.** This claim is set forth at Pet. at 187–89, DN 23.

**56.** Mr. Morris was the prosecutor at Matthews' trial.

THE COURT: The Jury will not consider those questions or answers relative to what happened two years ago.

TE IV at 375–76. Defense counsel did not attempt to preserve the testimony Mr. Peltier would have given by way of avowal.

162) Likewise, during the direct examination of Murray Turner the Court restricted Mr. Turner to testifying about the two warrants that Marlene took out against Matthews in 1981. TE VI at 606. Matthews' counsel did not attempt to elicit avowal testimony from Turner about the specifics of the warrants taken out by Marlene against Matthews prior to 1981. It is important to note, however, that even given the trial court's restriction to 1981, Mr. Turner testified he was "hired by Marlene to represent David against Marlene" several times. TE VI at 610. This necessarily implied that Marlene had taken more than the two 1981 warrants out against Matthews. Additionally, Mr. Turner testified that "I have represented David, you know, when Marlene would bring charges against him, and I believe *some of those were in 1981." Id.* at 608 (emphasis added). Again, this established that additional warrants were taken out by Marlene prior to 1981.

163) Finally, on re-direct examination by defense counsel, the trial court limited Laverne Matthews' testimony concerning her conflicts with Marlene:

Q: Now, had you had any problems yourself with Marlene?

A: No sir, only she jumped on me all the time. She would jump on me over him.

Q: Okay. Did you ever have occasion to take a warrant against Marlene?

A: Yes, sir.

Q: And what was that about?

MR. MORRIS: Objection. Judge.

THE COURT: Come around, Gentlemen.

. . .

THE COURT: Now, I will just ask that you Gentlemen to remember we are trying this case and try not to try some other cases, but anything that's communicated to what was communicated to the defendant which may have had some bearing upon this state of mind at the time of the alleged homicide, of course, is relevant and will be admissible.

MR. RIVERS: I can question her about had she talked to David.

THE COURT: Yes.

MR. BUSEE: Without going into specific warrants and so forth.

THE COURT: I think you shouldn't; you might get in trouble.

TE VI at 294–98. Matthews' counsel did not attempt to preserve the excluded testimony by way of avowal. However, Laverne Matthews went on to testify that she had problems with Marlene, that Matthews was aware of those problems, and that Marlene called her house so many times that she had to change her telephone number. *Id.* at 294–300.

164) In rejecting Matthews' avowal claim, the Kentucky Supreme Court held as follows:

Next, Matthews maintains that his counsel was ineffective because of a failure to present avowal testimony. A careful review of the record does indicate that counsel put in avowal testimony when necessary. The testimony of Peltier and Turner was of no value because Peltier admitted that the wife did not like him and Turner was permitted to testify about events in 1981 which could bear on the mental state in question but not to remote events which would not have been probative.

*Matthews II* at 7–8.

165) Matthews claims that trial counsel's failure to present the specific, excluded evidence on avowal amounts to in-

effective assistance of counsel because it prevented the trial court from reconsidering its decision and the Kentucky Supreme Court from considering the specific nature of the excluded evidence on appeal. Even if the Court assumes that counsel's failure to place the excluded testimony in the record by avowal was deficient, Matthews still cannot prevail on this claim because the alleged deficiency did not prejudice Matthews. It is unlikely that the trial court would have reversed its decision to allow the excluded testimony had Matthews placed it into the record by avowal. Moreover, even if it had, Matthews has utterly failed to demonstrate that, had the jury heard this evidence, there is a reasonable probability that he would not have been convicted of murder and sentenced to death.

166) Throughout the course of the trial the jury heard ample evidence of the marital troubles between Marlene and Matthews, that Marlene swore warrants out against Matthews, and that the Cruse and Matthews families did not get along. The evidence Matthews claims should have been placed in the record by avowal was simply cumulative to that already introduced, and it was not likely to have changed the jury's decision. Additionally, Matthews has failed to demonstrate that, had the evidence been placed into the record by way of avowal, it would have changed the outcome of his direct appeal. Despite his counsel's failure to place the excluded evidence into the record by avowal, the Kentucky Supreme Court considered the propriety of its exclusion:

> Appellant claims that he was prevented from presenting certain evidence tending to further explain why he acted under extreme emotional disturbance. This claim of error runs to objections sustained as to certain details of the testimony from appellant's mother, from a longtime friend, and from a former attorney who had been involved in representing both the appellant and his wife when various domestic warrants between the two surfaced in court. . . . In this case, the trial court permitted extensive presentation of evidence regarding previous domestic difficulties. The instances which are the subject of appellant's complaint were remote transactions between third parties and the deceased wife. Connection to appellant's state of mind at the time of the crime was nonexistent. If anything, the trial court permitted the appellant greater latitude than was reasonable in presenting evidence from third persons as to their problems with Marlene. Certainly, the trial court did not abuse its discretion with regard to those instances of which the appellant complains.

*Matthews I*, 709 S.W.2d at 419. Thus, even though the excluded evidence was not placed into the record by avowal, the Kentucky Supreme Court was able to adequately discern from the record its nature and to reach a reasoned conclusion that its exclusion by the trial court was proper.

167) In conclusion, the Kentucky Supreme Court's decision that counsel's failure to place the excluded evidence into the record by way of avowal did not prejudice Matthews, was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent.

### 7. Failure to request an admonition on the sex abuse and burglary warrants [57]

168) Next, Matthews complains that his counsel failed to request a limiting admonition regarding the purposes for which evidence pertaining to the sex abuse and burglary warrants against him could be

---

57. This claim is set forth at Pet. at 195–200, DN 23.

used. Matthews contends that the jury should have been instructed that the warrants could only be considered for the purpose of showing Matthews' state of mind.

169) The Kentucky Supreme Court reviewed and rejected this claim as it relates to the sexual abuse warrant on appeal from the denial of Matthews' RCr 11.42 motion:

> Matthews also claims that counsel was ineffective for failing to seek an admonition in regard to certain sexual abuse warrants to the effect that they were only to be considered as evidence of his state of mind. This Court found in the direct appeal that the evidence was admissible not only for the limited purpose of showing state of mind, but also as part of the immediate circumstances surrounding the crimes.

*Matthews II* at 8. Indeed, in *Matthews I*, the Kentucky Supreme Court held that:

> It is quite evident that the warrant issued at the behest of Marlene, charging the appellant with sexual abuse of his stepdaughter, and the court order to stay away from Marlene's house which resulted from this warrant, in the time framework of this case, *are relevant not only as evidence of motive or state of mind, but as part of the immediate circumstances bearing on the crimes charged.*

*Matthews I*, 709 S.W.2d at 414 (emphasis added). Because the sexual abuse warrant was admissible under state law to establish more than just Matthews' state of mind, it was not error for Matthews' counsel to fail to request an admonition that the warrant be considered only to prove state of mind. And, as discussed later in this report and recommendation, the sexual abuse warrant was clearly also relevant to prove motive and its introduction for that purpose did not violate Matthews' constitutional rights. *See infra* Part III.E.2.b. Accordingly, Mat-

thews' counsel were not deficient and the Kentucky Supreme Court properly rejected this aspect of his ineffective-assistance-of-counsel claim.

170) Matthews also argues that his counsel should have requested an admonition regarding the burglary warrant. Matthews attempts to explain the basis of this contention in his petition: "the Kentucky Supreme Court stated that this was part of the 'circumstances which evidenced the existing difficulties between the petitioner and his wife'... yet no limiting instruction was requested to restrict the jury's consideration of the evidence in this regard. Accordingly, the jury was free to consider the evidence of a prior bad act for all purposes." Pet. at 198, DN 23. The court is unclear what admonition Matthews believes his counsel should have requested in relation to the burglary warrant. Because the Kentucky Supreme Court did not address this aspect of Matthews' ineffective-assistance-of-counsel claim, the court will review it *de novo. See Maples*, 340 F.3d at 436.

171) Matthews has selectively quoted the Kentucky Supreme Court decision regarding the admissibility of the burglary warrant. A reading of the opinion in *Matthews I* reveals that the Kentucky Supreme Court found that the burglary warrant was admissible to establish more than just the domestic difficulties between Matthews and Marlene. *Matthews I*, 709 S.W.2d at 414. The Kentucky Supreme Court explained the relevancy of the burglary warrant as follows:

> Next, regarding the warrant charging the appellant with burglary of the same house on an occasion three days before the occurrence of the burglary and murders with which we are presently concerned, although there was no direct evidence that appellant was aware that this burglary warrant was outstanding,

the circumstances that led to the warrant, and the warrant itself, reflected on a relevant pattern of conduct. It was part of the circumstances which evidenced the existing domestic difficulties between the appellant and his wife. As such, it bears a direct relation to the events of the tragedy and was admissible. *Dye v. Commonwealth*, Ky., 477 S.W.2d 805 (1972). Indeed, appellant was using the supposedly unjustified bringing of warrants to explain his emotional state.

Standing alone, the prior burglary warrant may have had little evidentiary value. *But there was other evidence tying the appellant to this previous break-in, and there were striking similarities between the vandalism on the previous occasion and the vandalism on the occasion of the burglary charged in the present indictment.* There was no error in admitting the burglary warrant in the particular circumstances of this case. *The general rule foreclosing evidence of other, unrelated crimes, does not apply. Dye v. Commonwealth, supra.*

*Id.* (emphasis added). Thus, under state evidentiary law the burglary warrant was admissible to show similar prior acts by Matthews that resembled one of the crimes at issue in the trial (burglary). And, as discussed later in this report and recommendation, introduction of the warrant for this purpose did not violate Matthews' constitutional rights. *See infra* Part III.E.2.a. Because the burglary warrant was admissible for these purposes under state law, Matthews' counsel were not deficient for failing to request an admonition limiting the jury's consideration of the warrant to show only state of mind. The Kentucky Supreme Court properly denied relief on this claim.

## 8. Ineffective assistance of appellate counsel [58]

172) Finally, Matthews argues that he received ineffective assistance of appellate counsel on direct appeal from his final judgment. On review of the denial of Matthews' RCr 11.42 motion, the Kentucky Supreme Court found that ten issues were procedurally defaulted because they could have been raised on direct appeal, but were not. *See Matthews II* at 9–13. Matthews now argues that his appellate counsel's failure to raise eight of those ten issues on direct appeal violated Matthews' constitutional right to effective assistance of appellate counsel. Pet. at 123 n. 47, 258. The eight issues Matthews claims appellate counsel should have raised on direct appeal are: a) the trial court's failure to define EED; b) that the jury was improperly qualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny; c) that the jury instructions impermissibly implied that the jury had to be unanimous as to the mitigation requirements; d) that the jury instructions did not explicitly state that Matthews was to be presumed innocent of the aggravating circumstances; e) that the trial court should have instructed the jury on the elements of first degree burglary as an aggravator in the penalty phase instructions; f) that the jury instructions should have explained or defined mitigation; g) that the jury should have been instructed that, if they had any doubt, as opposed to reasonable doubt, it would render death inappropriate; and h) that the jury should have been instructed that if any juror believed a death sentence was not warranted, a sentence of twenty or more years must be imposed. *Id.*

173) First, the court considers respondent's argument that the ineffective-assistance-of-appellant-counsel claims have

---

58. This claim is set forth at Pet. 123, n. 7 and 257–66, DN 23.

been procedurally defaulted because they were not raised before the Kentucky Supreme Court. The court finds this argument unpersuasive because the Kentucky Supreme Court has held that "RCr 11.42 cannot be used as a vehicle for relief from ineffective assistance of appellate counsel." *Harper v. Commonwealth,* 978 S.W.2d 311, 318 (Ky.1998); *see also McElrath v. Simpson,* No. 5:05Cv–P60–R, 2006 WL 753086, *10–11, 2006 U.S. Dist. LEXIS 24135, *29–30 (W.D.Ky. March 21, 2006) (holding that claims of ineffective assistance of appellate counsel not cognizable in Kentucky state courts).

■■■ 174) In order to establish a Sixth Amendment violation, it must be shown both that appellate counsel's representation fell below an objective standard of reasonableness and that his deficiencies prejudiced the defendant. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. "As the Supreme Court has recently observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. In such cases, the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present.'" *Caver,* 349 F.3d at 348 (quoting *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)). "With respect to prejudice in the context of ineffective assistance of appellate counsel, a defendant must show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal." *Mapes v. Tate,* 388 F.3d 187, 194 (6th Cir.2004).

175) In *Mapes v. Coyle,* 171 F.3d 408, 427–28 (6th Cir.1999), the Sixth Circuit held that the following considerations ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently:

(1) Were the omitted issues "significant and obvious"?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

### a. Trial court's failure to define EED

176) Matthews asserted in his petition that appellate counsel's failure to raise the issue of the trial court's failure to define EED on direct appeal was ineffective assistance of counsel. Pet. at 123 n.47, DN 23. After two days of testimony on the issue of ineffective assistance of appellate counsel, DN 122, 126, Matthews submitted a brief focusing on appellate counsel's failure to raise the lack of an EED definition, DN 130. Matthews also filed two motions for this court to take judicial notice of six briefs on appeal to the Kentucky Supreme Court, filed between 1981 and 1986, roughly the same period of time during which Matthews' appeal was pending, which challenged the absence of a definition of EED.

DN 119 & 127. This court granted those motions, emphasizing that no ruling was made as to the appropriate weight to be given to those briefs or on the underlying claim. DN 128.

177) At the evidentiary hearing, Matthews presented the evidence of four of his appellate attorneys: Frank Heft, Jr., Randall Wheeler, Kathleen Kallaher, and Deborah Hunt. Heft testified that, at the time he represented Matthews on appeal, he had been practicing law a little over six years in the appeals division of the Jefferson County Public Defender's Office. DN 126 at 9. Heft withdrew as counsel in July or August 1983 before the briefs were filed in Matthews' case because of a conflict of interest centering on his belief that other attorneys in the Jefferson County Public Defender's Office, who had represented Matthews at trial, had rendered ineffective assistance regarding the handling of Dr. Chutkow's testimony. Id. at 11. Because Heft withdrew as counsel, Department of Public Advocacy attorneys Wheeler and Kallaher ended up taking the appeal;[59] Heft did not remember either of them contacting him about the appeal. Id. at 15–17. Heft testified that given that trial counsel had filed a motion to declare the Kentucky statute unconstitutional for failing to define EED, he would have considered the issue of the failure to define EED well-preserved, significant, and obvious and he would have raised the issue had he continued to represent Matthews. Id. at 21–22. Heft filed the brief in the McClellan[60] case, which raised the issue of the failure to define EED. Id. at 28–29.

178) Wheeler testified that he had been an attorney for about six years when he began handling Matthews' appeal. DN 122 at 15. He had not done any direct criminal appeals before Matthews' case. Id. at 16–17. Wheeler stated that in conducting the appeal he read the entire record, and that in doing so he realized that the failure to define EED was a preserved error. Id. at 22, 32. He stated that he and his co-counsel did not consider raising the failure to define EED on appeal and that the first he recalled of the issue was when McClellan was decided. Id. at 43–44. He stated that they had no justification for not raising the issue except that they had not identified it as an issue. Id. at 45. He explained that he remembered discussing some of the appeal issues with Matthews, although he could not remember which ones. Id. at 24.

179) Kallaher testified that at the time she joined Wheeler and Hunt in representing Matthews on appeal she had been practicing law about 14 or 15 months. Id. at 64. She stated that she had worked on one other capital appeal. Id. at 65. She worked on preparing for oral argument and on the petitions for rehearing and writ of certiorari. Id. at 66–67. She testified that in so doing she read the entire record. Id. at 68. She also testified that she did not make a decision not to raise the omitted issues because she did not spot them. Id. at 77.

180) Deborah Hunt testified that when she represented Matthews on his direct appeal, she had about three years of experience as an attorney. DN 126 at 32, 34.

59. Hunt and Wheeler prepared Matthews' direct appeal brief and reply brief. Wheeler and Kallaher prepared two motions for leave to cite supplemental authority to the Kentucky Supreme Court, a supplemental brief and a petition for rehearing and modification or extension.

60. As previously explained in this report and recommendation, in McClellan, the Kentucky Supreme Court finally defined the term "EED." McClellan was decided in 1986, just a year after the Kentucky Supreme Court affirmed Matthews' convictions and sentence on direct appeal.

She had handled some capital murder cases that had settled, some noncapital murder appeals, and may have worked on another capital murder appeal contemporaneous with Matthews' appeal. *Id.* at 34–35. She stated she had no specific memory as to why the issue of the failure to define EED was not raised, nor did she remember any strategic or tactical reason for excluding it. *Id.* at 43–45. She stated that she met with Matthews regarding his appeal, but that he did not reject any issues for appeal and she thought he trusted them to handle his appeal. *Id.* at 38.

181) Here, considering the first of the *Mapes* factors, Matthews presented evidence that the issue of the failure to define EED was " 'significant and obvious' " given that appellate counsel testified that they should have raised it and that other appellate attorneys were raising the issue as evidenced by the six briefs filed into the record. DN 122 at 45 (Wheeler); DN 126 at 21–22 (Heft); DN 130 at 6–7. The second *Mapes* question is closer: whether counsel had a duty to raise the issue, despite the contrary ruling in *Edmonds,* 586 S.W.2d at 27, in which the Kentucky Supreme Court held no definition of EED was required. However, other attorneys [61] were raising the issue in an attempt to change the Kentucky Supreme Court's mind, and in fact successfully did so, when, very shortly after Matthews' appeal was final, the Kentucky Supreme Court defined the term in *McClellan.*

182) Third, it appears that the failure to define EED was a stronger and more compelling issue than many of the thirty-seven issues which were raised on appeal given that, not long after Matthews' petition for rehearing was denied, the Kentucky Supreme Court decided *McClellan,* yet most of the issues in Matthews' case were denied without discussion by the Kentucky Supreme Court.

183) Fourth, the issue of the lack of a definition for EED was objected to at trial, and, fifth, the trial court's ruling would not have been subjected to deference on appeal as it was a purely legal issue. Sixth, according to counsel's testimony, there was no strategic decision to omit the issue because, as counsel testified, they failed to spot the issue. DN 122 at 43–45 (Wheeler), 77 (Kallaher); DN 126 at 43–45 (Hunt). Seventh, Matthews' appellate attorneys did not have a great deal of pertinent experience. DN 122 at 15–17 (Wheeler), 64–65 (Kallaher); DN 126 at 32, 34–35 (Hunt).

184) Eighth, while the appellate attorneys did discuss some of the appeal issues with Matthews, the issue of the failure to define EED would not have been discussed since appellate counsel did not identify that as an issue. Ninth, Wheeler and Kallaher both testified that they had reviewed the entire record. DN 122 at 22 (Wheeler), 68 (Kallaher). Tenth, the EED-definition issue was not dealt with in another assignment of error. Lastly, the evidence arguably supports a conclusion that the decision to omit the issue was "an unreasonable one which only an incompetent attorney would adopt."

185) Thus, most of the factors identified in *Mapes v. Coyle, supra,* weigh in favor of Matthews. The court will now turn its attention to whether prejudice occurred. Matthews argues that he was prejudiced by the failure to raise this issue because: 1) he was denied the opportunity to present the issue as an outright denial of due process under the Fourteenth Amendment and as one resulting in an arbitrary death sentence under the Eighth Amendment;

---

**61.** Indeed, Matthews' own trial counsel were astute enough to preserve this issue for appeal during his trial.

and 2) it denied him the opportunity to present the issue under the corresponding provisions of the Kentucky Constitution. Given that, on June 12, 1986, three weeks after the Kentucky Supreme Court denied Matthews' petition for rehearing, the Kentucky Supreme Court issued *McClellan*, defining EED, it cannot be said that prejudice to Matthews did not occur. The *McClellan* Court stated that it now believed that it was wrong in its *Edmonds* decision to have said that the definition of the term was unnecessary "because we know it when we see it" since that overlooked the fact that it is not the court but a jury that must make the factual determination whether the defendant acted under EED. *McClellan*, 715 S.W.2d at 467. The *McClellan* court also stated, "Without some standard or definition a jury is left to speculate in a vacuum as to what circumstances might or might not constitute extreme emotional disturbance. Since the General Assembly did not define the term, it becomes necessary for the court to do so." *Id.*

186) Thus, the court finds that Matthews has demonstrated "a reasonable probability that, but for his counsel's defective performance [in failing to raise the EED issue], he would have prevailed on appeal." *Mapes v. Tate*, 388 F.3d at 194. The court recommends granting the writ on this issue.[62]

## b. Remaining ineffective-assistance-of-appellant-counsel claims

187) Matthews makes no attempt whatsoever to demonstrate that the remaining seven omitted claims were stronger than the thirty-seven claims that his appellate counsel chose to present on direct appeal. Appellate counsel's failure to raise a non-frivolous issue in and of itself is not ineffective because appellate counsel is not obligated to raise each and every nonfrivolous issue identified on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. 746 ("Appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). "Indeed, the process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . is the hallmark of effective appellate advocacy." *Caver*, 349 F.3d at 348 (quoting *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)). Matthews has not shown that the remaining seven omitted claims resulted from anything other than the necessary winnowing by appellate counsel.

188) Moreover, even if appellate counsel's failure to include the remaining seven omitted claims was deficient, Matthews cannot show prejudice because there is not a reasonable probability that any of the seven would have been successful on appeal.

189) *The* Witherspoon *claim.* Matthews claims that he was sentenced to death by an improperly qualified jury under *Witherspoon* and its progeny. Although not well articulated in his habeas petition, this claim appears to be based on the fact that the jury panel was not questioned whether they would automatically impose the death sentence without considering other sentences. A review of the entire *voir dire*, however, demonstrates that Matthews' jury was properly qualified and questioned regarding their ability to impose the range of penalty options. Each

---

**62.** This recommendation is not inconsistent with the Court's recommendation that the writ should not issue on Matthews' argument that the trial court's failure to define "EED" was unconstitutional. *See supra* Part III.C.

Here, appellate counsel's failure to raise the issue on direct appeal denied Matthews the opportunity to present the lack of a definition to the state court as a state law issue.

juror was individually questioned by the judge outside the presence of the other jurors.

190) The trial judge asked each juror substantially the same question:

Q: [Y]ou have heard me say out there that the defendant has been indicted for a capital offense, two capital offenses, as a matter of fact, which simply means that if you are selected as a juror in this case, and if you believe the facts and circumstances justify a conviction of murder, you would be called upon to determine what penalty you would recommend. And under the law, murder being a capital offense in Kentucky, is punishable by from twenty years to and including a life sentence and death in the electric chair. Therefore if selected as a juror, you would be asked to consider that whole range of punishment to determine where in that range of punishment you felt an appropriate decision should be. So my question to you is whether you have any conscientious scruples which would prevent your considering that whole range of punishment, including a possible death sentence.

TE I at 37–38. Counsel were then permitted to ask follow-up questions depending on the answers given to the judge's question.[63] The manner in which the trial court qualified Matthews' jury has been determined to be constitutionally sound by the Kentucky Supreme Court, as well as the Sixth Circuit and other federal courts. *Davis v. Commonwealth*, 795 S.W.2d 942, 952 (1990); *McQueen*, 99 F.3d at 1330; *United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir.1995); *United States v. McVeigh*, 153 F.3d 1166, 1208–09 (10th Cir.1998). There is not a reasonable probability that Matthews' *Witherspoon* claim would have been successful on appeal.

191) *Unanimity in the mitigation requirements.* Matthews withdrew this claim from his habeas petition, DN 216, a concession of its obvious weakness.[64] Indeed, at the time of Matthews' trial and appeal there was no requirement that a jury be instructed that it could be non-unanimous on the existence of mitigating circumstances. Moreover, the United States Supreme Court has held that its decision in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), prohibiting a state from requiring that jurors unanimously agree that a particular mitigating circumstance existed before the jurors were permitted to consider that circumstance in a capital sentencing determination, does not apply retroactively.[65] *See Beard*, 542 U.S. at 420, 124 S.Ct.

**63.** The court notes that in his habeas petition, Matthews selectively quoted the *voir dire* in an attempt to make it appear as though the trial judge would not allow any questioning by the attorneys regarding sentencing. Pet. at 98, DN 23. While in a fit of frustration the trial judge did state that he would "not allow questions by either side" as quoted by Matthews, he quickly recanted stating, "Let me try to get some guidelines. I don't want to rush anybody.... I'm going to allow you to ask a question, but please let's not take all day on this examination. I don't want to cut you off entirely." TE I at 43. Matthews buried this recantation in a footnote and tried to make it appear as though counsel were precluded from asking any follow up questions. This is simply not true.

**64.** While Matthews withdrew this argument as a separate, independent claim in his habeas petition, he continues to assert that his appellate counsel's failure to raise it constituted ineffective assistance of counsel.

**65.** The court notes that in *Gall II*, the Sixth Circuit held that the trial court's failure to instruct the jury that their finding on the mitigation element could be non-unanimous violated Gall's constitutional rights. The Sixth Circuit's decision was premised on its finding that *Mills* applied retroactively to Gall's case. *See Gall II*, 231 F.3d at 324 ("*Teague* does not bar us from granting Gall habeas relief based on *Mills*."). As noted above, however, this holding is contrary to the United States Supreme Court's decision in

2504 ("We hold that *Mills* announced a new rule of constitutional criminal procedure that falls within neither *Teague* exception. Accordingly, that rule cannot be applied retroactively to respondent."). There is not a reasonable probability that this claim would have succeeded on appeal.

■■■ 192) *Innocence of aggravating circumstances instructions.* Matthews argues that the jury should have been explicitly instructed that he was to be presumed innocent of the aggravating circumstances. However, no such requirement exists. *See Delo v. Lashley,* 507 U.S. 272, 279, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993). Furthermore, during the penalty phase the trial judge orally reminded the jury that the presumption of innocence instruction given to them at the guilt phase still applied. TE VII at 680 ("In considering such evidence as may be unfavorable to the defendant, you will bear in mind the same instruction that was given to you in the first stage of the trial proceeding to the effect that the law presumes a defendant to be innocent, unless and until you are satisfied from the evidence beyond a reasonable doubt that he is guilty, and you shall apply that same presumption in determining whether there are aggravating circumstances bearing upon the question of what punishment should be adjudged against him in this case."). There is not a reasonable probability that this claim would have succeeded on appeal.

193) *Instructions on first degree burglary as an aggravator during the penalty phase.* Matthews argues that the trial court should have instructed the jury on the elements of first-degree burglary as an aggravator in the penalty phase instructions. Matthews has not explained how this alleged failure violated his constitutional rights. Moreover, the Kentucky Supreme Court held that requiring this kind of instruction was contrary to the law. *See Skaggs v. Commonwealth,* 694 S.W.2d 672, 679–80 (Ky.1985) ("To require the penalty jury to make a finding on the elements of robbery and burglary, would render the first verdict useless. Such a construction is contrary to the law."); *Carter v. Bell,* 218 F.3d 581 604 (6th Cir.2000) (holding that the Eighth Amendment does not require that the trial court restate the elements of any underlying felonies advanced as aggravating circumstances at the sentencing phase where the same jury remains impaneled during the guilt and the sentencing phase and the sentencing phase closely follows the guilt phase). There is not a reasonable probability that this claim would have succeeded on appeal.

194) *Instructions on the role of mitigating circumstances.* Again, Matthews withdrew this claim-in-chief from his habeas petition, DN 216, leaving as his only argument the issue of whether his appellate counsel were ineffective for failing to raise the claim on direct review. There is no constitutional requirement that jury instructions explain or define mitigation. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("[W]e have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible."); *Mason v. Mitchell,* 320 F.3d 604, 638 (6th Cir.2003) (holding that there is there is no clearly established due process right to a jury instruction on the definition of mitigation); *see also Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ("The fact that

2004 that *Mills* announced a new rule that does not apply retroactively to cases on collateral review. Thus, this portion of *Gall II* has

been effectively overruled by the United States Supreme Court.

the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."); *see also Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000). At the time of Matthews' conviction, there was no clearly established federal right to a jury instruction regarding how a jury must apply the mitigating factors. There is not a reasonable probability that this claim would have succeeded on direct appeal.

195) *Instructions on the level of doubt at the penalty phase.* Citing *Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), Matthews argues that his "jury should not have been instructed that it must have a 'reasonable doubt' as to the penalty to determine that death was inappropriate. It should have been instructed that if any one juror had a residual doubt as to the appropriate punishment Matthews could not be sentenced to death." Pet. at 137, DN 23. However, "*Lockhart* did not endorse capital sentencing schemes which permit such use of 'residual doubts,' let alone suggest that capital defendants have a right to demand jury consideration of 'residual doubts' in the sentencing phase." *Franklin v. Lynaugh*, 487 U.S. 164, 173, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *see also Mason*, 320 F.3d at 639 (denying habeas relief based on failure to instruct on residual doubt because "capital defendants do not have a constitutional right to demand jury consideration of residual doubt during the sentencing phase"). There is not a reasonable probability that this claim would have succeeded on appeal.

196) *Instruction in the penalty phase as to twenty years.* Mathews argues that his

jurors should have been instructed that if any believed a death sentence was not warranted, a sentence of twenty or more years must be imposed. The instructions in Matthews' case stated that the jury had three sentencing options: "1) imprisonment for twenty (20) years or any number of years greater than twenty (20) years; 2) imprisonment for life; or 3) to death by electrocution." TR II at 230. The jury was also instructed that: "if upon the whole case you have a reasonable doubt whether the defendant should be sentenced to death you shall recommend a sentence of imprisonment instead." *Id.* at 235. Since the two imprisonment options available were either twenty or more years' imprisonment or life imprisonment, the jury was adequately informed of and instructed to consider the whole range of penalties. There is not a reasonable probability that this claim would have succeeded on appeal. Indeed, the argument is patently frivolous, and Matthews' counsel on direct appeal were wise to omit it.

197) In conclusion, a review of the merits of the remaining seven omitted claims shows that they had no chance of success on appeal and Matthews' appellate counsel reasonably excluded them from Matthews' direct appeal. Matthews does not have any cognizable ineffective-assistance-of-appellant-counsel claim, and this portion of his habeas petition should be denied accordingly.

### E. Testimony–Related Issues [66]

#### 1. Excluded Evidence

198) Since Matthews conceded that he fired the shots that killed his estranged wife and her mother, the guilt phase of his trial focused on his defenses of intoxication and extreme emotional disturbance. He argues that the trial court violated his Sixth and Fourteenth Amendment rights

---

**66.** This claim is set forth at Pet. at 200–23, DN 23.

by limiting direct and cross examinations designed to elicit evidentiary support of his EED defense.[67] The specific objections follows:

### Limitations on Cross Examination

Exclusion of Margaret Matthews' testimony: The trial court precluded her from specifically identifying the problems she herself experienced with the murder victims and their family but ruled she could indicate that she had "trouble" and that Matthews was aware of it;

Exclusion of Edward Peltier's testimony: The trial court precluded Peltier, a long-time friend of Matthews', from testifying about Matthews' relationship with his estranged wife because Peltier's observations were remote in time;

Exclusion of Carol Engle's testimony: While the trial court permitted her to testify to statements as to what Matthews' professed reasons were for purchasing a gun (i.e., protection of his mother), she was prohibited from describing the specific "troubles" he said that he experienced with his estranged wife;

### Limitations on Direct Examination

Exclusion of Glenn Turner's testimony: The trial court limited the scope of the testimony of Turner, a lawyer, who described 1981 incidents where Marlene swore out warrants against Matthews only to post his bond and hire Turner to represent Matthews; he was also precluded from giving a specific explanation of Matthews' reaction to the sex abuse warrant;

Exclusion of Bobby Lee Masters' testimony: Masters, who was previously married to Marlene, was precluded from testifying about false warrants she took out against him because there was no evidence that Matthews was aware of this information; and

Exclusion of Larry Cruse's testimony: The trial court excluded as irrelevant the testimony of Larry Cruse, Marlene's brother, who would have testified about his attempt to post bond for Matthews, purportedly to preclude the need for a criminal trial.

199) In rejecting Matthews' claim, the Kentucky Supreme Court did not address his federal constitutional arguments, instead focusing exclusively on whether the trial court erred as a matter of state law in its evidentiary rulings. *Matthews I*, 709 S.W.2d at 419. Moreover, it addressed only three of the six challenges Matthews advanced on direct appeal, to wit, challenges to excluded testimony from "[Matthews'] mother, from a longtime friend [Peltier], and from a former attorney who had been involved in representing both the appellant and his wife when various domestic warrants between the two surfaced in court [Turner]." *Id.* Quoting *Shumate v. Commonwealth*, 433 S.W.2d 340, 342 (Ky.1968), the Kentucky Supreme Court opined that "[t]he question of remoteness of evidence is one of degree, a relative concept with no fixed standard." *Id.* And, it noted that courts depend " 'upon the facts of each case' " to determine if the evidence is too remote. *Id.* (citation omitted). In affirming the lower court's eviden-

---

**67.** Matthews raised most of these arguments in his brief on direct appeal. Direct Appeal Plead., Appellant's Br. at 13–16. While the subsection's title in his direct appeal brief references the Sixth Amendment and the generic term "due process," his argument is based exclusively on analysis of state court case law. Matthews' Fourteenth Amendment due process claim was not fairly presented to the Kentucky Supreme Court. As will be shown below, however, this failure to present the federal due process claim will not substantively affect Matthews' challenge because the same analysis applies whether a petitioner advances this type of challenge under the Sixth or the Fourteenth Amendment.

tiary rulings, the Kentucky Supreme Court held:

> In this case, the trial court permitted extensive presentation of evidence regarding previous domestic difficulties. The instances which are the subject of appellant's complaint were remote transactions between third parties and the deceased wife. Connection to appellant's state of mind at the time of the crime was nonexistent. If anything, the trial court permitted the appellant greater latitude than was reasonable in presenting evidence from third persons as to their problems with Marlene. Certainly, the trial court did not abuse its discretion with regard to those instances of which the appellant complains.

*Id.*

200) In the absence of a state court decision explicitly addressing the federal constitutional issue in question, this court " 'exercise[s its] independent judgment' " and undertakes a *de novo* review of the claim. *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir.2003) (quoting *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir.2002)).

201) The Supreme Court has recognized that the " 'meaningful opportunity to present a complete defense' " finds its root in the Due Process Clause of the Fourteenth Amendment and in the Compulsory Process or Confrontation clauses of the Sixth Amendment. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted). An essential component of this right is the "opportunity to be heard." *Blanton v. Elo*, 186 F.3d 712, 715 (6th Cir.1999).

202) Citing *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), Matthews essentially claims that he possesses an unfettered right to present any evidence that supports his defense. In *Washington*, the Supreme Court addressed the constitutionality of a proce-

dural rule that disqualified an alleged accomplice from testifying on behalf of the defendant. In deeming the rule "arbitrary," the Court held that the rule deprived the defendant of his "right to have compulsory process for obtaining witnesses in his favor." *Washington*, 388 U.S. at 23, 87 S.Ct. 1920. It did not, however, hold that the right is absolute, observing that a defendant has "the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.*

203) Accordingly, notwithstanding the protections afforded by the Sixth Amendment, "the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir.2003). A trial judge possesses " 'wide latitude' " to exclude evidence that is only " 'marginally relevant,' " *Crane*, 476 U.S. at 689, 106 S.Ct. 2142 (citation omitted), and the judge may exclude evidence that is " 'incompetent, privileged, or otherwise inadmissible under standard rules of evidence.' " *Rockwell*, 341 F.3d at 512 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)); *see, e.g., Miskel v. Karnes*, 397 F.3d 446, 452 (6th Cir.2005) (holding that an accused is guaranteed "an *opportunity* for effective cross examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish.") (original emphasis, citation and internal quotation marks omitted). A defendant " 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *Rockwell*, 341 F.3d at 512 (quoting *Chambers v. Miss.*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297

(1973)). So long as evidentiary rules are not " 'arbitrary' " or " 'disproportionate to the purposes they are designed to serve,' " the Constitution is not offended when evidence is excluded pursuant to them. *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (citation omitted).

204) Turning to the merits of Matthews' challenge, the court notes that at his trial he relied on the defense of extreme emotional disturbance, a defense that required a showing that he committed the offense while "under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KY. REV. ST. § 507.020(1)(a). He sought to introduce evidence to establish that his rocky marriage triggered his emotional disturbance and argues that the excluded evidence would have reflected on his state of mind at the time he murdered his estranged wife and her mother. This court disagrees.

205) As the Kentucky Supreme Court accurately acknowledged on direct review of Matthews' conviction, the trial court gave him wide latitude in questioning witnesses and only excluded evidence that was remote in time, irrelevant, or concerned matters between third parties and Matthews' estranged wife. Matthews sought to present evidence of events that took place long before he committed the murders or that was marginally relevant. In excluding the evidence, the trial judge did not render an arbitrary decision. On the contrary, he allowed the introduction of more evidence than the state's highest court thought admissible. In excluding

this evidence, the trial judge acted well within his discretion. Because Matthews offers this court nothing but his conclusory allegations as to why he believes the trial court erred, this court concludes that there is no merit to these particular federal habeas challenges, and the claims should be denied.

### 2. Included Evidence

206) Matthews advances three arguments concerning evidence he claims was included in violation of his Fourteenth Amendment right to a fair trial.[68] He first claims that the evidence of the burglary and sex abuse warrants his wife secured prejudiced his right to a fair trial. He maintains that the introduction of his post-arrest recorded statement was irrelevant. And, third, he challenges the introduction of Dr. Chutkow's testimony as a violation of the psychiatrist-patient privilege.

207) When reviewing this particular type of due process claim, the United States Supreme Court has made clear that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68, 112 S.Ct. 475. Generally, a state evidentiary ruling is not a matter for federal habeas review. *Seymour*, 224 F.3d at 552. If a state court's evidentiary ruling deprives a defendant of a fundamentally fair trial in violation of the Due Process Clause, then a federal court may review the substance of the state law claim. *Lott v. Coyle*, 261 F.3d 594, 607, n. 6 (6th Cir.2001) ("While a claim based *solely* on an error of state law is not remediable on a petition for habeas corpus relief, where 'a state court's error in interpreting or applying its own law has rendered the trial that convicted the appellant so fundamentally unfair as to have deprived appellant

---

**68.** Matthews also indicates that the inclusion of the evidence violated "his right as secured by the Sixth Amendment" but does not otherwise state how that right was violated. Pet. at 210, DN 23.

of substantive due process in violation of the U.S. Constitution,' we may properly provide habeas relief.") (emphasis in original) (quoting *Norris v. Schotten,* 146 F.3d 314, 329 (6th Cir.1998)); *see also Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Fundamental fairness, however, "does not require a perfect trial." *Clemmons v. Sowders,* 34 F.3d 352, 358 (6th Cir.1994).

208) Keeping these principles in mind, the court now turns to the issue of whether the trial court's inclusion of the above-described testimony violated Matthews' federally protected constitutional right to due process.

### a. Burglary warrant

209) During the colloquy concerning whether the warrants for burglary and sex abuse should be admitted, trial counsel for Matthews stated that "I will admit that the burglary warrant was taken so close in time, it may be part of the res gestae of the whole event," TE II at 180–81, and "I would agree as to the burglary warrant, Judge, because that's so close in time that they can establish any mental state they want off of that...." *Id.* at 181; *see also id.* at 183 ("I think if the Commonwealth is insistent upon showing a motive, I'm just saying that the burglary warrant is sufficient to complete that motive....").

210) The burglary warrant, dated June 27, 1981, was read and received into evidence without objection. TE IV at 392–93; Com. Exh. 23. The criminal complaint portion of that warrant alleged:

> The affiant, Mary M. Matthews, says that on the 26th day of June, 1981, in Jefferson County, Kentucky, the above-named defendant unlawfully ... broke into affiant's house by tearing a window out and entering. Affiant states defen-

dant intentionally cut affiant's clock cords and took affiant's phone off the hook causing less than $500 in damage. Affiant states defendant has been calling affiant every nite threatening to get affiant. Affiant states she has a case pending against defendant.

Com. Exh. 23.[69]

211) Matthews argues that, as the prosecution admitted, he did not know of the burglary warrant at the time that the murders were committed; therefore, the warrant could not be admitted to show motive. Pet. at 211, DN 23. He contends that the admission of the burglary warrant violated his constitutional right to be tried only on the offenses charged. *Id.* at 211–12 (citing *Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

212) The Kentucky Supreme Court held the following with regard to Matthews' assignment of error concerning the introduction of the burglary warrant.

> Next, regarding the warrant charging the appellant with burglary of the same house on an occasion three days before the occurrence of the burglary and murders with which we are presently concerned, although there was no direct evidence that appellant was aware that this burglary warrant was outstanding, the circumstances that led to the warrant, and the warrant itself, reflected on a relevant pattern of conduct. It was part of the circumstances which evidenced the existing domestic difficulties between the appellant and his wife. As such, it bears a direct relation to the events of the tragedy and was admissi-

---

**69.** During the Commonwealth's case-in-chief, the Commonwealth elicited testimony from a friend of Marlene's who was with Marlene when she discovered the burglary on June 26 and when Marlene swore out the warrant

related to the burglary. TE IV at 398–404. The Commonwealth also elicited testimony from the officer who arrested Matthews pursuant to the burglary warrant on June 29, 1981. *Id.* at 407–11.

ble. *Dye v. Commonwealth*, Ky., 477 S.W.2d 805 (1972). Indeed, appellant was using the supposedly unjustified bringing of warrants to explain his emotional state.

Standing alone, the prior burglary warrant may have had little evidentiary value. But there was other evidence tying the appellant to this previous break-in, and there were striking similarities between the vandalism on the previous occasion and the vandalism on the occasion of the burglary charged in the present indictment. There was no error in admitting the burglary warrant in the particular circumstances of this case. The general rule foreclosing evidence of other, unrelated crimes, does not apply. *Dye v. Commonwealth, supra.*

*Matthews I*, 709 S.W.2d at 418–19. Because the Kentucky Supreme Court's decision did not touch on Matthews' constitutional claim in this regard, review is *de novo.*

213) In Kentucky, where "prior domestic difficulties [bear] a direct relation to the events of the tragedy," evidence of a separate offense is admissible. *Dye*, 477 S.W.2d at 807–08. Here, the fact that Marlene had sworn out a warrant regarding a burglary involving the same mode of entry (breaking a window) at her home where she and her mother would be killed three days later was related to the offenses charged against Matthews in the indictment and, hence, relevant, admissible evidence. *See id.* at 808. The Supreme Court has held that where the evidence admitted at trial was relevant, the habeas petitioner's right to due process was not violated by the admission at trial of relevant evidence. *See Estelle*, 502 U.S. at 70, 112 S.Ct. 475.

214) Matthews' argument that the admission of the evidence violated his constitutional right to be tried only on the offenses charged fails. The cases he cites are inapposite. The question in *Romano*, 512 U.S. at 12, 114 S.Ct. 2004, was whether the admission into evidence that the defendant had previously been sentenced to death in another case so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. Because the jury had been adequately instructed as to its role in deciding the sentence and was properly limited to consideration of the aggravating factors which the State sought to prove, the Court held no due process violation had occurred. *Id.* at 13, 114 S.Ct. 2004. This court does not find that the fact that the prior burglary warrant, properly admitted as relevant to the circumstances surrounding the charged offenses in Matthews' case, equates with putting before the jury the extraordinary fact that the defendant already has received the death penalty in another case. *Romano* is distinguishable.

215) In *Stirone*, 361 U.S. at 213–14, 80 S.Ct. 270, also cited by Matthews, the defendant was charged in the indictment of violating the Hobbs Act by unlawfully delaying the shipment in interstate commerce of sand in order to extort money. However, over the defendant's objection, the trial court allowed evidence to be admitted of the effect on interstate commerce not only of sand shipments but also steel shipments. *Id.* at 214, 80 S.Ct. 270. The trial court also, again over the defendant's objection, charged the jury that the interstate commerce aspect of the case could rest either on a finding regarding the shipments of sand or on a finding that concrete was used to construct a mill which would manufacture articles of steel to be shipped in interstate commerce. *Id.* The Supreme Court reversed the conviction because the indictment could not fairly be read to include interference with movement of steel and because it could not be said, given the jury instructions, that

the jury convicted only on the charge set out in the indictment (interference of interstate commerce of sand). *Id.* at 217–19, 80 S.Ct. 270.

216) Here, in contrast, Matthews' counsel acceded to the introduction of the burglary warrant, and the jury was instructed only with regard to the burglary occurring on June 29, 1981, *i.e.,* the charged offense. TR II at 241. The admission into evidence of the prior burglary warrant clearly was relevant and did not *de facto* amend the indictments. The writ should be denied as to this claim.

### b. Sex abuse warrant

217) On May 26, 1981, Marlene Matthews filed a criminal complaint against her husband accusing him of sexually abusing her daughter, his step-daughter. Com. Exh. 22. On May 28, 1981, Matthews was arrested and taken into custody on a charge of sexual abuse in the first degree. TE IV at 391. On June 19, 1981, he appeared in state court, which reduced his bond and released him. *Id.* at 392. The court also ordered him to have no contact with his estranged wife or her family. *Id.* His case was continued to July 29, 1981. During his capital trial, the Commonwealth introduced into evidence the state court file on the sexual abuse charge. *Id.* at 391. The criminal complaint portion of that sexual abuse warrant stated as follows:

> The affiant, Mary Matthews, says that on the 25th day of May, 1981, in Jefferson County, Kentucky, the above-named defendant unlawfully broke into [affiant's] house. [Respondent] tore [affiant's] 6 yr. old['s] clothes off of her and was kissing her in a suggestive way. [Affiant] spoke to [a detective] of [the] Sex Offense Squad.

Com. Exh. 22.

218) In his habeas petition, Matthews objects not only because the complaint was read into evidence but also because the Commonwealth questioned several witnesses about the sexual abuse charge. Pet. at 212–16, DN 23. He maintains that this evidence was nothing more than an "attempt to smear and malign" his character which in turn forced him to defend this charge in addition to the charges he actually faced, arguing that "[f]ew charges inflame a jury more than charges of sex abuse." *Id.* at 214.

219) In rejecting his argument on direct appeal, the Kentucky Supreme Court stated:

> The sexual abuse warrant had a direct bearing on the appellant's state of mind at the time that Marlene and her mother were killed. This kind of evidence is admissible to prove intent or state of mind. *Ringstaff v. Commonwealth,* Ky., 275 S.W.2d 946 (1955).
>
> . . .
>
> It is quite evident that the warrant issued at the behest of Marlene, charging the appellant with sexual abuse of his step-daughter, and the court order to stay away from Marlene's house which resulted from this warrant, in the time framework of this case, are relevant not only as evidence of motive or state of mind, but as part of the immediate circumstances bearing on the crimes charged. In *Francis v. Commonwealth,* Ky., 468 S.W.2d 287 (1971), we stated:
>
> > While the prosecution is not privileged to show unconnected and isolated unlawful conduct that had no bearing whatsoever upon the crime under scrutiny, yet all the circumstances may be shown which have a relation to the particular violation of the law imputed, even if, in so doing, other offenses may be brought to light. *Id.* at 289.

*Matthews I,* 709 S.W.2d at 418. Because the Kentucky Supreme Court did not explicitly address Matthews' federal constitu-

tional claim, this court will undertake a *de novo* review of the claim. *McKenzie,* 326 F.3d at 727.

220) This court does not discount Matthews' observation that sexual-abuse charges could inflame a jury. The question here, however, is whether that information deprived him of his federally protected constitutional right to due process. The court concludes that it did not.

 221) In Kentucky, evidence is admissible to show "all relevant facts and circumstances which tend to establish any of the constitutive elements of the crime of which the defendant is accused in the case on trial." *Ringstaff,* 275 S.W.2d at 949. "Evidence of other crimes is competent when it tends to establish identity, or knowledge of guilt, or intent or motive for the commission of the crime under trial...." *Id.* at 949–50. The fact that evidence of another crime "may tend to prejudice the accused in the minds of the jurors is not a ground for its exclusion." *Jones v. Commonwealth,* 554 S.W.2d 363, 367 (Ky.1977). Though it may be conceded that when the evidence in question is relatively unimportant, or does not have much probative value, the policy reasons for excluding it may outweigh its value to the prosecution, if the evidence of the other crime tends to establish, *inter alia,* motive, it should be admitted. *Id.* at 367–68.

 222) The sex abuse warrant was clearly relevant to both motive and the immediate circumstances surrounding the murders. As such, Matthews' right to due process was not violated by the admission at trial of that relevant evidence. *See Estelle,* 502 U.S. at 70, 112 S.Ct. 475.

223) Moreover, Matthews' argument that his constitutional rights were violated by the admission of this evidence is undercut by the fact that defense counsel used the fact that warrants had been sworn out against Matthews by Marlene as part of its defense strategy, eliciting testimony from Dr. Chutkow that Marlene's repeatedly having Matthews arrested and jailed played a part in Matthews' distorted judgment about what his wife was up to and what her role was in his personal distress during the relevant period. TE VI at 561. In asking Dr. Chutkow whether Matthews' mental state amounted to extreme emotional disturbance at the time of the offense, Matthews' counsel elicited from Dr. Chutkow the following statement: "[Matthews] began to perceive himself more and more as a victim of the wife and possibly the mother-in-law's meanness or domineering attitude, especially in this matter of repeatedly getting him arrested...." *Id.* at 567–68. Matthews' trial counsel also put on testimony from attorney Glenn Turner, who stated that on several occasions, including in 1981, he was hired by Marlene to represent Matthews after Marlene had sworn out a warrant on Matthews. *Id.* at 605–11. For the foregoing reasons, the writ should be denied as to this claim.

### c. Tape recorded confession

224) At the time of his arrest, Matthews gave the police a recorded statement in which he consistently denied involvement in the killings, including that he borrowed money from Carol Engle to purchase a gun and attempted to hide the gun after the shootings. Matthews claims that because he conceded his role in the killings at trial, his previous statement to police was irrelevant as there was no question at trial about his involvement in the deaths. Matthews argues that the Commonwealth introduced his statement to police solely to inflame the jury and prejudice him in violation of his right to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. The Kentucky Supreme Court did not specifically address this claim. Accordingly, this

court must review it *de novo.* *Maples,* 340 F.3d at 437.

225) In *Martin v. Foltz,* 773 F.2d 711, 720 (6th Cir.1985), *abrogated on other grounds by Merlo v. Bolden,* 801 F.2d 252 (6th Cir.1986), the defendant, like Matthews, argued that the introduction of false exculpatory statements as substantive evidence of his guilt denied him a fair trial and violated due process. In rejecting this argument, the Sixth Circuit held that "false exculpatory statements are probative of a guilty conscience and hence of guilt and are admissible." *Id.* The same is true in Matthews' case, and the relevancy of the statement is not changed by the fact that Matthews conceded that he killed his wife and mother-in-law at trial. His plea was still one of not guilty, and he maintained throughout the trial that he was innocent of murder because he was either acting under extreme emotional distress and/or intoxicated at the time he committed the offenses.

226) In all criminal cases, the government must prove each element, even those that the defendant does not specifically contest, beyond a reasonable doubt to convict a defendant. *Estelle,* 502 U.S. at 69, 112 S.Ct. 475 ("[T]he prosecution's burden *to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.").* Thus, even though Matthews admitted the killings, the prosecution still had to prove its case, and the taped false confession was an important part of the case as it evidenced guilt. Moreover, not only was the false confession evidence of a guilty conscience, as the Commonwealth argued in its closing argument, the fact that Matthews felt the need to invent a story regarding his whereabouts and actions also tended to undermine his EED defense. TE VII at 672–75

("If he believed himself his conduct on June 29th to be reasonable, he would have told the detective in the statement. Yeah my wife, she sexually harassed me or she sexually frustrated me. I was real nervous. I wasn't in my right mind. All of these things, and, oh, yeah, they bothered my mother and stuff. He never told that to the detective. He just denied it....")

227) The taped statement was relevant and admissible. Its introduction did not deprive Matthews of a fundamentally fair trial as a matter of federal due process law. This claim should be denied.

### d. Communications with Dr. Chutkow

228) Next, citing KY.REV.STAT. § 421.215(2), Matthews complains that his constitutional rights were violated when statements he made to Dr. Chutkow regarding how he killed his mother-in-law and wife were elicited by the Commonwealth during Dr. Chutkow's cross-examination.[70] Kentucky Revised Statute § 421.215(2) provides as follows:

(2) Except as hereinafter provided, in civil and criminal cases, in proceedings preliminary thereto, and in legislative and administrative proceedings, a patient, or his authorized representative, has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental condition between patient and psychiatrist, or between members of the patient's family and the psychiatrist, or between any of the foregoing and such persons who participate, under the supervision of the psychiatrist, in the accomplishment of the objectives of diagnosis or treatment.

229) In rejecting this claim on direct appeal, the Kentucky Supreme Court held as follows:

---

**70.** Matthews argues that he has a protected liberty interest arising out of the Common- wealth's recognition of the psychiatrist-patient privilege.

Appellant utilized the services and testimony of a psychiatrist to testify in support of his claim that he acted under extreme emotional disturbance. On cross-examination the Commonwealth pursued the same line of inquiry as used by defense counsel on direct, only with more details about the statements that appellant made to the psychiatrist describing the events of the night of the murder.

KRS 421.215(2) sets out the psychiatrist-patient privilege, and its limitations. It is "a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental condition . . . ."

In this case there was no refusal to disclose. On the contrary, the appellant called the witness, called for the disclosures, and made no objections to the cross-examination pursuing the same subject. The privilege was intentionally disregarded as a matter of trial tactics. In Kentucky the psychiatrist-patient privilege is placed "upon the same basis as that provided by the law between attorney and client." *See Southern Bluegrass Mental Health v. Angelucci,* Ky.App., 609 S.W.2d 931 (1980). The privilege has no application in the present circumstances.

*Matthews I,* 709 S.W.2d at 419.

230) In support of his argument, Matthews first cites *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake,* however, the United States Supreme Court merely held that a state must, at a minimum, provide an indigent defendant "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83, 105 S.Ct. 1087. Here, there is no doubt that the Commonwealth fulfilled its obligations under *Ake.* Matthews was provided funding for not one, but two, mental health experts to assist in his defense. There was no *Ake* violation.

231) Additionally, assuming without deciding that Ky. Rev. Stat. § 421.215(2) creates a liberty interest as Matthews argues, this court agrees with the Kentucky Supreme Court that the statute was not invoked, and therefore, not violated in Matthews' case. Matthews' counsel made a tactical decision to call Dr. Chutkow to the stand testify regarding whether Matthews was acting under EDD at the time of the offenses in question. Having done so, the defense intentionally and knowingly waived any protections afforded to Matthews under Ky.Rev.Stat. § 421.215(2), and therefore, had no basis on which claim protection under the patient-psychiatrist privilege.[71]

232) Accordingly, introduction of this testimony did not violate Matthews' constitutional rights, and this claim should be denied.

### F. Burglary Conviction and Sentence [72]

233) Matthews argues that in affirming his death sentence the Kentucky Supreme Court substantially broadened the definition of burglary to include a non-possessory spouse entering the marriage domicile. He also asserts that the Kentucky Supreme Court failed to address his attack

---

**71.** Additionally, the court notes that Matthews appears to have understood the implications of speaking to Dr. Chutkow about his role in the alleged crimes. TE VI at 555 ("Q: But at the time [Matthews] spoke with you, he was willing to discuss that he had committed these offenses? A: He was willing to do this and also to be aware of the implications of a trial and possibly sentencing of this would carry out.").

**72.** This claim is set forth in Pet. at 253–54, DN 23.

on the burglary conviction as not being supported by any evidence to show that he entered or remained unlawfully in his own house and that no evidence was adduced at trial of the intent to commit a crime at the time of the putative burglary.

■ 234) First, the court notes that, with regard to Matthews' contention that the Kentucky Supreme Court failed to address his argument that no evidence showed that he entered or remained in his house unlawfully, on direct appeal, the Kentucky Supreme Court stated the following:

> Appellant claims that he was entitled to a directed verdict on the burglary charge because he had formerly shared occupancy of the premises. His position is that the house was first rented as an abode for him and his wife, that he had occupied it with her during their marriage except for the periods when they were estranged, and that, therefore, he had a legal right to be on the premises, regardless of proof that on the night in question he forcibly broke into the house against the occupant's wishes.
>
> He claims that in these circumstances he was entitled to a directed verdict on the burglary charge, and, further, that the burglary charge could not be an aggravating factor for the death penalty.
>
> The evidence was that the house in question was owned by the victim's brother and rented to her, to be used as a marital abode when the parties were not separated. The appellant was under a court order issued in connection with the sexual abuse charge, previously discussed, to stay away from the premises. We reject the position that there is any absolute right on the part of one spouse to be with the other against the other's wishes, giving a right to break into the home of the other with the intent to

commit a crime. We adopt the position of the Florida court in *Cladd v. State,* Fla., 398 So.2d 442 (1981), of the Ohio court in *State v. Herrin,* 6 Ohio App.3d 68, 453 N.E.2d 1104 (1982), and of the Washington court in *State v. Schneider,* 36 Wash.App. 237, 673 P.2d 200 (1983), all of which hold that burglary is an invasion of the possessory property right of another and extends to a spouse. As stated in *Cladd v. State:*

> "[W]here premises are in the sole possession of the wife, the husband can be guilty of burglary if he makes a nonconsensual entry into her premises with intent to commit an offense." 398 So.2d at 444.

*Matthews,* 709 S.W.2d at 419–20. Thus, contrary to Matthews' assertions, the Kentucky Supreme Court did address his contention that no evidence was adduced to show that he entered or remained unlawfully in his own house.

235) In his petition, Matthews did not argue that the Kentucky Supreme Court's purported extension to include a non-possessory spouse's entering the marriage domicile in his case was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See* § 2254(d)(1). However, in a supplemental brief to this court, he argues that, under *Gall II* and the Supreme Court precedents cited therein, the Kentucky Supreme Court's unforeseen adoption of a new rule regarding burglary violated his due-process rights. DN 142 at 13–14.

236) In *Gall II,* the Sixth Circuit explained that if a new interpretation of state law was "in fact unforeseeable, if it was applied to events occurring before its enactment, and if the interpretation disadvantages the offender affected by it, then *Bowie* and *Dale* [73] instruct that due pro-

---

**73.** *Dale v. Haeberlin,* 878 F.2d 930, 934 (6th Cir.1989).

cess is violated just as the ex post facto clause would be." *Gall II,* 231 F.3d at 305 (citations omitted). Thus, first, Matthews must show that the Kentucky Supreme Court's interpretation of the burglary statute in his case was new and unforeseeable. *See id.* Matthews offers no support for his argument that the Kentucky Supreme Court impermissibly extended the definition of first-degree burglary to include a non-possessory spouse. In his petition, he cited *Hedges v. Commonwealth,* 937 S.W.2d 703 (1996), in which the Kentucky Supreme Court reversed a burglary conviction involving an estranged husband who destroyed some items after he had received permission from his wife to use the phone in her apartment. *Hedges* is easily distinguished from Matthews' case. In *Hedges,* Hedges, unlike Matthews, received express permission from his wife to enter her premises to make a phone call; the protective order that Hedges was subject to did not forbid him from contacting or visiting his wife's premises; and he had no intent to commit a crime and was not armed when he entered. *Hedges,* 937 S.W.2d at 704–05. Upon entering, Hedges discovered that his wife had a man hiding in the bedroom; became enraged; and broke various jointly-owned items in the apartment. He also grabbed his wife by the neck but caused her no injury. *Id.* at 705, 937 S.W.2d 703.

237) In his supplemental brief, Matthews refers to, without explanation, the commentary to the burglary statute as support for his position that the Kentucky Supreme Court extended the offense of burglary in his case. DN 142 at 14. The commentary to that statute explains that the basic offense of burglary (burglary in the third degree) "emphasizes the unlawfulness of an intrusion[;]" "'the true essence of ... burglary should be intrusion into premises without license or privilege.'" Commentary to Ky.Rev.Stat. § 511.020. Nothing in the commentary it-

self states that a spouse could not commit burglary where the intrusion occurs at a place where the spouses previously had lived together as husband and wife.

238) Prior to the adoption in 1974 of the burglary statute under which Matthews was convicted, burglary, except in a few cases, was a common-law crime. "At common law burglary [wa]s the breaking and entering at nighttime of another's dwelling with intent to commit a felony therein." *Rayburn v. Commonwealth,* 476 S.W.2d 187, 189 (Ky.1972). The statute adopted in 1974 defined the basic crime of burglary as follows: "A person is guilty of burglary in the third degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building." Ky Rev. Stat. § 511.040. The statute clearly was intended to change the law of burglary. *See* Commentary to § 511.020 ("The three degrees of burglary, as created in KRS 511.020, 511.030 and 511.040, make some significant changes in the pre-existing law.... The changes made by this chapter affect not only pre-existing common law burglary but also pre-existing statutory burglary offenses.") The statutory commentary makes clear that the law was designed to protect *occupants:* "With this definition, burglary is designed to encompass all unlawful intrusions which are accompanied by alarm and danger to occupants." *Id.*

239) Neither the statutory language nor the commentary thereto explicitly address the situation in which the one entering is an estranged spouse, and, apparently, the Kentucky courts had not yet had occasion to rule on this precise issue before Matthews' case. This court finds, however, that, even if the interpretation of this statute to include an estranged husband like Matthews was "new," it was not unforeseeable. As the common law was replaced by statutory law, the modern view developed

that burglary should be more concerned with occupancy than ownership. *See* Michael M. Pacheco, Comment, *The Armed Career Criminal Act: When Burglary Is Not Burglary*, 26 Willamette L.Rev. 171, 177 (1989). The Kentucky courts, years before the decision in Matthews' case recognized the changes that were being wrought on the common law with the statutory enlargement of married women's property rights in holding that one could be guilty of larceny in taking the property of his or her spouse:

> Under our statutes a married woman may acquire and hold property, real and personal, by gift, devise, descent, or purchase, and may in her own name, as if she were unmarried, sell or dispose of her property, make contracts, sue and be sued, as a single woman. KRS 404.020. This statutory enlargement of a married woman's property rights, we think, abrogates the common law rule. We conclude, therefore, that a spouse can be guilty of larceny for taking the other's property.

*Fugate v. Commonwealth*, 308 Ky. 815, 215 S.W.2d 1004, 1005–06 (1948).

240) In Matthews' brief to the Kentucky Supreme Court on direct appeal, the only caselaw he cited as support for his argument was a Florida case from 1977 in which the Florida court held that burglary could not occur where a husband who is physically separated from his wife enters the premises possessed by the wife without consent. Direct Appeal Plead., Appellant's Br. at 92–93 (citing *Vazquez v. State*, 350 So.2d 1094 (Fla.App.1977)). As Matthews acknowledged, in 1980 (before Matthews committed the crimes charged against him), the Florida Supreme Court disapproved *Vazquez* in *Cladd v. State*, 398 So.2d 442 (Fla.1981). In *Cladd*, the Florida Supreme Court held that "[s]ince burglary is an invasion of the possessory property rights of another, where premises are in the sole possession of the wife, the

husband can be guilty of burglary if he makes a nonconsensual entry into her premises with intent to commit an offense, the same as he can be guilty of larceny of his wife's separate property." *Cladd*, 398 So.2d at 444. The court finds no indication that the decision in *Matthews I* was "unforeseeable." Because the court finds that even if the decision in *Matthews I* was a "new" interpretation of the burglary statute it was not unforeseeable, the Due Process Clause was not violated by his conviction for burglary. *Cf. Gall II*, 231 F.3d at 305.

241) Turning to his insufficiency-of-the-evidence challenge to his burglary conviction, the elements of first-degree burglary are defined at KY.REV.STAT. ANN. § 511.020, as follows:

> (1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:
>
> (a) Is armed with explosives or a deadly weapon; or
>
> (b) Causes physical injury to any person who is not a participant in the crime; or
>
> (c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

KY.REV.STAT. ANN. § 511.020(1).

242) Puzzlingly, Matthews argues that the Commonwealth offered no evidence that the entry was not consensual or that entry was made with the intent to commit a felony. In fact, the evidence showed that Matthews broke into his wife's house, without consent, with the intent to commit a crime, armed with a deadly weapon, and caused physical injury to two people not participants in the crime.

243) While it may have been true that Matthews had a history of leaving the home where his wife lived while they were fighting only to return some time later after a reconciliation, the evidence adduced at trial was that on the night of the murders Matthews was under court order to have no contact with his wife. TE IV at 391–92; Com. Exh. 22. Moreover, the evidence at trial was that Matthews physically broke into the home. Mr. Cruse, Marlene's father, testified that, on the morning after the murders, he went to the house and saw that glass had been knocked out of the side door; a half-open knife had been left on the step; and the screen had been cut. TE III at 236, 239. Photographs of the door, screen, and glass were introduced into evidence. Com. Exhs. 4–7.

244) Although Matthews relies on Dr. Chutkow's testimony as support for his theory that his entry into the home was consensual, in fact, Dr. Chutkow's testimony supports the Commonwealth's theory. At trial, Dr. Chutkow quoted from his notes from his interview with Matthews as follows: "[Matthews] said ... 'One or two o'clock in the morning, had the pistol with me. I was just wild from the pills.'" TE VI at 585. Dr. Chutkow continued, "[Matthews] said, 'We talked about everything till six o'clock what to do. We talked about and then made love one or two times.' Now, prior to this review, he also told me that he had gone to the other room and shot his mother-in-law when she was in bed." Id.

245) On re-cross examination, Dr. Chutkow was asked, "[Matthews] didn't tell you about threatening her during that period of time with the gun?"[74] TE VI at 598. Dr. Chutkow answered, "No, he didn't." Dr. Chutkow was then asked, "And he didn't tell you whether they were awake or

not *when he broke into the home?*" *Id.* (emphasis added). Dr. Chutkow answered, "No." *Id.* Although Dr. Chutkow's testimony was that Matthews had told him that he and his wife "made love" that night, on redirect, Dr. Chutkow clarified that Matthews did not in fact state to him whether he had forced his wife to make love to him. TE VI at 599.

246) In sum, the evidence at trial was sufficient to support the burglary conviction, and Matthews does not offer clear and convincing evidence that the state court's factual determination that the elements of burglary were proven was incorrect. *See* § 2254(e)(1). The writ should be denied on this issue.

247) With regard to the penalty phase, Matthews argues that the Commonwealth failed to prove beyond a reasonable doubt the essential elements of first-degree burglary in the guilt phase; therefore, the same defects in proof were present in the sentencing phase, requiring that his death sentence be vacated. Pet. at 254–55, DN 23. As has already been discussed, Matthews does not offer clear and convincing evidence that the state court was incorrect in determining that the elements of burglary had been proven beyond a reasonable doubt. His argument regarding the penalty phase fails, and the writ should be denied on this issue as well.

### G. Double Counting of Burglary [75]

248) Matthews argues that the Double Jeopardy Clause's prohibition against multiple punishments for the same offense was violated because the jury sentenced him to 20 years in prison on the burglary conviction and also used the evidence submitted in support of the burglary conviction as an aggravating circumstance in sentencing

---

74. The time referred to is the period between when Matthews had shot his mother-in-law, around 2:00 a.m., until he shot his wife.

75. This claim is set forth at Pet. at 255–57, DN 23.

him to death for the murders. He argues that his sentence of death based upon the aggravating circumstance of burglary violates the Double Jeopardy Clause, the Fourteenth Amendment's Due Process Clause, and the Eighth Amendment's requirement that a capital sentencing scheme must narrow the class of persons eligible for the death penalty.

249) Matthews raised this issue on direct appeal to the Kentucky Supreme Court. Direct Appeal Plead., Appellant's Br. at 147–52. The Kentucky Supreme Court rejected the claim without explicitly considering the merits. Accordingly, this court must review the claim *de novo*. *Maples*, 340 F.3d at 437.

250) In making this argument, Matthews asserts that burglary was the only statutory aggravator found by the jury and, therefore, the only circumstance authorizing the sentence of death. Pet. at 250 n. 133, DN 23. In support, he cites to a prior section of his petition in which he argued on another point of error that the jury did not find "multiple death" as an aggravating circumstance, *Id.* at 148–50; however, Matthews has since withdrawn that argument.[76] *See* DN 216. Since Matthews has withdrawn his claim that the jury did not find the other statutory aggravator present, it is not necessary to address his claim that using the fact that the murders were committed during a burglary as an aggravator was unconstitution-

al. Because the jury expressly found that the other statutory aggravator was present,[77] Matthews' death sentence would not have to be set aside even if it could not be based on the fact that the murders were committed during the course of a burglary. *See Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (holding sentence of death need not be set aside if one aggravator is invalid where jury expressly found other aggravating circumstances that were valid and legally sufficient to support death penalty); *see also Lowenfield*, 484 U.S. at 241–46, 108 S.Ct. 546 (upholding death penalty where the sole aggravating factor was the finding of multiple murders). The court should, therefore, deny this claim.

## H. Introduction of Sentencing into the Guilt Phase[78]

251) Over defense counsel's objection, the trial court instructed the jury at the guilt phase that if it found Matthews guilty of first-degree manslaughter of either Marlene or Magdalene Cruse, the punishment would be fixed at 10 to 20 years, TE VI at 620, 626–27, 630–31; if it found Matthews guilty of second-degree manslaughter the sentence would be five to 10 years. *Id.* at 627–28, 631–32. The trial court did not provide a range of penalties for a guilty verdict of intentional or wanton murder, instructing the jury to return that verdict, if warranted, without deliberating

**76.** In fact, the jury clearly did find the existence of the multiple-death aggravator. *See* TE VII at 735–36. The jury recommended the death sentence after finding with regard to the verdict as to Marlene's death the following aggravating circumstances to be true: "(a) That the defendant's act or acts in killing Mary Marlene Matthews were intentional and resulted in the death of Mary Marlene Matthews. (b) That the offense of murder was committed while the defendant was engaged in the commission of Burglary in the First Degree." *Id.* at 735. The jury recommended the death sentence after finding with regard

to the verdict as Magdalene Cruse's death "the following aggravating circumstances: "(a) That the defendant's act or acts in killing Magdalene Cruse were intentional and resulted in the death of Magdalene Cruse. (b) That the offense of murder was committed while the defendant was engaged in the commission of Burglary in the First Degree." *Id.* at 736.

**77.** And Matthews no longer argues to the contrary.

**78.** This claim is set forth at Pet. at 113–18, DN 23.

on the question of recommending the punishment. *Id.* at 625–26, 629–30.

252) Matthews argues that the trial court impermissibly injected sentencing into the guilt phase of his trial in violation of the Supreme Court's holdings that in capital proceedings the accused's guilt and punishment must be decided separately. Pet. at 113–18, DN 23. He also argues that his due process rights were violated because the instructions violated Ky.Rev. Stat. § 532.025(1)(b).[79] *Id.* at 115, 117. He asserts that the magnitude of this error is compounded by the fact that the jury was primarily concerned with how it could keep Matthews off of the streets for the longest period of time. *Id.* at 116–17 (citing DN 25, Ex. 21, 22, in which jurors David Durham and Mary Jo Fischer Raichart both averred: "Because we believed that Mr. Matthews might be eligible for parole in a relatively short period of time if we handed down a sentence of less than death, I voted for the death penalty so that Mr. Matthews would have to stay in prison."). Although Matthews raised this argument on direct appeal, Direct Appeal Plead., Appellant's Br. at 127–130, the Supreme Kentucky of Kentucky rejected it without discussion. Accordingly, this court must conduct a *de novo* review of the claim. *Maples,* 340 F.3d at 437.

■ 253) First, the court is unpersuaded that the Supreme Court requires bifurcation of the guilt and penalty phases. It is true that "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield,* 484 U.S. at 244, 108 S.Ct. 546 (citation omitted). However, in *Lowen-*

*field,* the Court saw "no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase." *Id.*

254) Per Kentucky law, this "narrowing function" occurs at sentencing. Ky.Rev. Stat. § 532.025(1)(b). That statute provides:

> In all cases in which the death penalty *may be imposed* and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury.... Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant. Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law.

Ky.Rev.Stat. § 532.025(1)(b) (emphasis added).

255) Matthews argues that the procedure prescribed by § 532.025(1)(b) was violated and that, because he had a legitimate Fourteenth Amendment expectation that this procedure would be followed, his due process rights were violated. Pet. at 17, DN 23 (citing *Hicks v. Oklahoma,* 447 U.S. 343, 344–45, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980)). In *Hicks,* 447 U.S. at 346, 100 S.Ct. 2227, the Supreme Court held that where "a State has provided for the imposition of criminal punishment in the discretion of the trial jury," the defendant in such a case has a substantial and legitimate expectation protected by the Fourteenth Amendment "that he will be deprived of his liberty only to the extent

**79.** That statute states in pertinent part: "In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury."

determined by the jury in the exercise of its statutory discretion."

■ 256) Thus, under *Hicks*, where a defendant has a legitimate liberty interest in state procedure, his constitutional rights may be violated if the state procedure is not followed. Here, however, there was no violation of state law. A presentence hearing was held for the offenses for which the death penalty could be imposed, *i.e.*, the murders, as required by § 532.025(1)(b). As Matthews admits, the instructions to the jury during the *guilt* phase included only *non-capital* verdicts. Thus, his constitutional argument, premised on *Hicks*, fails. The writ should be denied as to this issue.

### I. Alleged Capital Sentencing Instruction Errors [80]

#### 1. Procedurally defaulted claims

257) Matthews raises two claims regarding sentencing instructions that were raised for the first time in his RCr 11.42 motion: (1) no residual doubt instruction was given; and (2) no instruction was given on the presumed innocence of aggravating factors. RCr 11.42 Appeal Proc., Appellant's Br. at 42–48. As respondent points out in his answer, Answer at 89, DN 33, the Kentucky Supreme Court held in its decision on collateral review that these issues were procedurally defaulted and they would not be considered on appeal of Matthews' RCr 11.42 motion. *Matthews II* at 11. Even though the Kentucky Supreme Court also briefly considered the merits of the claims, they are still procedurally defaulted. *Harris*, 489 U.S. at 260, 109 S.Ct. 1038. Because Matthews has not established "cause and prejudice" for the procedural default or actual innocence, the

court may not reach the merits of these claims.[81] *Id.*

#### 2. Remaining assignments of error

■ 258) The remaining assignments of error concerning the penalty phase jury instructions were raised on direct appeal and, therefore, were not procedurally defaulted. "On habeas review, errors on instructions are not reviewable unless they deprive a defendant of constitutional due process." *Gall II*, 231 F.3d at 321. The standard for reviewing jury instructions from the selection phase of a capital sentencing process is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' " *Buchanan*, 522 U.S. at 276, 118 S.Ct. 757 (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

#### a. Sentence less than death

259) Matthews argues that his constitutional rights were violated because no instruction was given to the jury on its ability to sentence him to less than death even if an aggravating circumstance was found. Pet. at 133–35, DN 23. He asserts that the trial court should not have rejected the following proffered jury instruction: "Even if one aggravating circumstance is proven beyond a reasonable doubt and you do not find the existence of any mitigating factor, you are instructed that you are not required as a matter of law to return a verdict of death by electrocution." *Id.* at 133–34.

260) Respondent argues that this claim was one of the many claims raised on state collateral review which were considered

---

80. These claims are set forth at Pet. at 113–156, DN 23.

81. Nevertheless, the merits of these claims are briefly addressed in Part III.D.8 in the Court's analysis of whether appellate counsel's failure to raise these claims was ineffective.

procedurally defaulted by the Kentucky Supreme Court. *See* Answer at 89, 92, DN 33. However, as Matthews points out in his petition, he raised this claim as issue number twenty-five of his direct appeal. Direct Appeal Plead., Appellant's Brief at 173–75. It was rejected by the Kentucky Supreme Court without discussion. Therefore, it was not procedurally defaulted, and the court will conduct a *de novo* review of its merits. *Maples,* 340 F.3d at 437.

261) At Matthews' trial, the jury was instructed:

> You may recommend that the defendant ... be sentenced (a) to confinement in the penitentiary for a term of twenty (20) years or more; (b) to confinement in the penitentiary for life; or (c) to death, in your discretion, but you cannot recommend that he be sentenced to death unless you are satisfied from the evidence beyond a reasonable doubt that at least one of the statements listed as (a) or (b) in Instruction No. 2 (Aggravating Circumstances) is true in its entirety, in which event you must designate in writing signed by the foreman, which of the aggravating circumstances you found beyond a reasonable doubt to be true.

TR II at 234. The jury also was instructed

> (a) If you have a reasonable doubt as to the truth or existence of any one of the "aggravating circumstances" listed in Instruction No. 2, you shall not make any finding with respect to it.
>
> (b) If upon the whole case you have reasonable doubt whether the defendant should be sentenced to death, you shall recommend a sentence of imprisonment instead.

*Id.* at 235.

262) The jury verdict form provided: "We, the jury, find the following aggravating circumstances to be true: [A space was left for the jury to fill in the appropriate aggravating circumstance(s) and for the jury foreman's signature.] We, the jury recommend that the defendant, David Eugene Matthews, be sentenced to death. [A space was left for the jury foreman to sign and for the date to be filled in.]" *Id.* at 237–38.

263) Here, the court finds the Supreme Court's decision in *Weeks,* 528 U.S. 225, 120 S.Ct. 727, is dispositive. In *Weeks,* when, during deliberations, the jury asked for clarification as to its role in deciding between the death penalty and a life sentence, defense counsel asked that the jury be instructed that they could impose a life sentence even if it found one of more aggravators. *Id.* at 230, 120 S.Ct. 727. Instead, the trial judge referred the jury to the instructions, which provided:

> If you find from the evidence that the Commonwealth has proved, beyond a reasonable doubt, either of the two alternatives, and as to that alternative, you are unanimous, then you may fix the punishment of the defendant at death, or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at imprisonment for life, or imprisonment for life with a fine not to exceed $100,000.

*Id.* at 229, 120 S.Ct. 727.

The Supreme Court found that the jury had been adequately instructed. *Id.* at 232–34, 120 S.Ct. 727. In so doing, the Court relied on *Buchanan,* 522 U.S. at 276, 118 S.Ct. 757, which discussed prior Court cases establishing "that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence" but "the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giv-

ing effect to any relevant mitigating evidence."

264) The jury instructions in Matthews' case were substantially similar to those in *Weeks*. The jury was instructed as to the three sentencing options available: 1) twenty or more years in prison; 2) life in prison; or 3) death. TR II at 234. It also was instructed that if upon the case as a whole, a reasonable doubt existed whether death should be the sentence, a sentence of imprisonment was required. *Id.* at 235. Review of the instructions as a whole, as this court must do, reveals no constitutional violation. *See Boyde*, 494 U.S. at 378, 110 S.Ct. 1190 ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."). The court finds Matthews' claim on this issue to be without merit.

### b. No instruction was given on statutory mitigating circumstances

265) Matthews argues that the trial court's instructions regarding mitigating evidence did not comport with KY.REV. STAT. § 532.025 and improperly implied, with the help of the prosecution's closing argument, what the weight of the statutory mitigating circumstances should be. Pet. at 137–42, DN 23. He asserts that the jury was left "rudderless" because, under the instructions, the jury could have assumed that the standard of proof required in the penalty phase was the same as that required in the guilt phase. *Id.* at 141–42. He further contends that the instructions actually precluded the jury from considering as mitigating circumstances Matthews' intoxication, extreme emotional disturbance, adjustment disorder, and belief that his actions were justified because the jury already had found that those circumstances were insufficient to constitute a defense to the crime. *Id.* at 142. Matthews raised this issue on direct appeal at

issue twenty-one, Direct Appeal Plead., Appellant's Br. at 152–58, and the Kentucky Supreme Court denied it without discussion. Accordingly, this court will conduct a de novo review of the claim. *Maples*, 340 F.3d at 437.

266) At the penalty phase, the jury was given the following instruction regarding mitigating circumstances.

> In recommending a sentence for the defendant ... you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence *and you believe to be true*, including but not limited to such of the following *as you believe from the evidence to be true:*
>
> (a) That the defendant has no significant history of prior felony convictions.
>
> (b) That when he committed the offense or offenses of which you have found him guilty he was acting under the influence of extreme mental or emotional disturbance.
>
> (c) That the offense or offenses were committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.
>
> (d) That at the time he committed the offense or offenses the defendant's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was impaired as a result of the use of alcohol.
>
> (e) That at the time he committed the offense or offenses the defendant's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was impaired as a result of the use of drugs.
>
> (f) The presence of any other circumstance or circumstances arising

from the evidence which you, the Jury, deem to have mitigating value.

In addition to the foregoing, you shall consider also those aspects of the defendant's character and record, and those facts and circumstances of the particular offense or offenses of which you have found him guilty, about which he has offerred [sic] evidence in mitigation of the penalty to be imposed upon him and *which you believe from the evidence to be true.*

TR II at 231–32 (emphasis added).

267) First, whether or not the jury instructions comported with KY.REV.STAT. § 532.025 does not raise a constitutional claim as required for habeas relief. *See Seymour*, 224 F.3d at 552 (holding errors in state law do not warrant federal habeas relief). Second, the court is unconvinced that the jury was left "rudderless" as to the standard of proof. The jury was instructed, specifically, to consider as mitigators Matthews' lack of criminal record, EED, belief that his actions were justified, and impaired capacity, if they believed those circumstances to be true. The jury also was instructed to consider any other circumstance deemed to have mitigating value which it believed from the evidence to be true. There is no constitutional prohibition against placing the burden of proof as to mitigating circumstances on the defendant. "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged ... a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton v. Arizona*, 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The writ should not issue on this claim.

### c. No instruction was given on applicable mitigation evidence

268) Matthews next argues that, in violation of his constitutional rights, the trial court encouraged the jury to give less weight to a statutory mitigating factor by rejecting his proffered instruction that at the time of the capital offense Matthews' ability to appreciate the criminality of his conduct was impaired as a result of a mental disease or defect even though the impairment was insufficient to constitute a defense to the crime. Pet. at 142–44, DN 23. Matthews raised this issue on direct appeal at issue twenty-two. Direct Appeal Plead., Appellant's Br. at 159–63. The Kentucky Supreme Court denied it without discussion, and therefore, this court will review the claim *de novo*. *Maples*, 340 F.3d at 437.

269) The court finds this argument unavailing. In *Buchanan*, the trial court rejected the defendant's proffered jury instructions on individual mitigating factors. 522 U.S. at 273–74, 118 S.Ct. 757. Instead, the jury was instructed to base its decision on all of the evidence. *Id.* at 277, 118 S.Ct. 757. The Supreme Court held that the failure of the instructions to instruct on a particular statutory mitigating factor did not violate the Constitution since the jury was given an instruction to consider all of the evidence and since extensive arguments had been made by defense counsel and the prosecutor on the mitigating evidence and the effect it should have on the sentencing determination. *Id.* at 278, 118 S.Ct. 757. Here, as well, the jury was instructed to consider not just the listed mitigators but all of the evidence. *See* TR II at 232 (jury instructed to consider "the presence of any other circumstance or circumstances arising from the evidence which you, the Jury, deem to have mitigating value"). Moreover, as in *Buchanan*, it is unlikely that Matthews'

jury would have disregarded the extensive testimony on Matthews' mental and emotional problems. The writ should not issue on this claim.

### d. The penalty phase verdict forms were impermissibly weighted in favor of death

270) Matthews argues that the penalty phase verdict forms were unconstitutionally weighted in favor of death by failing to give equal dignity to mitigating and aggravating circumstances, by the location of the aggravating circumstances on the jury form, and by the repeated use of the word "recommend." Pet. at 144–48, DN 23. Matthews raised these issues on direct appeal (issues seventeen, twenty-three, and twenty-six), Direct Appeal Plead., Appellant's Br. at 139–44, 164–66, 177–78, and the Kentucky Supreme Court denied them without discussion, requiring a *de novo* review by this court. *Maples,* 340 F.3d at 437.

271) Matthews' argument that the jury verdict form should have required the jury to make written findings as to the mitigating circumstances, Pet. 145–146, DN 23, is unavailing. The Sixth Circuit has held that there is no constitutional requirement that written findings be made regarding mitigating circumstances at the penalty phase. *McQueen,* 99 F.3d at 1332 (holding that there is no constitutional requirement that written findings be made at the penalty phase).

272) Matthews' argument that the location of the jury's recommendation of death, *i.e.,* after the place on the form where the jury was required to write out which aggravators it had found, effectively directed that a sentence of death be returned, also fails. A review of the instructions as a whole reveals no constitutional violation. *See Boyde,* 494 U.S. at 378, 110 S.Ct. 1190. As this court already has found, the jury instructions in Matthews' case were substantially similar to those upheld in *Weeks.* The jury was instructed that the three sentencing options were available; that if upon the case as a whole a reasonable doubt existed whether death should be the sentence, a sentence of imprisonment was required; and that a sentence less than death was required if there was reasonable doubt as to whether death should be the sentence. TR II at 234–35. "A jury is presumed to follow its instructions." *Weeks,* 528 U.S. at 234, 120 S.Ct. 727. The court does not find that the location of the sentence recommendation effectively directed a sentence of death.

273) Furthermore, as will be discussed in greater detail, the use of "recommend" was not unconstitutional. *See infra* Part III.L. The writ should not issue on this claim.

### J. Jury Selection [82]

274) Matthews raises four arguments with respect to the selection of the jury. He first argues that the jury was not properly qualified. Second, he claims that the trial court improperly refused to strike Venireman Eaton for cause. Third, he claims that the trial court improperly removed Venireman Furlong for cause. Finally, he claims that counsel were ineffective because they did not move to strike Juror Kavich for cause. The court will separately address each challenge.[83]

### 1. Inadequate examination of the venire panel

275) Matthews argues that the jury was not properly qualified because the trial court unduly limited questioning of the

---

82. These claims are set forth at Pet. at 98–111, DN 23.

83. Matthews' fourth argument has already been addressed in the ineffective-assistance-of-counsel-section of this report and recommendation. *See supra* Part III.D.

venire panel. Matthews raised this argument as issue number four of his postconviction appeal brief. RCr 11.42 Appeal Proc, Appellant's Br. at 40–42. The Kentucky Supreme Court held that the issue was "not properly raised in an RCr 11.42 motion [and] could have and perhaps should have been raised on direct appeal." *Matthews II* at 10. While the Kentucky Supreme Court looked at the merits of the claim, the claim is still procedurally defaulted because "the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds" of procedural default. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *see also Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Clifford v. Chandler,* 333 F.3d 724, 728–29 (6th Cir. 2003) ("When the state court relies on an independent procedural ground in order to deny relief, its discussion of the merits of the claim will not disturb the procedural bar."), *overruled in part on other grounds by Wiggins,* 539 U.S. 510, 123 S.Ct. 2527.

276) Because the court concludes that this claim has been procedurally defaulted, it must next determine whether Matthews has shown "cause and prejudice" or actual innocence sufficient to overcome the procedural default. *See Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. 2497. " 'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

277) Matthews argues that ineffective assistance of appellate counsel excuses his procedural default of this issue. Pet. at 257–266, DN 23. Even assuming that Matthews could meet the "cause" prong to excuse his procedural default, he cannot meet the "prejudice" prong because he failed to establish that he was actually prejudiced as a result of the claimed constitutional error. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Rust,* 17 F.3d at 161–62. The prejudice must have worked to a petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. 1584. If there is strong evidence of a petitioner's guilt and a lack of evidence for his claim, the actual prejudice requirement is not satisfied. *Id.* at 172, 102 S.Ct. 1584; *Rust,* 17 F.3d at 161–62. There is no prejudice where the petitioner does not show a reasonable probability of a different verdict. *Mason,* 320 F.3d at 629. And, the mere possibility of prejudice is insufficient. *Frady,* 456 U.S. at 170, 102 S.Ct. 1584.

278) Here, Matthews failed to establish the requisite "actual prejudice" because there is strong evidence of his guilt as he conceded his guilt in the matter. Moreover, he failed to establish that the verdict would have been different had this alleged error not occurred. And, he failed to establish that he was actually innocent. Accordingly, the court concludes that the claim is procedurally barred and should be denied.

279) Furthermore, even if the claim were not procedurally defaulted, the court does not believe that it would merit habeas review. In rejecting this claim, the Kentucky Supreme Court held that "a review of the record does not support the contention by Matthews that his counsel was not given sufficient latitude in questioning the jury regarding their views on capital punishment.... At trial, both group *voir dire* and individual voir dire were conducted and the trial judge permitted counsel to ask questions of the jury." *Matthews II* at 10. A review of the voir dire and relevant federal authority, *see supra* Part III. D.8.b,[84] confirms that the Kentucky Su-

---

**84.** The court throughly analyzed the *voir dire* and relevant case law in assessing Matthews'

preme Court properly rejected this claim.

## 2. Venireman Eaton

280) Citing no case law, Matthews argues that the failure to remove Venireman Eaton for cause violated his rights under both his Eighth and Fourteenth Amendments to the United States Constitution.[85] During group *voir dire,* defense counsel asked members of the panel whether they could consider the lesser included degrees of homicide notwithstanding the fact that Matthews shot both his wife and mother-in-law. TE II at 150. Specifically, counsel asked:

> DEFENSE COUNSEL: [I]f you have no doubt that [Matthews] killed one of the individuals but have some doubt as to the degree of the offense, you must find him guilty of the lesser degree. Does everyone understand that?
>
> VENIREMEN: (no response)

*Id.* Venireman Eaton thereafter responded by stating, "Murder is murder. If it's beyond a reasonable doubt, that's it." *Id.* At that point the trial judge intervened by asking this venireman whether he could follow that court's instructions notwithstanding his personal beliefs. Venireman Eaton said he could. *Id.* Later, the trial court overruled the defense's motion to excuse Venireman Eaton for cause on the ground that the venireman indicated he could follow the court's instructions. *Id.* at 173–74. And, it overruled counsel's motion to question this venireman further. *Id.* Defense counsel removed this venireman by way of a *peremptory challenge,* Pet. at 74, DN 23, and he did not sit on the jury, TE II at 187.

281) Matthews raised this argument as issue number four on direct appeal. Direct Appeal Plead., Appellant's Brief at 43–46. The Kentucky Supreme Court, however, did not specifically address the claim. Accordingly, this court must conduct a *de novo* review of the claim. *Maples,* 340 F.3d at 437.

282) The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI. The right to an impartial jury is applicable to the states by way of the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The Supreme Court held in *Ross v. Oklahoma,* 487 U.S. 81, 85–86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), that a defendant's right to challenge the failure to remove a venireman for cause is dependent upon whether the juror actually sat on the jury, and if petitioner properly preserved his claim. As long as the jury that sits is impartial, the fact that a defendant must use a peremptory challenge to achieve that end does not rise to the level of a Sixth Amendment violation. *Id.* at 88, 108 S.Ct. 2273. Thereafter, in *United States v. Martinez–Salazar,* 528 U.S. 304, 315–16, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), the Supreme Court held that when a defendant objects to a trial court's denial of a for-cause challenge to a potential juror, the defendant may choose either to remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge, or to allow the juror to sit, thereby preserving the Sixth Amendment claim for appeal. *Id.*

283) Here, defense counsel chose to exercise a peremptory challenge to remove Venireman Eaton from the jury. He did not sit on Matthews' jury and was not a member of the jury that convicted Mat-

---

independent claim that his appellate counsel's failure to present this argument on direct appeal constitutes ineffective assistance of counsel.

**85.** It is unclear why Matthews premised this argument on the Eighth Amendment as it is the Sixth Amendment which guarantees a criminal defendant the right to an impartial jury. The court will so review the claim.

thews and subsequently fixed his punishment at death. Thus, Matthews has no Sixth Amendment challenge based on the trial court's failure to remove Venireman Eaton for cause. *See Wolfe v. Brigano*, 232 F.3d 499, 501–03 (6th Cir.2000) (discussing *Ross* and *Martinez–Salazar* in a decision that granted habeas corpus relief on this issue). Accordingly, the claim should be denied on the merits.

### 3. Venireman Furlong

284) During individual *voir dire*, the trial court specifically questioned Venireman Furlong about his beliefs on the death penalty. The following exchange occurred:

> TRIAL COURT: My question to you, sir, is do you have any conscientious, moral or religious scruples which would prevent your considering this whole range of punishment, including death?
>
> FURLONG: Well, I do have some reservations about the death penalty, yes.
>
> TRIAL COURT: I expect most people do, but are you telling me that in this or any other case, you could never consider giving death as a penalty?
>
> FURLONG: I think I would really have a hard time.
>
> TRIAL COURT: I understand that, sir.
>
> FURLONG: I would almost rule it out. I can't say absolutely.
>
> TRIAL COURT: Well, I need for you to. I have to know.
>
> FURLONG: I would rule it out.
>
> TRIAL COURT: You would not consider it in this or any other case, you can imagine?
>
> FURLONG: I just can't see giving the death penalty to anybody. That's just my personal beliefs.
>
> TRIAL COURT: So that in this case, no matter what the circumstances were, or in any other case, you would never consider death as a penalty?
>
> FURLONG: No, I just can't see. I can't consider that.

TE I at 108–09. After further questioning by defense counsel, Venireman Furlong ultimately concluded that "I couldn't see giving it [*i.e.*, the death penalty] to anybody under any circumstances." *Id.* at 111. The trial court dismissed him for cause, *id.*, and Matthews argues that Venireman Furlong's removal for cause violated his rights under both the Eighth and Fourteenth Amendments to the United States Constitution.[86]

285) Matthews raised this argument as issue number three on direct appeal. Direct Appeal Plead., Appellant's Br. at 40–43. The Kentucky Supreme Court, however, did not address this argument in any substantive manner. *Matthews I*, 709 S.W.2d at 417. Accordingly, this court must conduct a de novo review of the claim. *Maples*, 340 F.3d at 437.

286) In *Witherspoon*, 391 U.S. at 521, 88 S.Ct. 1770, the Supreme Court held that it is improper to exclude veniremen simply because they voiced general objections to the death penalty or expressed conscientious or religious objections to its imposition. The proper standard for determining when a prospective juror may be excluded for cause is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 418–26, 105 S.Ct. 844; *Greer v. Mitchell*, 264 F.3d 663, 686 (6th Cir.2001). When the trial court is left with the clear impression that the prospective juror could not apply the law in a faithful and impartial manner, then the prospective juror may be excluded for cause and "deference

---

**86.** Again, it is unclear why Matthews premised this argument on the Eighth Amendment as it is the Sixth Amendment which guarantees a criminal defendant the right to an impartial jury. The court will so review the claim.

must be paid to the trial judgment who sees and hears the juror." *Id.* at 426, 105 S.Ct. 844; *see also Uttecht v. Brown,* 551 U.S. 1, 127 S.Ct. 2218, 2229, 167 L.Ed.2d 1014 (2007).

287) Here, the court concludes that Venireman Furlong was properly excused for cause. The testimony reflects that Furlong did not merely voice general objections to the death penalty. Rather, he believed he could never consider the death penalty as a possible sentence for Matthews and was steadfast in his belief that the death penalty was never justified. It is clear that his position would have prevented or substantially impaired the performance of his duties as a juror had he been selected, and the trial court properly excused him. This court concludes that there is no federal constitutional error here; the claim should be denied.

### K. Jury Deliberation Related Issues [87]

288) Matthews raises two issues with respect to the jury deliberations. First, he argues that the jury impermissibly considered parole in considering whether to sentence him to death. Second, Matthews argues that the trial court should not have allowed the jury to separate and failed to properly admonish the jury when it did separate. Matthews argues that these occurrences violated his Sixth, Eighth, and Fourteenth Amendment rights.

#### 1. Jury considered parole

289) During the penalty phase of the jury's deliberations, the jury sent a note to the trial judge asking six questions. Four of the questions dealt with parole. Specifically, the jury asked the following questions about parole:

(3) If a sentence of life imprisonment is imposed what is the minimum time that must be served before one becomes eligible for parole?

(4) If a sentence of a certain length of time is imposed, what lengths of time must be served before one becomes eligible for parole; for instance, if a sentence of 50 years is imposed when does one become eligible for parole?

(5) If two life sentences or two fixed terms are imposed, can the jury recommend that the terms be consecutive or concurrent?

(6) If a life sentence or a fixed term is imposed can the jury recommend the sentence to be served without parole?

TE VII at 729–30. In response, the trial court instructed the jury that these "are questions which the court cannot instruct you on." *Id.* at 432. The trial court then told the jury to "consider the court's instruction as given to you, and see if you can reach a verdict." *Id.*

290) Matthews has now presented the affidavits of two jurors, David Eugene Durham and Mary Jo Fisher Raichart. Both jurors state that they voted for death to avoid the possibility that Matthews would be paroled.[88] At the time of Mat-

---

87. These claims are set forth at Pet. at 159–67, DN 23.

88. Mr. Durham states:

1. I was a juror in the 1981 capital trial of David Eugene Matthews in Louisville, Kentucky.

2. While we as a jury were deliberating on the kind and type of sentence to recommend for Mr. Matthews, one of the jurors said that they thought that no matter what kind of sentence we gave him, that he would be eligible for parole within a short period of time after being sentenced.

3. We all felt that this had a great impact upon our sentencing decision, therefore, we asked the judge how we were to consider parole in the sentencing choices we had to make.

4. The judge told us he could not answer our questions. However, he never told us not to consider parole in deciding upon an appropriate sentence.

thews' sentencing, Kentucky law prohibited the consideration of parole by the jury. *See Brown v. Commonwealth*, 445 S.W.2d 845, 848 (Ky.1969). Matthews argues that the jury's consideration of parole served as a nonstatutory aggravator, and therefore, violated his constitutional rights.

291) Matthews raised this argument as issue number two of his postconviction appeal brief. RCr 11.42 Appeal Proc., Appellant's Br. at 36–38. However, the Kentucky Supreme Court concluded that this argument was not properly brought under RCr 11.42 because Matthews raised it on direct appeal. *Matthews II* at 9 ("Matthews continues to argue that the jury improperly considered the possibility of parole.... [On direct appeal] this court determined that the trial judge adequately instructed the jury as to parole."). The argument raised and decided on direct appeal, however, was whether the trial judge adequately instructed the jury about parole in response to their questions. *Matthews I*, 709 S.W.2d at 422. This is a distinct issue from whether the jury's actual consideration of parole violated Matthews' constitutional rights. Thus, although raised by Matthews, the state court has never considered whether the jury's consideration of parole violated Matthews' federal constitutional rights. As such, the court must undertake a de novo review of this claim. *Maples*, 340 F.3d at 437.

292) The first issue the court must address is whether the affidavits are admissible for consideration by the court. Rule 606(b) of the Federal Rules of Evidence [89] prohibits a juror from testifying as to "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith," except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. *Id.* Thus, under this rule courts generally hold that external considerations are admissible while internal ones are not.

293) In *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court provided examples of internal and extraneous jury influences. Examples of internal influences include the behavior of jurors during deliberations, the jurors' ability to hear or comprehend trial testimony, and physical

---

5. Because we believed that Mr. Matthews might be eligible for parole in a relatively short period of time if we handed down a sentence of less than death, I voted for the death penalty so that Mr. Matthews would have to stay in prison.
DN 25, Ex. 22.
Mrs. Fisher Raichart states:
1. I was a juror in the 1982 capital trial of David Eugene Matthews in Louisville, Kentucky.
2. My name at the time of the trial was Mary Jo Fisher. My name is now Mary Jo Fisher Raichart. The jury was concerned about the possibility of parole within a short time.
3. We all felt that this had a great impact upon our sentencing decision, there-fore, we asked the judge how we were to consider parole in the sentencing choices we had to make.
4. The judge told us he could not answer our questions. He never told us not to consider parole in deciding upon an appropriate sentence.
5. Because we believed that Mr. Matthews might be eligible for parole in a relatively short period of time if we handed down a sentence of less than death, I voted for the death penalty so that Mr. Matthews would have to stay in prison.
DN 25, Ex. 21.

**89.** Pursuant to Federal Rule of Evidence 1101(e), the Federal Rules of Evidence apply to habeas corpus cases brought under § 2254.

or mental incompetence of a juror. *Id.* at 118, 107 S.Ct. 2739. In contrast, Tanner explained that external influences are generally specific pieces of information considered by the jury such as a newspaper article or a juror's personal experience with one of the parties. *Id.* at 117–18., 107 S.Ct. 2739

294) Thus, the issue in this case is whether the jurors' consideration of the possibility that Matthews might be paroled if not sentenced to death is an inadmissible internal consideration or an admissible external one.

295) In *Gall II*, 231 F.3d at 334, the Sixth Circuit held that a juror's testimony regarding "the effect of parole and other factors upon [that juror] or any other juror's 'mind or emotions as influencing the juror to assent or to dissent from the verdict'" was the kind of "paradigmatic internal considerations" prohibited by Rule 606(b). *Id.* (quoting Fed.R.Civ.P. 606(b)).

296) The Seventh Circuit confronted a similar issue in *Silagy v. Peters*, 905 F.2d 986, 1008 (7th Cir.1990), and reached the same conclusion. In that case, like the present case, during the sentencing phase of the trial, a juror took it upon himself to inform the other jurors about his understanding of Illinois sentencing procedures. *Id.* The rogue juror stated that even if sentenced to life the defendant would serve no more than five to seven years before being paroled. *Id.* The district court refused to consider testimony from other jurors about this statement and its effect because it found that the testimony was barred under Rule 606(b). *Id.* The Seventh Circuit affirmed explaining:

> The district court concluded, this discussion was simply the result of "a juror's erroneous ideas"—that is to say, this is not something upon which we permit the impeachment of jury verdicts under Federal Rule of Evidence 606(b). As was noted by this court in *United States*

*v. Ford*, 840 F.2d 460 (7th Cir.1988), Rule 606(b) is designed to protect the judicial process from constant attempts to undermine jury verdicts through the scrutiny of the juror's thoughts and deliberations. With this policy in mind, this court "will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes, in the absence of a claim of external influence." *Id.* at 465 (emphasis added). Petitioner cannot use this juror's statements in a habeas corpus proceeding to impeach the jury's sentencing determination. *Shillcutt v. Gagnon*, 827 F.2d 1155, 1158–59 (7th Cir.1987) (Applying Rule 606(b) in a § 2254 hearing). Accordingly, Petitioner's challenge to his sentence based on that ground is rejected.

*Id.* at 1008–09.

297) Matthews has not presented this court with any evidence that the jury considered some external piece of information that was not admitted at trial in reaching its sentencing verdict. If that were the case, then the court might be able to consider it. Rather, Matthews has presented the Court with only affidavits from two jurors stating that the possibility of parole influenced their verdict. As explained by the Sixth Circuit in *Gall II*, such evidence is undisputably intrinsic in nature, and therefore, inadmissible under Rule 606(b). Thus, the court cannot consider it in this habeas action.

298) Even if the court were to consider this evidence, the fact that the jury considered parole in violation of Kentucky law does not establish a violation of federal law. *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir.2003) ("Consideration of a nonstatutory aggravating circumstance, *even if contrary to state law*, does not violate the Constitution.") (emphasis added).

299) At the time that Matthews was sentenced, no clearly established Supreme Court precedent held that it was impermissible for a jury to consider the possibility that the defendant might be paroled in determining whether to impose the death penalty. As explained by the Sixth Circuit in *Gall II*:

> [A] habeas court can only review claims that allege a violation of federal law. *See Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). ***Thus, Gall's argument that Kentucky law prohibits a jury from considering parole is not cognizable on habeas review.*** The Commonwealth also correctly points out that considering the potential for parole or a defendant's "return to society" does not violate constitutional norms. *See, e.g., Simmons v. South Carolina*, 512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (concluding that "it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not"); *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (upholding a judicial instruction regarding a governor's power to commute a life sentence); *see also Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (stating that the "Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules"). Thus, neither of these arguments alone merits habeas review.

*Gall II*, 231 F.3d at 334 n. 33 (emphasis added); *see also Salazar v. Dretke*, 419 F.3d 384, 403 (5th Cir.2005) ("[T]here is no indication from the Supreme Court ... that a jury's discussion of parole law runs counter to any constitutional principle. If anything, what little the Supreme Court has said on the issue (or related issues) leans in the other direction.").

300) Thus, even if admissible, the fact that Matthews' jury considered the possibility of parole in deciding to sentence him to death does not present any federal constitutional violation. *See Gall II*, 231 F.3d at 334; *see also McQueen*, 99 F.3d at 1332 ("[T]here is no support for the proposition that any jury question about parole implicates a federal constitutional standard."). As such, Matthews is not entitled to habeas relief on this claim, and it should be denied.

## 2. The trial court's refusal to sequester the jury

301) Prior to trial, Matthews' counsel moved that the jury be sequestered. TE II at 137–39. The trial judge overruled the motion by informing the jury on the first day of trial that he did not believe sequestration would be necessary. *Id.* at 190. The trial court then instructed the jury as follows:

> The reception of evidence in a case is the evidence which you get in the Courtroom.... That is the evidence that a Jury must consider. I say this because there may very well be news stories about this case itself, and I want you to know that news stories very often give background material or other material which is gained from other sources which may or may not be reliable and certainly is not subject to cross examination or to your scrutiny of the witnesses who said certain things. Therefore it will be your responsibility, since we are not sequestering this Jury, if there is a news story, don't read it; simply do not read it. If there is a story on the radio or the television, please don't watch it; don't listen to it.
>
> ...
>
> An admonishment must be given to you each time we separate or if I give it to you now, we can simply remind you of it later, and that is the admonition that, of

course, you don't want to begin to make up your minds or form any opinion about the guilt or innocence of the defendant until you have heard all that is to be presented. It is only fair that you hear the whole case first. Therefore; until you get ready to go back into your juror room finally to deliberate on this case, you should not discuss it among yourselves nor with anyone else, nor should you permit anyone to discuss the case in your presence. If someone should try to do so, it would be your obligation to tell them that you are on the jury and therefore ask them to stop. If they should persist, then you should report that fact to the Court to try to ascertain who it is. That's violating the rule, because it would be contemptuous of the Court proceeding and would be treated in that fashion. . . . That admonition which I gave you just then, Ladies and Gentleman, we will call our separation admonition, and I won't have to repeat that all over again. I will simply remind you of it when we separate.

*Id.* at 193–94. As promised, the trial court reminded the jurors of their separation admonishment each time they separated.

302) Matthews argues that the trial court's refusal to sequester the jury violated his Sixth, Eighth, and Fourteenth Amendment rights. According to Matthews, the Federal Constitution requires that a jury in a capital case must be sequestered throughout the course of the trial, even before it begins jury deliberations. Matthews asserts that the trial court's refusal to sequester the jury, in his case was particularly problematic because during the same period in which Matthews was being tried, October 5–8, 1982, another capital defendant, Edward Lee Harper, was also being tried in a different division of the Jefferson Circuit Court, and portions of that "sensational trial" were televised. Finally, Matthews argues that the failure to sequester the jury was com-

pounded by the trial court's failure to repeat the separation admonishment in full each time the jury separated. Matthews raised these arguments as issues number five and six in his direct appeal. Direct Appeal Plead., Appellant's Br. at 47–54. Because the Kentucky Supreme Court did not address these claims, the court will review them *de novo*. *Maples,* 340 F.3d at 437.

303) Matthews claims that the right to sequestration is clearly established by "both United States Supreme Court precedent and historical antecedents." However, Matthews has not cited a single United States Supreme Court case that requires a capital jury be sequestered. He cites only to a Supreme Court of Indiana case, which states that the court was not aware of any capital defendant being sentenced to death by a jury that was not sequestered. *See Lowery v. State,* 434 N.E.2d 868, 870 (Ind. 1982), *overruled in part on other grounds by Modesitt v. State,* 578 N.E.2d 649, 652 (Ind.1991). An in dicta statement by the Indiana Supreme Court, however, does not make sequestration a clearly established federal constitutional right.

304) "Sequestration is an extreme measure, one of the most burdensome tools of the many available to assure a fair trial." *Drake v. Clark,* 14 F.3d 351, 358 (7th Cir.1994) (quoting *United States v. Greer,* 806 F.2d 556, 557 (5th Cir.1986)). In *United States v. Johnson,* 584 F.2d 148, 155 (6th Cir.1978), the Sixth Circuit concluded that the decision whether to sequester a jury is entrusted to the sound discretion of the trial judge and that the trial court's "failure to sequester a jury standing alone could rarely, if ever, constitute reversible error." *Id.* More importantly, although there is a constitutional right to a fair trial, there is no absolute right to have one's jury sequestered in a criminal case, capital or otherwise. *See Lydon v. Kuhlman,* 62

F.Supp.2d 974, 979 (E.D.N.Y.1999); *Andrews v. Shulsen*, 600 F.Supp. 408, 420 (D.Utah 1984). Indeed, in federal criminal trials, the general practice is not to sequester jurors. *See Pena v. Rivera*, No. 05–Civ. 3109, 2006 WL 2265078, at *7, 2006 U.S. Dist. LEXIS 54587, at *20–21 (S.D.N.Y. July 31, 2006) (collecting cases). Thus, Matthews has failed to show that the trial court's refusal to sequester the jury violated a clearly established constitutional right as determined by the United States Supreme Court.

305) Furthermore, Matthews has not shown that the trial court's failure to sequester the jury was unreasonable in light of the circumstances. As noted above, the trial court instructed the jurors at the beginning of the trial not to watch, listen to, or read any news stories about Matthews' case or to discuss the case amongst themselves or others prior to deliberations and reminded the jurors of this admonishment each time they separated. Matthews has not presented any evidence to show that the jurors did not understand the admonishment or disobeyed it during the course of his trial. In short, Matthews has failed to show that he was prejudiced in any manner by the trial judge's refusal to sequester the jury. The most Matthews alleges is that a different capital trial was going on at the same time as his and that parts of that trial were televised. Matthews has not shown that any members of his jury saw this coverage, or even if they did see it, that it affected the outcome of his case.

306) While a separation admonishment generally is required to ensure a fair trial, *United States v. Williams*, 635 F.2d 744, 746 (8th Cir.1980), Matthews' has not cited, nor has this court located, any Supreme Court precedent that establishes that the separation admonishment must be repeated in full each time the jury separa-

rates. The court finds that the reminders that the trial court gave prior to each separation were adequate to protect Matthews' right to a fair trial. *See, e.g., Kleven v. United States*, 240 F.2d 270, 274 (8th Cir.1957) ("[W]e have never held, nor has any other court so far as we can find, that such admonition must be repeated at every recess, and we do not believe it is error to fail to do so when, as here, the court had earlier given a continuing admonition to the jury.") The court concludes that the admonishment and reminders were constitutionally adequate in light of the circumstances.

307) In conclusion, the court finds that Matthews' federal rights were not violated by the trial court's refusal to sequester the jury or its separation admonishment and that the state court properly rejected these claims. As such, Matthews is not entitled to habeas relief on these claims and they should be denied.

### L. Use of "recommend" diminished jury's role at sentencing [90]

308) Matthews asserts that his Eighth and Fourteenth Amendment rights were violated because the jury's role in sentencing him was vitiated by the use of the word "recommend" and the prosecutor's suggestion that the ultimate authority to sentence lay elsewhere. Pet. at 122, DN 23. Matthews claims that the prosecutor's "incessant" use of the word "recommend" and reference to the appellate process in closing led the jury to believe erroneously that the responsibility of imposing the death sentence did not rest with it. Matthews points to the fact that, since the decision in this case, Kentucky has adopted a bright-line rule forbidding the use of the word "recommend" in capital proceedings. *Id.* at 119 (citing *Tamme v. Commonwealth*, 759 S.W.2d 51, 53 (1988)). He also points out that the trial court granted his post-

---

**90.** This claim is set forth at Pet. at 118–22, DN 23.

conviction motion finding that the jury impermissibly had believed that the ultimate sentencing burden did not lie with it. *Id.* at 121–22.

309) Matthews cites to the following instances in the record wherein the term "recommend" was used in the instructions, in open court, and during closing. The jury instructions charged:

> You may *recommend* that the defendant ... be sentenced (a) to confinement in the penitentiary for a term of twenty years or more; (b) to confinement in the penitentiary for life; or (c) to death, in your discretion, but you cannot *recommend* he be sentenced to death unless you are satisfied from the evidence beyond a reasonable doubt that at least one of the statements listed as (a) or (b) in Instruction No. 2 (Aggravating Circumstances) is true in its entirety....

TE VII at 705 (emphasis added). In discussing mitigating and aggravating circumstances, the trial court twice referred to the fact that the jury would be "recommending a sentence for the defendant." *Id.* at 703–04. Additionally, defense counsel's objection to the use of the word "recommend" was denied as follows:

> MR. MORRIS: Objection, Judge.
> THE COURT: Yes, sir, I think the Jury, of course, will make a *recommendation.*
> MR. BUSSE: Your Honor, I would move that they be instructed that they *set* the penalty in this case, because they do set the penalty.
> THE COURT: The Jury is instructed to make a *recommendation.*

*Id.* at 724 (emphasis added).

310) The prosecutor also used the word "recommend" in closing, stating, "[Y]ou all promised us that you could consider imposing, fixing, *recommending* a death penalty ...," *Id.* at 707 (emphasis added); "I ask you, when you resolve yourself to *recommending* a penalty in fixing a penalty, to consider those thought processes, consider those facts that you had before you in reaching your verdict in this case," *Id.* at 710 (emphasis added); and "It's a very heavy burden to make this *recommendation,* and nobody promised you when you came on for jury duty that it was going to be a piece of cake or was going to be easy." *Id.* (emphasis added). The prosecutor also referred to the appellate process with regard to the implementation of sentence in this case:

> [Y]ou can render a verdict of death, and his rights are still protected, because that's the way the system works, and we don't go out immediately after something happens and go after retribution like that.... We have a process of steps and procedures and that's how civilized people operate, and we have operated under those procedures from day one, the time of his arrest.

*Id.* at 713–714.

311) This issue was raised on direct appeal. Direct Appeal Plead., Appellant's Br. at 139–45. The Kentucky Supreme Court rejected it, holding that because the pertinent statute, Ky.Rev.Stat. § 532.025(1)(b),[91] used the word "recommend," the trial court did no more than follow the language of the statute in instructing the jury. *Matthews I,* 709 S.W.2d at 420. The Kentucky Supreme Court continued:

> We are aware of the recent decision of the United States Supreme Court in *Caldwell v. Mississippi,* 472 U.S. 320,

---

91. Section 532.025(1)(b) states in pertinent part: "Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances, as defined in subsection (2) of this section, exist and to recommend a sentence for the defendant."

105 S.Ct. 2633, 86 L.Ed.2d 231(1985). In *Caldwell,* the Supreme Court reversed and ordered a new trial where the prosecutor, over defense counsel's objection, advised the jury that "the decision you render is automatically reviewable by the Supreme Court." The holding is that even though such a statement is a correct statement of the law, the prosecutor must not seek "to minimize the jury's sense of responsibility for determining the appropriateness of death." To do so results in a constitutionally impermissible violation of the U.S. Constitution Eighth Amendment's prohibition against cruel and unusual punishments.

The Concurring Opinion in *Caldwell v. Mississippi, supra,* by Justice O'Connor clarifies its application. It makes clear that the problem in *Caldwell* was that the words of the instruction, though correct, when coupled with "the prosecutor's misleading emphasis on appellate review," left the jury with "the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate."

Thus, we conclude that although in this area the court and prosecutor must be extremely careful to avoid leaving the jury with any impression that would diminish its "awesome responsibility" in imposing the death sentence (*McGautha v. California,* 402 U.S. 183, 208, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)), use of the word "recommend" is not per se constitutionally impermissible. It is not incorrect as long as the context in which it is used does not mislead the jury as to its role in the process or its responsibility in exercising its sentencing function.

We note, with approval, that in the present case the prosecutor said nothing to diminish the jury's sense of responsibility in imposing the death penalty. On the contrary, the prosecutor referred to the jury's responsibility as "a very heavy burden," and asked the jury for "a verdict, a penalty of death by electrocution." He stated that "the facts you heard ... warrant a death sentence." The prosecutor's remarks charged the jury with its responsibility, rather than diminishing it.

During closing argument of defense counsel, a colloquy took place regarding use of the word "recommendation" in the instructions. It was an exchange precipitated by the defense counsel's overstatement of the jury's function, not the prosecutor's understatement of the jury's role, and clarified by the court in an appropriate manner. We see no possibility of error or prejudice from this exchange.

Unlike *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984), cited by the appellant in support of his claim of error, here the prosecutor did not misuse the term recommend in a manner that could have been misleading to the jury. The conduct of the prosecutor in the present case was well within the bounds of propriety. Although a prosecutor must be extremely careful to avoid any remarks which could mislead the jury as to its role in the sentencing process, there was no impropriety here.

*Id.* at 421–22.

312) On post-conviction review, the trial court disagreed with the Kentucky Supreme Court's determination on this issue and entered an order that vacated the judgment imposing Matthews' death sentence because it had used the word "recommend" when instructing the jury during the penalty phase. TR V at 702–03. However, on review, the Kentucky Supreme Court held that, under the law-of-the-case doctrine, the trial court's order was void because the Kentucky Supreme Court previously ruled against Matthews

on direct appeal on this issue. TR VI at 769–70. The Kentucky Supreme Court additionally held that a trial court cannot adjudicate in a RCr 11.42 proceeding that which was raised on direct appeal and also that Matthews improperly raised the "recommend" issue not in his RCr. 11.42 motion itself, but in an amendment thereto. *Id.* at 770. Because the Kentucky Supreme Court reinstated the original judgment imposing the two death sentences as affirmed by the Kentucky Supreme Court on direct appeal, *see id.,* the AEDPA standard of review applies to that decision. *See* 2254(d).

313) In *Caldwell,* the seminal case in this area, the Supreme Court held that it was "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. 2633. Under *Caldwell,* "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). The Kentucky Supreme Court's application of *Caldwell* was not unreasonable, as an examination of the Sixth Circuit's recent decision in *Slaughter v. Parker,* 450 F.3d 224, 240 (6th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2914, 168 L.Ed.2d 243 (2007), makes clear.[92]

314) In *Slaughter,* the Sixth Circuit held that Slaughter's rights under *Caldwell* had not been violated because Slaughter had failed to make the required showing that the remarks to the jury did not correctly describe the role assigned to the jury un-

der Kentucky law. *Id.* at 240. As the Sixth Circuit explained, "After considering any aggravating and mitigating circumstances in a capital case, a jury in Kentucky 'recommends' a sentence for the defendant," and then the trial judge fixes the sentence within the limits prescribed by law. *Id.* (citing Ky.Rev.Stat. § 532.025(1)(b)). The *Slaughter* court noted that, in the past, the Kentucky courts struggled with jury instructions in capital cases that used the word "recommend," eventually holding in *Tamme* that henceforth "recommend" could not be used in *voir dire,* instructions, or closing arguments. *Id.* at 241. However, in *Slaughter,* because the description of the jury's role accurately reflected then-current Kentucky law, which granted the trial court the power to reduce the jury's recommended penalty, *Caldwell* was not violated, and habeas relief was not available.[93]

315) Similarly, here, following *Slaughter,* Matthews is not entitled to habeas relief on this claim. The description of the jury's role accurately reflected the law at the time, and the state-law prohibition against the use of the word "recommend," which went into effect after Matthews' trial, is not retroactive.

316) Additionally, as in *Slaughter,* the word "recommend" was not used in such a profligate way that it would confuse the jurors. *Compare Kordenbrock,* 919 F.2d at 1101 (jury was informed that it would make "a recommendation, that is all," which would not be binding on the court; also, jury instruction used "recommend" in reference to the sentence). The Kentucky Supreme Court's decision was not an unreasonable application of clearly estab-

---

**92.** The Sixth Circuit also has considered and rejected nearly identical claims to the one Matthews raises here in two other cases. *See Gall II,* 231 F.3d at 330; *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1101 (1990).

**93.** Slaughter's trial and conviction occurred in 1983, two years after Matthews' conviction and five years before the Kentucky Supreme Court's *Tamme* decision forbidding the use of the word "recommend."

lished federal law or an unreasonable determination of the facts. Consequently, Matthews' request for habeas relief on this issue should be denied.

## M. Prosecutorial Misconduct [94]

317) Matthews argues that he was deprived of the Sixth Amendment right to a fair trial, Eighth Amendment right to a rational sentencing procedure, and Fourteenth Amendment right to due process during his trial because of prosecutorial misconduct. In particular, Matthews points to the following events, actions, and testimony in support of his claim: 1) the prosecutor struck death-hesitant but death-qualified jurors; 2) the prosecutor asked Lawrence Cruse, Carol Engle, and Dr. Chutkow improper questions; and 3) the prosecutor made incorrect and prejudicial statements in closing arguments in both the guilt and penalty phases of the trial. With the exception of issue number one (discussed below), Matthews raised all of these arguments in his direct appeal. Direct Appeal Plead., Appellant's Br. at 106–127. Because the Kentucky Supreme Court did not address the claims, the court will review them *de novo*. *Maples*, 340 F.3d at 437.

318) The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the "narrow one of due process." *Darden*, 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "To be cognizable" on habeas review, prosecutorial misconduct "must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir.2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 637, 94 S.Ct. 1868). In this respect, "'the touchstone of the due process analysis . . . is the fairness

of the trial, not the culpability of the prosecutor.'" *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir.1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). If the court determines that a statement or action is improper, it must then weigh the following factors: "(1) whether the conduct or remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the conduct or remarks were deliberately or accidentally made; and (4) whether other evidence against the defendant was strong." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir.2001). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir.2004).

### 1. Strikes on the death-hesitant but death-qualified jurors

319) Matthews complains that the prosecutor used peremptory challenges to remove jurors who stated that they were willing to impose the death penalty, but nevertheless expressed some hesitancy about imposing it. Matthews raised this argument in his postconviction RCr 11.42 appeal brief. RCr 11.42 Appeal Proc., Appellant's Br. at 48. The Kentucky Supreme Court rejected the claim, holding that: "Such an issue could have been raised on direct appeal, but it was not. It is not the proper subject of an RCr 11.42 motion." *Matthews II* at 13. The Kentucky Supreme Court then briefly looked at the merits of the claim, stating that "there was no error because the Commonwealth properly used its peremptory challenges to strike some jurors." *Id.* Although the Kentucky Supreme Court briefly considered the merits, the claim is still procedurally defaulted because "the state court decision indicates clearly and

---

**94.** This claim is set forth at Pet. at 224–43, DN 23.

expressly that it is alternatively based on bona fide separate, adequate, and independent state grounds" of procedural default. *Michigan v. Long,* 463 U.S. at 1041, 103 S.Ct. 3469.

320) Absent either cause and prejudice or a finding of actual innocence, a federal court may not reach the merits of claims that have been procedurally defaulted in state court. *Reed v. Farley,* 512 U.S. at 354–55, 114 S.Ct. 2291. To establish cause, the petitioner must present a substantial reason to excuse the default. Matthews argues that ineffective assistance of appellate counsel excuses his procedural default of this issue. *See* Pet. at 257–66, DN 23. Even assuming that Matthews could meet the "cause" prong to excuse his procedural default, he cannot meet the "prejudice" prong because he failed to establish that he was actually prejudiced as a result of the claimed constitutional error.

321) Matthews failed to establish that the "death-hesitant" jurors would not have voted for death in this case. In fact, as Matthews points out, although they expressed hesitancy about the death penalty, each stricken juror indicated an ability to consider the death penalty in an appropriate case. Thus, Matthews fails to demonstrate the "reasonable probability of a different verdict" had the prosecutor not stricken these jurors. All Matthews has alleged is that there is a *possibility* that the verdict might have been different. This is insufficient. Accordingly, the court concludes that this claim is procedurally defaulted and should be denied.

322) Even if this claim were not procedurally defaulted, however, it would not warrant habeas relief. Matthews has not cited any controlling federal authority to support the proposition that a prosecutor may not use peremptory challenges to strike "death hesitant" jurors. Indeed, the little case law that this court has located on the subject indicates to the contrary.

*See Brown v. Dixon,* 891 F.2d 490, 497 (4th Cir.1989) ("We have nothing but respect for the district court's willingness to safeguard the rights of criminal defendants, and particularly of those facing a death sentence. We disagree, however, that the Sixth and Fourteenth Amendments contain the right it would extend to [the petitioner], and therefore hold that a state may use its peremptory challenges to purge a jury of veniremen not excludible for cause under *Witherspoon*."); *Alderman v. Zant,* No. CV488–122, 1989 U.S. Dist. LEXIS 6393 at *41 n. 15 (S.D. Ga. June 6, 1989). Thus, while it clearly would have been error under Witherspoon to strike the death-hesitant jurors for cause, the Commonwealth's use of its peremptory strikes on the death-hesitant jurors did not violate Matthews' constitutional rights.

## 2. Examination of witnesses

### a. Lawrence Cruse

323) Lawrence Cruse found the victims the morning of the killings and testified about his observations of the crime scene. Mr. Cruse, however, did not testify that he saw the perpetrator at the crime scene. Nevertheless, at the conclusion of direct examination, the prosecutor asked Mr. Cruse:

Q: Did you tell the police officers who did this?

A: Yes, sir, I bet my life on it.

Q: What did you tell the police officers that day?

A: I told them David Matthews is the one who shot them.

Q: Why did you say that?

A: Because. I don't know, because, but I just know.

TE III at 247–48. Matthews argues that this line of questioning was irrelevant and was asked simply to prejudice him.

324) Certainly, it does not appear that the prosecutor laid a proper foundation for this question since Mr. Cruse indicated early in his testimony that he discovered the victims after the perpetrator left the scene. As such, the question improperly sought to have a lay witness speculate regarding who committed the crime without an adequate factual basis for doing so. Because the court concludes that the prosecutor improperly asked this question, the court must apply the *Carter* factors.

325) Given the fact that Matthews admitted that he killed his wife and mother-in-law numerous times throughout the trial, it is impossible to see how the question or answer misled the jury or prejudiced Matthews. While the question was no doubt deliberate, it was isolated and the prosecutor did not seek to have Mr. Cruse elaborate. Finally, given that Matthews admitted the killings, it likely had little or no bearing on the ultimate outcome of the trial. Thus, the court does not find that this question so infected Matthews' trial with unfairness as to make his resulting conviction a denial of due process. Accordingly, this claim should be denied.

### b. Carol Engle

326) On the re-direct examination of Carol Engle, the prosecutor conducted the following inquiry:

Q: At the time of this offense, the time you had just met Mr. Matthews, were you aware of any charges, sexual abuse charges, taken against him by his wife?
A: The only thing that I was aware of was that he had been in jail on Friday and this friend of mine had been in there with him, and that's how I met David, through this friend. I knew that he was in there, but I didn't know what for. David didn't tell me or this friend didn't tell me.

TE IV at 360.

327) Matthews claims that there was no legitimate justification for this question and that it was asked simply to reemphasize the existence of the sexual abuse warrant in an effort to unduly prejudice him. This court has already determined that introduction of the sexual abuse warrant did not violate Matthews' constitutional rights. *See supra* Part III.E.2.b. As the Kentucky Supreme Court noted, *Matthews I*, 709 S.W.2d at 418, Matthews "was using the supposedly unjustified bringing of the warrants to explain his emotional state" when he killed the victims. Ms. Engle testified that she spent a considerable amount of time with Matthews the afternoon and early evening before the killings. Whether Matthews discussed the warrant with her during this time could be relevant to prove or disprove his emotional state at the time of the killings. The fact that Matthews did not discuss the warrant with Ms. Engle might be relevant to discredit his extreme emotional disturbance claim. If Matthews did not discuss the warrant in the hours preceding the killings, then possibly he was not that distressed by it. The court finds nothing improper about this line of questioning, and therefore, its inquiry ends here. *See Carter*, 236 F.3d at 783. This claim should be denied.

### c. Dr. Chutkow

328) Matthews argues that the prosecutor engaged in several acts of misconduct while questioning Dr. Chutkow. Specifically, Matthews argues that it was misconduct for the prosecutor to ask Dr. Chutkow about the burglary and sex abuse warrants, imply that Dr. Chutkow's investigation was inadequate, state that Matthews had "kicked down the door" of the house, and to ask Dr. Chutkow to discuss the fact that Matthews made love with his wife prior to shooting her. The court will discuss each of the alleged acts of misconduct below.

#### i. Sex abuse and burglary warrants

329) On cross-examination the prosecutor questioned Dr. Chutkow as follows:

Q: And this defendant, you say, had all those because of what he has told you about a number of charges that were brought by his wife.

A: That's what he said, right.

Q: Okay, and if I were to tell you that the evidence that we are considering has to do with two warrants that were taken, one, a charge of sexual abuse which was not against his wife but was against one of his wife's children, not the defendant's children, and possibly, we don't know for certain, and I don't think your notes reflect whether he was aware of a burglary warrant that was taken by his wife. Would that give you any second thought about your opinion that you have given, even about the adjustment disorder or anxiety that he has?

A: No, the symptoms that he has presented would be the same.

TE VI at 580.

330) Again, since the warrants themselves were properly part of the evidence, the court cannot find that this line of questioning amounted to misconduct. Furthermore, because Dr. Chutkow testified on direct examination that Marlene Matthews' act of constantly swearing out warrants and having Matthews arrested was one of the stressors that contributed to Matthews' adjustment disorder, it was entirely reasonable for the prosecution to question Dr. Chutkow about the warrants. The questioning was proper, and the claim should be denied.

#### ii. Dr. Chutkow's investigation

331) The prosecutor asked the following questions of Dr. Chutkow about the extent of his investigation:

Q: I understand Mr. Busse had contacted you to arrange to see this defendant. Did you make any inquiry as to Mr. Busse as to what the police files reflect other evidence might be or question anything that the defendant might have told you?

A: No. This is strictly an examination of the defendant. No other records were consulted.

Q: Did you ever consider giving your background of professionalism talking to Mr. Bussee or any of the investigators in the case relating to this defendant's background before coming before this Jury and giving your opinion.

A: Yes. Mr. Busse did give me some of his information. When I concentrated on examining the defendant in his mental state as he perceived or remembered it.

Q: I believe you indicated to us during the break that you didn't bring your entire file with you; is that right?

A: That's correct. I was not asked to bring my entire file, so I brought only my notes.

Q: By counsel?

A: Yes.

TE VI at 583–84.

332) Matthews claims that this line of questioning was improper because its purpose was to leave the jury with the impression that Dr. Chutkow did not conduct a proper investigation. There is no merit to this argument. The prosecution was entitled to ask Dr. Chutkow what he considered or did not consider in formulating his opinion and what he brought with him to court. There was nothing improper about the questions or answers, and the claim should be denied.

#### iii. Prosecutor's statement that Matthews "kicked down the door"

333) Matthews also argues that the prosecutor improperly indicated by a question to Dr. Chutkow that Matthews had kicked down the door of the house on the

night of the crimes without an evidentiary basis for the question:

> Q: And that's only based upon what he has told you at later times, and I'd like to ask you whether if a person is suffering from extreme emotional disturbance, in your opinion, if he, or two or three hours before the incident occurs, purchases or borrows money for a gun, fifty dollars, purchases a weapon some two hours before the action, goes over to— and, incidentally if you think about it, in order to purchase the gun, you would have to know something about where you can get a gun at, to give it some thought, and **go over and then kick down, kick through a window,** get into a house and kill two people. Would you still say, given those facts, that the entire period of time he was suffering from extreme emotional disturbance?
>
> A: Yes.

TE VII at 581–82 (emphasis added).

334) One could have certainly inferred from Mr. Cruse's testimony and the photographs admitted therewith that Matthews entered the house with force:

> Q: Can you point with your finger and show the jurors what door you knocked on?
>
> A: Here's the door, the back door that I knocked on right here. Well, I didn't get no answer, so I happened to look over here and see the screen cut here and this knife laying on the second step half open, **the glass all around here,** so that's when I knowed something was wrong when I went in.

TE III at 239 (emphasis added). Thus, from the pictures of the crime scene and Mr. Cruse's testimony it was logical to infer that Matthews had entered the home with force either by kicking or breaking the glass door or window in some way. Since this evidence had already been admitted, the prosecutor's inference that Matthews "kicked down the door" was not improper. This claim should be denied.

#### iv. Sexual intercourse with Marlene Matthews

335) Finally, Matthews complains that the prosecutor inappropriately questioned Dr. Chutkow about the fact that Matthews told him that he made love with his wife prior to shooting her. TE VI at 586. Matthews claims that the court had previously ruled that such testimony could not be admitted to show sexual contact between Matthews and Marlene prior to the homicide. However, this is not what the court had ruled. The court ruled that a laboratory examination, which represented one-half of a rape examination involving samples taken from Marlene Matthews' body, could not be admitted into evidence. TE, Oct. 1, 1982, Supp. Hr'g at 39–42; TE VII at 186. The report indicated that Marlene Matthews had some sexual activity prior to her death. TE, Oct 1, 1982, Supp. Hr'g at 39. However, because no samples were taken from Mr. Matthews the results were not matched up. *Id.* at 40. Thus, there was nothing to establish that Marlene Matthews had engaged in intercourse with her husband immediately prior to her death. *Id.* Accordingly, the court held that the report itself could not be admitted because there was nothing in it to tie Marlene Matthews' recent sexual activity with Mr. Matthews.[95] TE VII at 186. As such, the court believed the report would serve only to invite speculation by the jury regarding who Marlene Matthews had sex with prior to her death. TE, Oct 1, 1982, Supp. Hr'g at 41. The court indicated, however, that it would be

---

**95.** Conversely, there was nothing in the report that excluded Matthews as the source of the semen either.

permissible for the prosecution to question Matthews regarding whether he had sex with his wife before shooting her. TE VII at 186.

336) Dr. Chutkow testified regarding what Matthews told him occurred on the night before and morning of the killings. Thus, asking Dr. Chutkow whether Matthews indicated that he had sexual relations with his wife was akin to the prosecution asking that question directly to Matthews, a subject the trial court held was proper as it went to Matthews' state of mind at the time of the shootings. The report, the only matter which the court had explicitly ruled inadmissible, was not mentioned. The prosecutor's questions to Dr. Chutkow were not improper. The prosecutor simply asked Dr. Chutkow to tell the jury what Matthews said happened shortly before the shootings, a subject that went directly to Matthews' state of mind. This claim should be denied.

### 3. Guilt Phase Closing Arguments

#### a. Sexual relations

337) Matthews argues that in attempting to portray Matthews as a "sex crazed maniac hostile to Marlene," the prosecution made several inappropriate remarks about the nature of the sexual relations between Matthews and his wife on the night in question, about the sexual abuse warrant, and about what Marlene Matthews desired from her husband.

338) During a portion of his closing argument, the prosecutor made the following statement:

He executed his mother-in-law, and, after that, for four hours, Ladies and Gentlemen, four hours, he was in the same room with his wife, and he had sexual intercourse with his wife, and the doctor testified. That's what I'm saying, who's testifying here? He made love with his wife. He made love with his wife. That isn't in his vocabulary, Ladies and Gentleman.

He forced her to have sex with him to meet his desires. That's what he wanted. He got all of his needs out then, and it was a conscious objective to meet his needs.

TE VII at 676–77. Matthews claims that this statement was improper because there had not been any evidence adduced during the trial that Matthews forced his wife to have sex with him against her will. Under Kentucky law, it was proper for the Commonwealth to make reasonable inferences from the evidence during their closing arguments. *See Richards v. Commonwealth*, 517 S.W.2d 237, 242 (Ky.1974). It was not unreasonable to assume that Matthews' wife may not have consented to have sex with him, given the fact that he had broken into the home armed with a knife and gun and had just shot her mother in the head in the next room. This line of argument was proper given the evidence adduced at trial.

339) Next, Matthews argues that the prosecution improperly attempted in closing to link the sex abuse warrant with Matthews' sexual frustration concerning his wife:

He's got an emotional disorder. He's got an adjustment disorder, because he can't handle what his wife wants. Whatever his wife wants, whatever his wife wants, a good husband, take care of her kids, stop running around and spend time with me at home.

What effect do all those things, the sexual, what he calls aggregation, the sexual frustration that he has. What effect does that have on the sexual abuse warrant?

Deprive me of being a male. That's what he tells his psychiatrist. Deprive me of being a male. Mr. Macho Man

here, he can't handle it being sexual[ly] frustrated.

TE VII at 670.

340) The court is somewhat confused by the prosecutor's argument about how the sexual abuse warrant played into Matthews' "sexual frustration." Possibly, the prosecutor was trying to make an argument that Matthews was further emasculated by his wife taking out the sexual abuse warrant. It is unclear at best. Although admittedly this portion of the prosecutor's closing argument was confusing and somewhat incoherent, the court does not agree that it was improper or prejudicial. The sexual abuse warrant was admitted into evidence, and the prosecutor was free to make arguments concerning its impact on Matthews and his motivations. The court does not find that this remark, whatever its purpose, was improper.

341) Finally, Matthews claims that it was improper for the prosecutor to argue what type of a husband Marlene Matthews wanted because there was no evidence to support his assertions. There was evidence, however, that Marlene Matthews would get upset when Matthews was away on the barge for long periods of time and that she once became upset when he went out with friends. Thus, there was some evidence to support the prosecutor's assertions that Marlene wanted her husband to stay home and take care of her and the children. This portion of the closing was not improper.

### b. Dr. Chutkow and extreme emotional disturbance

342) Matthews states that "while discussing extreme emotional disturbance the prosecutor said that he agreed with Dr. Chutkow, that Mr. Matthews was 'emotionally disturbed,' but that it was not extreme." Pet. at 232, DN 23. Matthews argues that this statement was improper because it distorted and misrepresented Dr. Chutkow's testimony. Matthews has

taken the prosecutor's statement out of context. The prosecutor actually stated: "Now, I will agree with him [Dr. Chutkow] that this individual is emotionally disturbed. He has an extreme emotional disturbance, but what's extreme about his emotional disturbance?" TE VII at 667. The prosecutor never stated that Dr. Chutkow testified that Matthews did not have an extreme emotional disturbance. Rather, the prosecutor sought to convince the jury that it should not accept that testimony and argued that the jury should consider whether any emotional disturbance that Matthews suffered from was extreme as that term is used in the statute. This was an entirely permissible argument to make as part of a closing statement.

343) Matthews also argues that the prosecutor improperly led "the jury to believe that he [Matthews] was dangerous to anyone rather than just his wife and mother-in-law." Pet. at 232, DN 23. This argument is apparently based on the prosecutor's statement that: "He had a temporary—he has temporary, emotional distress. He has anxiety. He has tension. He has nervousness. He has irritability. He has a tendency to hurt himself and others." TE VII at 666–67. The prosecutor's statement was consistent with Dr. Chutkow's testimony. TE VI at 558 ("And the adjustment disorder can have symptoms such as anxiety, nervousness, depression, even suicide attempts or attempts to hurt other people."). Moreover, the prosecutor did not elaborate on the statement to try and convince the jury that Matthews was a threat to any random individual that might cross his path. This portion of the closing was based on the evidence at trial, and there was nothing improper about it.

### c. Intoxication

344) Matthews also argues that the prosecutor misstated Dr. Chutkow's testi-

mony that Matthews' intoxication "doesn't rise to that level," when referring to the level of intoxication that prevents the ability to form specific intent. TE VII at 664. However, Matthews omits to point out that in his case, Dr. Chutkow did testify that Matthews understood and intended his actions at the time of the alleged events despite being under the influence of drugs and alcohol at the time:

Q: Doctor, you are not saying that under the influence of alcohol and the drugs you mentioned, someone is totally out of touch with what they are doing?

A: No. In Mr. Matthews' particular situation, he knew where he was, whether his orientation was correct, he knew the time and the day, and so forth, he knew where he was going when he went to see his wife and mother-in-law, and he also knew what he was thinking about at the time, but his emotional level, as far as judging the wife and her mother, was very distorted.

Q: So it did have an effect, but it didn't break him totally from reality; is that a fair statement?

A: That's right. He was aware of the physical world around him.

. . . .

Q: Doctor, isn't it true, as you indicated on the direct examination, that the defendant was fully aware of who he was and what he was doing.

A: Yes.

Q: So isn't it also true Doctor, that this is an intentional act on his part?

A: An act of intention? Yes.

TE VI at 563; 587–88. Based on this testimony one could infer that while Matthews was in control of his actions, his thought process regarding the necessity of those actions might have been distorted. However, it does appear that Dr. Chutkow was confident that Matthews had the capacity to and did form an intent to kill his mother-in-law and wife despite being un-

der the influence of drugs and alcohol. The prosecution did not improperly distort Dr. Chutkow's testimony as Matthews argues.

345) Matthews also asserts that it was improper and a serious misstatement of the law for the prosecutor to tell the jury that intoxication is not a defense and that the jury could throw out that instruction. The prosecutor's statement in this regard must be examined in context:

The drugs that he took made a difference on the way this guy, this defendant could handle self control. He was not intoxicated if he knew what he was doing, he knew where he was, and it was his conscious intention to accomplish all these tasks.

Intoxication is not a defense, and in the instructions, within the body of the instructions, you can take that page out, intoxication, by their own expert is not a defense. It doesn't rise to that level.

TE VII at 664.

346) Contrary to Matthews' assertions, the prosecutor was not saying that intoxication is not an available legal defense to a murder charge. Rather, his argument was that based on the evidence presented at trial, particularly Dr. Chutkow's testimony, the elements of the defense of intoxication could not be satisfied by the proof in Matthews' case. The jury instructions stated that the jury was to find Matthews not guilty by virtue of intoxication "if at the time he entered the residence of Mary Marlene Matthews, or at the time he shot Mary Marlene Matthews or Magdalene Cruse, **the defendant was so intoxicated that he did not have a conscious intention to commit these crimes.**" TR at 252 (emphasis added). Thus, based on Dr. Chutkow's testimony that Matthews' actions were intentional, the prosecutor argued that the jury should reject intoxication as a defense. Possibly,

the prosecutor should have avoided telling the jury that they could "take that page out." However, given the fact that the trial judge left the instruction in and told the jury to consider all the instructions, the court does not find that this statement, when examined in the proper context, can be said to have deprived Matthews of a fair trial.

#### d. Reasonable person standard

347) Matthews argues that during his closing argument the prosecutor attempted to mislead the jury into evaluating the "reasonableness" of Matthews' actions by an objective and not a subjective standard. In his closing, however, the prosecutor, repeatedly quoted the actual text of the jury instructions, which stated that in order to find Matthews guilty of murder the jury must find that he caused either one of the victims' deaths "intentionally and not while acting under the influence of extreme emotional disturbance **for which there was no reasonable justification or excuse under the circumstances *as he believed them to be.*"** TE VII at 666 (2 times), 669, 671, and 675 (emphasis added). In fact, the prosecutor explained the "reasonableness" prong as follows:

> The last part of the definition, and I will finish up, I will read the whole thing: "While acting under the influence of extreme emotional disturbance for which there was a reasonable justification or excuse under the circumstances as he believed them to be." *That's what they are trying to show. He is acting under this disorder, it was reasonable as he believed it was reasonable.* Here's the evidence in our case today that makes this belief, on his part, unreasonable. He knew his actions were unreasonable before and after he murdered his mother-in-law and wife. He knew it was unreasonable because he was secretive in obtaining the gun.... He knew afterwards, because he came home and

tried to hide the gun.... He's covering up, Ladies and Gentleman, because he himself does not believe that his—any disorder he might have are his reasons for murdering his wife and his mother-in-law.

*Id.* at 671–72 (emphasis added). Given the many times the prosecutor repeated the words of the instruction verbatim and the fact that he specifically told the jury that Matthews was trying to prove that his actions were reasonable as he believed them to be at the time, the court does not agree with Matthews that the closing as a whole misrepresented the reasonableness standard. Moreover in *Matthews III* at 7, the Kentucky Supreme Court stated that the first prong of the test has an objective element. *See supra* Part III.D.5. The prosecutor's statements were not improper, and this claim should be denied.

#### e. Denigration of defense

348) Matthews claims that throughout his closing argument, the prosecutor denigrated the defense of extreme emotional disturbance as a fabrication, a collusion between counsel and client. Specifically, Matthews points to the following portion of the closing:

> [Mr. Matthews] is arraigned, he meets his attorney and either he tells his attorney, I did it or I didn't do it. One or the other. But the attorney knows what the evidence is. By the way, the defendant knows what the evidence is, because while he's giving this statement, its sitting forth in front of him at the Homicide Office. Here's the gun. Here's the shoes, David. "Nan, nah, I never saw it before. I never borrowed a gun. I never borrowed any money. I wasn't there. I was at home in bed asleep." He's denying it there.
>
> And what does his attorney think? His attorney sees all this evidence, and he's going through his mind, what kind of

legal excuse can I have? What is this man's defense? Self protection? No, there's no proof of a gun found at that house on 310 North 24th Street. No proof of that. Protection of another? The defendant's mother is at home on Lytle Street. He isn't protecting her over on North 24th Street. Intoxication? Yeah, well, he was drinking that night. Maybe that will mean something. But that isn't enough, Ladies and Gentlemen. Mr. Busse has to contact a psychiatrist to see his client, and he comes in and sees his client one month after the day of his arrest, one month to the day, and by that time, Mr. David Eugene Matthews sees his defense in the form of Doctor Chutkow, and do you think this guy is aware of what's going on? He's competent. ***He can work with his attorneys, and he enhances his story to Doctor Chutkow.*** Yeah, I was drinking. I was drinking a lot. I was taking a lot of pills, too, and let me tell you about the pills I was taking. Don't you think he has a purpose in enhancing his story to the psychiatrist? Don't you think he would exaggerate his fears about his wife, his mother-in-law, and all these other things about what other people might be doing to his mother? Don't you think he would overstate the extent of his intoxication to his psychiatrist? ***It's the defense of last resort, Ladies and Gentleman. He has no excuse for his conduct, but that's his only way out.*** And that's not to say that Mr. Bussee is unethical. Not at all. He is entitled to the best defense he can get, but that's the only defense he has, what the doctor has to say, and that's not to say the doctor gets on the stand and perjures himself. He's telling you the truth.

TE VII at 673–74 (emphasis added).

349) The Sixth Circuit previously considered whether a prosecutor's denigration of the legally viable defense of insanity constituted prosecutorial misconduct. *See Gall II,* 231 F.3d at 311–12. Applying Supreme Court precedent in *Darden,* 477 U.S. at 181, 106 S.Ct. 2464, and *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868, the Sixth Circuit found that the prosecutor's remarks in Gall's closing argument violated Gall's due process rights and warranted habeas relief. During closing argument, the prosecutor in *Gall II* significantly misrepresented the psychological evidence and disparaged the possibility that psychological evidence may ever be worthy of belief. *Gall II,* 231 F.3d at 312–13. The Sixth Circuit explained that:

> [F]acing Gall's considerable evidence of insanity and EED, counsel for the Commonwealth chose not to rebut that evidence directly. Instead, he expressed his personal belief as to the weakness and partiality of Gall's expert witnesses' testimony, and he mischaracterized crucial aspects of that testimony. He disparaged the very use of an insanity defense as the "last line of defense" and the "M1 Rifle"; he belittled the medical and psychological tools used to support such a defense; and he equated the doctors' testifying about Gall's condition to three blind men asked to "identify an elephant"—"you can imagine the bizarre opinions which they got back." He then pleaded with the jury not to let Gall loose through the insanity defense.

*Id.* The Sixth Circuit found that the prosecutor's remarks "comprised part of a broader strategy of improperly attacking Gall's insanity defense by criticizing the very use of the defense itself, rather than addressing its evidentiary merits head on." *Id.* at 313. The Sixth Circuit noted that "courts have long castigated prosecutors when their efforts to rebut an insanity defense constitute no more than an attack on the rationale and purpose of the insanity defense itself." *Id.* In reaching its con-

clusion, the *Gall II* court recognized that, while a prosecutor is entitled to vigorously argue his case, "because ours is a system of law, the arsenal available to a prosecutor to achieve that legitimate goal is limited to arguments rooted in properly introduced evidence and testimony rather than words and tactics designed to inflame passions, air unsubstantiated prosecutorial beliefs, and downplay the legitimacy of a legally recognized defense." *Id.* at 316. In light of the extensiveness of the prosecutor's comments and his suggestion that Gall would go free if found not guilty, the Sixth Circuit granted habeas corpus relief to Gall on his prosecutorial misconduct claim. *Id.*

350) It was not improper for the prosecutor to suggest that Matthews might have embellished his story to the psychiatrist. The prosecutor is always free to argue that the jury should not accept the defendant's version of events. This is precisely one of the purposes of the closing argument—to persuade the jury not to buy into a defendant's (or the Commonwealth's) theory of his case.

351) However, "no prosecutor may employ language which denigrates the right of a criminal defendant to retain the counsel of his choice, or otherwise limits the fundamental due process right of an accused to present a vigorous defense." *Sizemore v. Fletcher,* 921 F.2d 667, 671 (6th Cir.1990). In stating that Matthews "can work with his attorneys, and he enhances his story to Doctor Chutkow," the prosecutor implied that Matthews and his counsel colluded with one another to manufacture the extreme emotional disturbance defense. This statement was improper as was the prosecutor's statement that EED was a "defense of last resort." Because these statements were improper, the court must apply the *Carter* factors.

352) First, very quickly after making these statements the prosecutor backpe-daled and stated that he was not trying to imply that either counsel or Dr. Chutkow was unethical or had fabricated testimony. In fact, the prosecutor stated that Dr. Chutkow was telling the jury the truth. Based upon the prosecutor's quick retraction, it is unlikely that the jury actually believed that counsel, Matthews, and Dr. Chutkow colluded with one another to manufacture an EED defense.

353) Second, unlike in *Gall II,* the remarks were fairly isolated. Throughout the rest of the closing, the prosecutor discussed the EED defense with the seriousness it commanded. Although he urged the jury not accept the defense, he did not degrade its legal significance or disparage Dr. Chutkow's qualifications, motives, or methods. He simply argued that the facts in the case did not support the defense.

354) As for the third element, it is difficult to say whether the prosecutor's remarks were deliberately or accidently made. It does not appear that the prosecutor intended his remarks to be prejudicial or made them knowing that they were improper. Indeed, given the prosecutor's quick attempt to reform his improper statements and the fact the rest of closing was relatively "clean" in this regard, the court finds that for the most part that they were most probably unintentional.

355) Finally, the other evidence against Matthews was strong. Even in the absence of these statements, the evidence was overwhelming that Matthews committed the murders and there was enough evidence before the jury for them to reject the EED defense. Matthews' actions prior to the killing could have been viewed as calm and calculating, and therefore, inconsistent with EED—he borrowed money from his girlfriend; asked a friend to take him to go buy a gun; sat at home on his front porch watching for his wife to leave her parents' home; broke into his wife's

house; killed his mother-in-law; spent several more hours in the house; engaged in sexual intercourse with his wife and then shot her not once but twice because he believed he might have missed the first time; went home; hid the gun; and then lied to the police about his actions.

356) Thus, there was ample factual evidence from which the jury could have rightfully rejected the EED defense independent of the prosecutor's closing argument statements. While these statements were undoubtedly improper, in light of the *Carter* factors, the court does not find that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." As such, this claim should be denied. However, in light of the Sixth Circuit's analysis in *Gall II,* the court believes that reasonable jurists could find this analysis to be debatable or wrong and will recommend that a certificate of appealability issue with respect to this claim. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

### f. Empty chair reference

357) At the conclusion of his closing argument, the prosecutor made the following statement:

> I don't know if you noticed these two chairs here. They mean something. They are the two witnesses for the Commonwealth that aren't here. They are Marlene Cruse and Mrs. Cruse. Now, they can't testify for you about what happened, because they are long gone. They've been dead for a year and a half.

TE VII at 675–76. Matthews claims that "theatrical stunts" like this have no place in the guilt phase of a criminal trial and were employed by the prosecutor simply to inflame the jury. The court agrees that this conduct was improper. *See Frazier v. Huffman,* 343 F.3d 780, 793 (6th Cir.2003) (holding that the "placing of an empty chair before the jury during the prosecu-

tor's closing argument to 'represent' the victim was 'improper' "). As such, the court must apply the *Carter* factors to determine if the conduct denied Matthews a fair trial.

358) The prosecutor's remarks could have misled the jury to believe that they could be guided by sympathy toward the victims in reaching a determination in the guilt phase, and the remarks were certainly deliberate. On the other hand, the remarks were isolated, and given the strength of the evidence against Matthews, it is doubtful these isolated remarks impacted the outcome of the trial. Considering the *Carter* factors together, the court does not believe that the prosecutor's brief reference to the "empty chairs," as wrongful as it may have been, denied Matthews a fundamentally fair trial.

### 4. Closing argument at sentencing

359) Matthews first argues that the prosecutor's closing in the sentencing phase was improper because he discussed the impact the crime had on the victims and their families. In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court held as follows:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id.* at 827, 111 S.Ct. 2597. Although *Payne* was decided after Matthews' trial, it is nevertheless applicable. *See Free v. Peters,* 12 F.3d 700, 703 (7th Cir.1993)

(holding that defendant could not challenge application of new *Payne* standards allowing victim impact evidence on theory that *Payne* could not apply retroactively to his case that began under *Booth*[96] standards because *Teague*[97] rule may only be used by the state, not petitioner, to object to application of new rule to old case) (citing *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). By rejecting this claim (without discussion), the Kentucky Supreme Court implicitly affirmed that the discussion of victim impact evidence in the sentencing phase was not barred by state law. *Cf. McQueen v. Commonwealth,* 669 S.W.2d 519, 523 (Ky.1984) ("[W]e find no error in bringing to the attention of the jury that the victim was a living person, more than just a nameless void left somewhere on the face of the community."). As such, the court cannot find that the prosecutor's victim-impact references violated Matthews' constitutional rights.

360) Matthews also argues that the prosecutor wrongfully diminished the jury's responsibility in sentencing Matthews to death by using the word "recommend" in his closing and by inferring that the jury's decision would be subject to appellate review before it was imposed. The court has already determined that the use of the word "recommend" in the instructions was permissible under Kentucky law at the time, and therefore, did not violate Matthews' constitutional rights. *See supra* Part III.L. Because the word "recommend" was properly used in the instructions, it was not misconduct for the prosecutor to repeat it in his closing.

361) As for the finality of the jury's verdict, the prosecutor made the following statement:

Now he's had all those rights, and all his constitutional rights have been protected, and you can render a verdict of death, and his rights are still protected, because that's the way the system works, and we don't go out immediately after something happens and go after retribution like that. That isn't the way we work. That isn't the way the law works. We have a process of steps and procedures and that's how civilized people operate, and we have operated under those procedures from day, the time of his arrest.

TE VII at 713–14.

362) In *Caldwell,* 472 U.S. 320, 105 S.Ct. 2633, the prosecutor told the jury that any decision it made would automatically be reviewed by the state supreme court and that its decision would not be final. *Id.* at 324–26, 105 S.Ct. 2633. The Supreme Court held that the statement violated the defendant's constitutional rights because it is "impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633. The prosecutor's remarks in Matthews' case are quite different than those in *Caldwell.* Matthews' prosecutor never indicated to the jury that its decision would be automatically reviewed by a higher court or suggest that it was not final. At most, he contrasted the way in which Matthews would be executed with the way his victims were killed. The prosecutor noted that Matthews' victims were killed before they had a chance to get their lives in order, but that if Matthews was sentenced to death, he would have time to get his affairs in order because as a civilized society there are certain procedures that would be car-

**96.** *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

**97.** *Teague,* 489 U.S. 288, 109 S.Ct. 1060.

ried out before the death sentence would be imposed. The prosecutor never indicated to the jury that if it sentenced Matthews to death there was a chance that he would not be executed. The prosecutor did not diminish the gravity of the jury's decision or imply that its decision could be easily overturned by another court. As such, the court does not find that the prosecutor's remarks were improper.

363) Finally, Matthews complains that the prosecutor improperly asked the jury to rely on its findings in the guilt phase to abrogate the necessity of considering mitigating factors in the death penalty deliberations:

> I'd ask, also, when you go back to the evidence that you heard in the case in chief that you relate the defendant's state of mind to his actions, and I went through that in a lot of detail in my closing argument a few hours ago. You found the defendant guilty of intentional murder, a conscious act. You found, I assume by your verdict, that there was no reasonable explanation that he was working under an extreme emotional disturbance at the time by virtue of your verdict.
>
> Now, there's language in the mitigating circumstances that bring those factors up again. I ask you, when you resolve yourself to recommending a penalty, in fixing a penalty, to consider those thought processes, consider those facts that you had before you in reaching your verdict in this case. And you thinking about intoxication as a mitigating emo-

tional disturbance and whatever disorder the defendant was supposed to have. Use those factors in rendering your verdict.

TE VII at 710.

364) The prosecutor's statement in this regard was not a misstatement of the law. The prosecutor did not tell the jury that its guilt-phase determinations regarding extreme emotional disturbance and intoxication were binding in the penalty phase. Rather, the prosecutor asked the jury when considering the mitigating circumstances in the sentencing phase, to consider the factors that led it to reject those defenses in the guilt phase. This is different from telling the jury that it had to reach the same determination in the guilt and penalty phases, which would have been a misstatement of the law. Additionally, Matthews had the last word in closing arguments, giving his counsel an opportunity to explain to the jury that they were to consider the mitigating factors differently in the penalty phase than they did in the guilt phase.[98] The prosecutor's statement was not improper.

365) In summary, this court concludes that none of the comments, testimony, or actions to which Matthews objects constitute prosecutorial misconduct. Accordingly, this court finds that Matthews' prosecutorial misconduct claims should be denied. However, a certificate of appealability is warranted on the issue of whether the prosecutor's denigration of the EED defense warrants habeas relief.

---

**98.** *Matthews' counsel explained:*

> I had prepared these notes to discuss with you what are considered to be some of the mitigating factors in the statute, and if you read the instructions, it says that you shall consider mitigating or extenuating facts and circumstances as has been presented to you. Even if they don't amount to a legal defense, you have each of you signed a verdict or agreed to a verdict that David

intention[ally] killed his wife and mother-in-law. You did so after your early deliberations, and you did so knowing much of the evidence, and we respect that verdict, but the issue is different now. The issue is far more intent, more important, far more permanent, and that's the way these mitigating factors are submitted to you to review along with the aggregating factors.

TE VII at 718.

## N. Refusal to transcribe grand jury proceedings [99]

366) Matthews argues that his constitutional right to a fair trial was violated when the Commonwealth refused to record the grand jury proceedings and to provide to him a transcription of those proceedings. Although this issue was raised and rejected on direct appeal, Direct Appeal Plead., Appellant's Brief at 35–37, the Kentucky Supreme Court did not explicitly consider this argument. Therefore, the AEDPA's deference to the state court decision does not apply, and this court's review of this claim is de novo. See Maples, 340 F.3d at 437.

367) As Matthews concedes, at the pertinent time, the Commonwealth was not obligated by law to record or transcribe grand jury proceedings. Pet. at 243 n. 129, DN 23 (citing White v. Commonwealth, 394 S.W.2d 770 (Ky.1965)). However, according to Matthews, on or about July 6, 1981, before the grand jury convened, Matthews requested that the Commonwealth transcribe the grand jury proceedings and make that transcript available to him. The grand jury met and returned its indictment against Matthews a few weeks later. Because the motion was not filed in the correct court, the court did not receive the motion until August 31, 1981, two weeks after the grand jury returned the indictment. See Pet. at 244, DN 23. Matthews argues that the Commonwealth should have honored his request to have the grand jury proceedings recorded and transcribed, especially in light of the fact that a new rule of criminal procedure, RCr. 5.16(1) became effective September 1, 1981, which required the Commonwealth to record and maintain transcripts of all grand jury proceedings.

368) The Sixth Circuit has rejected the contention that the Constitution requires that grand jury proceedings be transcribed. In United States v. Hensley, 374 F.2d 341, 352 (6th Cir.1967), appellants challenged their conviction, in part, by claiming a constitutional infringement because no record was made of grand jury minutes and hence the testimony was not available to them. The Sixth Circuit held that, while having a stenographer present to transcribe the testimony given before the grand jury would be better procedure, such a transcript is not a constitutional requirement. Id. Moreover, although in certain circumstances the Constitution requires the disclosure of exculpatory evidence,[100] the Supreme Court has held that federal due process does not require the prosecution to disclose its evidence against a defendant. Gray v. Netherland, 518 U.S. 152, 168, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (citing Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)). Matthews admits that there was no then-applicable state-law duty to record the grand jury proceedings, and there was no constitutional requirement for the Commonwealth to make a recording. See Hensley, 374 F.2d at 352; Gray, 518 U.S. at 168, 116 S.Ct. 2074. Thus, Matthews' request for habeas relief on this claim should be denied.

## O. Right of Access to Court Records Relating to Proportionality Review [101]

369) Matthews complains that he was denied access on appeal to KY.REV.STAT.

---

**99.** This claim is set forth at Pet. at 243–46, DN 23.

**100.** "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**101.** This claim is set forth at Pet. at 266–67, DN 23.

§ 532.075(6) data compiled by the Kentucky Supreme Court regarding the application of capital punishment throughout the Commonwealth. Matthews contends that the Kentucky Supreme Court's failure to release this data deprived him of his constitutional right to effective assistance of appellate counsel, rational sentencing, due process and equal protection of law. Matthews raised this argument on direct appeal. Direct Appeal Plead., Appellant's Br. at 231–33. Although the Kentucky Supreme Court conducted the required proportionality review, it did not discuss Matthews' claim regarding his right to review the data collected by that court to reach its determination. Accordingly, the court must review this claim *de novo*. *Maples*, 340 F.3d at 437.

370) Kentucky's proportionality statute provides that the court shall determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." KY.REV. STAT. § 532.075(3)(c). To aid the court in its proportionality determination, KY.REV. STAT. § 532.075(6) requires the Chief Justice of the Kentucky Supreme Court to assign to an administrative assistant who is an attorney the tasks of accumulating the records of all Kentucky felony offenses in which the death penalty was imposed after January 1, 1970, providing the court with summaries of those cases, and compiling any other data requested by the Chief Justice for the purpose of determining the validity of the death sentence. The Kentucky Supreme Court has held that a capital defendant does not have the right to the production of the court's proportionality research files for use in litigation. *Ex parte Farley*, 570 S.W.2d 617 (Ky.1978); *Skaggs v. Commonwealth*, 694 S.W.2d at 682 (holding that "public advocate was not entitled to data compiled for this court pursuant to KRS § 532.075(6)(a), (b) and (c)").

371) Comparative proportionality review on appeal is performed to ensure that a given death sentence is not disproportionate relative to other sentences imposed for similar crimes. Comparative proportionality, as opposed to inherent proportionality (which measures the proportionality of a sentence to the severity of the crime), is not required by the Constitution, *Pulley v. Harris*, 465 U.S. 37, 43–44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Bowling v. Parker*, 344 F.3d at 521; *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir.2002); *see also Coe v. Bell*, 161 F.3d 320, 352 (6th Cir.1998) (finding no Eighth Amendment right to proportionality review), but if a state adopts a scheme for such review, it must comport with due process. *Bowling*, 344 F.3d at 521; *Greer v. Mitchell*, 264 F.3d at 691. The state court's failure to perform a statutory proportionality review is not reviewable in federal court as an issue of state law. *Pulley*, 465 U.S. at 41, 104 S.Ct. 871; *Bowling*, 344 F.3d at 521. Instead, federal habeas corpus review is limited to whether the state court engaged in a good faith proportionality review. *Walton*, 497 U.S. at 655–56, 110 S.Ct. 3047. Citing the lack of direction in the statute regarding how the Kentucky Supreme Court is to conduct its proportionality review, the Sixth Circuit has expressed grave doubts regarding whether the statute even creates a liberty interest giving rise to a federal due process claim for alleged procedural lapses by the state supreme court in its review. *Bowling*, 344 F.3d at 521–22.

372) Matthews' claim, however, is even more narrow than the one considered by the Sixth Circuit in *Bowling*. Matthews does not allege that the Kentucky Supreme Court improperly conducted its review. Rather, he complains that the court's refusal to share its underlying data with his public advocate prevented him from properly assessing the court's review. However, Matthews overlooks the fact that

in determining that Matthews' sentence was not excessive or disproportionate, the Kentucky Supreme Court did list the twenty-one cases it examined as part of its proportionality review. *See Matthews I,* 709 S.W.2d at 424 n. 1. Those cases are all reported. Matthews was free to examine the cases himself and make any arguments he deemed appropriate from that examination.

373) There is no constitutional requirement that the court must share its legal research with an appellant, and Matthews has failed to show that the Kentucky Supreme Court did not engage in a good faith proportionality review. Accordingly, this claim should be denied.

### P. Jefferson County Jail Mental Health Records [102]

374) Matthews contends that on April 23, 1999, his post-conviction counsel received evidence regarding his mental health from the Jefferson County Department of Corrections that the state had never before disclosed. This evidence consists of five 3″ × 5″ note cards documenting mental health treatment Matthews received while he was being held in the Jefferson County Jail awaiting trial. These notations start on June 30, 1981, the day following Matthews' arrest, and continue through May 19, 1982, approximately four months before his trial.

375) The documentation reflects that on June 30, 1981, Matthews' mother indicated that he might be suicidal. In response, Matthews was interviewed on July 1, 1981, and reported a history of alcohol abuse and stated that he "doesn't want to talk

unless lawyer present." DN 31, Attach. 1. He was prescribed 50 mg. of Vistaril [103] twice a day for ten days and placed on suicide watch. *Id.* The next documented contact occurred on September 27, 1981, when Matthews was referred to Dr. Jefferson for evaluation based on his complaint of "nerves." *Id.* In response to that complaint, Matthews was evaluated on October 2, 1981. *Id.* The records indicate that Matthews was "nervous and upset [about] Ct. coming up." *Id.* At that time it was noted that Vistaril had helped Matthews and that he reported no medical problems and no suicidal thoughts. *Id.* He was diagnosed as suffering from an anxiety disorder and was prescribed a reduced dosage of 25 mg. of Vistaril twice a day for ten days. *Id.*

376) On November 24, 1981, Matthews again complained of nerves and was referred to Dr. Jefferson. *Id.* Matthews was seen on January 1, 1982. *Id.* At that time, he again reported that the medication was not causing him any problems. *Id.* He denied past drug abuse and denied any suicidal thoughts. He stated that he was "worried over Ct date." *Id.* Dr. Jefferson again prescribed 50 mg. of Vistaril twice a day for ten days. *Id.*

377) On February 28, 1982, the records indicate that Matthews was upset about his upcoming murder trial, but that he talked rationally about the charges and his case. *Id.* This is the only documented occasion on which Mellaril [104] was prescribed for Matthews. *Id.* Dr. Jefferson discontinued the Vistaril and prescribed 50 mg. of Mellaril twice a day for two weeks.

---

**102.** Matthews raised this claim at pages 1–26 of his amended petition. DN 31.

**103.** Vistaril is a type of hydroxyzine used to treat anxiety and tension. *See* http://www.rxlist.com/cgi/generic/vistaril_ids.htm.

**104.** Mellaril (thoirdazine) was previously used to treat depression, anxiety, and other psy-

chotic disorders. Due to serious cardiac side effects, it is no longer widely used and is currently only used to treat schizophrenia that has failed to respond to other treatments. *See* http://www.drugs.com/pro/thioridazine.html.

*Id.* At the end of that two-week period, Matthews was seen again. *Id.* At that time, he again complained of nerves. *Id.* However, he also stated that he was experiencing headaches on the Mellaril. *Id.* The Mellaril was discontinued. *Id.* Instead, he was given 50 mg. of Benadryl twice a day for ten days. *Id.*

378) The final notations are dated May 19, 1982. At that time, Matthews voiced no complaints, stated that he felt better on no medication, and requested that his medication be discontinued. *Id.*

379) Matthews argues that 1) the prosecution's failure to turn over Matthews' mental health records from the jail violated *Brady, supra*; and 2) his trial counsel were ineffective for failing to discover and/or exploit that he was on Mellaril.[105] Respondent argues that this court should not review these claims because they are procedurally defaulted. In the alternative, respondent asserts that the state court's decision to reject them was not an unreasonable application of clearly established federal law.

380) The court must apply the *Maupin* factors to determine whether these claims have been procedurally defaulted. *Maupin*, 785 F.2d at 138.

381) First, the court must determine whether there is an applicable state procedural rule that Matthews failed to comply with in presenting the claims. *Id.* In the present case, both claims were first raised by Matthews at the state court level in 2000 by way of a motion to vacate, set aside, or correct his sentence of death

pursuant to RCr 11.42, or, in the alternative, for relief from the final judgment pursuant to Rule 60.02. DN 91, attach. 1. An RCr 11.42 motion must be filed within three years of the final judgment unless the motion alleges and the movant proves "that the facts upon which the claim is predicated were unknown to the movant, and could not have been ascertained by the exercise of due diligence; or that the fundamental constitutional right asserted was not established within the period ... and has been held to apply retroactively." RCr 11.42(10). A Rule 60.02 motion must be made within a "reasonable" time and if brought under subsections (a)-(c) not more a year after the final judgment. CR 60.02. As discussed more fully below, because Matthews was aware he was being medicated during the relevant time period, it appears that he failed to timely present his claims to the Kentucky courts.

382) Next, the court must determine whether the Kentucky courts "actually enforced the state procedural sanction," and if so, "whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Maupin*, 785 F.2d at 138. The majority of the Kentucky Supreme Court's decision on the Mellaril issue is devoted to an analysis of the federal questions raised by Matthews. However, under a separate section of the opinion, entitled "Timely Proceedings," the Kentucky Supreme Court expressly and unambiguously held that Matthews' claims were untimely:

---

**105.** In his habeas petition, Matthews also makes a myriad of other "claims" about how the lack of knowledge that he was on Mellaril affected his trial. *See* Am. Pet. at 14–20, DN 31. However, the only two issues presented to the Kentucky Supreme Court concerned the alleged *Brady* violation and ineffective assistance of counsel. The other "claims" are actually not independent claims so much as

arguments regarding how the alleged *Brady* violation and ineffective assistance of counsel affected Matthews' trial. The court, therefore, will not individually address these "claims" as they are subsumed within the *Brady* violation and ineffective-assistance-of-counsel claims and were not independently presented to the Kentucky Supreme Court for consideration.

Errors by collateral attack counsel do not justify an untimely or successive collateral attack motion. *T.C. Bowling v. Commonwealth,* KY., 981 S.W.2d 545 (1998). The essential fact relating to both of the claims of Matthews were known by him or his attorneys and could have been raised in the original RCr 11.42 motion. All of these complaints could have been asserted within the time limits of RCr 11.42(10) and CR 60.02. He did not need jail records to raise an issue about the medication **The claims contained in the successive motions are untimely.**

*Matthews III* at 6–7 (emphasis added). "[A] state court need not fear reaching the merits of a federal claim in an alternative holding.... In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Harris,* 489 U.S. at 264, 109 S.Ct. 1038. Thus, even though the Kentucky Supreme Court considered the merits of Matthews' claims, this court is precluded from reviewing its decision if it determines that the "judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Id.* at 260, 109 S.Ct. 1038. It is apparent that the Kentucky Supreme Court's decision rests on an adequate and independent basis of state law as the court expressly held that the claims were untimely under a separate and independent section of its opinion.

383) Thus, absent cause and prejudice or a miscarriage of justice, this court is precluded from reviewing Matthews' claims. *Maupin,* 785 F.2d at 138.

▮ 384) The court will first examine whether Matthews can show cause and prejudice for his failure to raise the *Brady* claim. "A petitioner who has procedurally defaulted a *Brady* claim satisfies the 'cause and prejudice' test for overcoming

the default by satisfying the second and third prongs of the *Brady* test; that is, by showing that 'the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence,' and that 'the suppressed evidence is material for *Brady* purposes.'" *Henley v. Bell,* 487 F.3d 379 (6th Cir.2007) (quoting *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004)). "Cause is shown when the factual basis of the claim was reasonably unknown to the defendant's counsel." *Jamison v. Collins,* 291 F.3d 380, 388 (6th Cir.2002). However, the state's failure to disclose information is not cause for procedural default when a habeas petitioner himself is aware of the information. *See Spirko v. Mitchell,* 368 F.3d 603, 611 (6th Cir.2004).

385) The jail's records demonstrate that Matthews requested medication for his nerves and later requested that it be stopped. Additionally, in a January 3, 1982, letter to Carol Engle, Matthews demonstrated his awareness that he was being medicated by the jail to calm his nerves:

> Them pills that I've been taking has been helping me a lot. I'm able to sleep a lot longer and a lot sounder. I hope they keep me on them, until I go to court. As you already know their's not much for a person to do in this place. It helps when a person can sleep the biggest part of the day away. That's why I hope that the jail will leave me on them pills. It'll make my time go by faster.

DN 25, attach. 10. If Matthews were able to communicate to Ms. Engle that he was being medicated by the jail, then surely he could have just as easily communicated that information to counsel or Dr. Chutkow. There is no question that Matthews was aware he was being given medication for his nerves pending his trial. He did not have to wait to receive the jail's mental health records to confirm that fact.

Thus, Matthews has failed to establish cause for procedurally defaulting his *Brady* claim. *See, e.g., Matthews v. Ishee,* 486 F.3d 883 (6th Cir.2007) (finding no cause for procedural default on *Brady* claim where prosecution was not in sole possession of information and defendant could have discovered it on his own).

386) The cause-and-prejudice analysis is a conjunctive one, requiring a petitioner to satisfy both prongs to excuse a procedural default. Because Matthews has not shown cause, the court is not required to, nor will it, address whether he has satisfied the prejudice prong. *Broom v. Mitchell,* 441 F.3d 392, 405 (6th Cir.2006) ("As Broom has not shown the requisite cause to excuse the procedural default of this claim, we will not examine whether he has shown the requisite prejudice, nor will we proceed to the merits of Broom's *Brady* claim.").

387) The court will next examine whether Matthews can show cause and prejudice for his failure to raise the ineffective-assistance-of-counsel claim. As established above, Matthews was aware that he had been medicated by the jail and could have conveyed that information to his post-conviction counsel who could have pursued an ineffective-assistance-of-counsel claim at the proper time. Again, Matthews did not need to wait for the jail's records to launch a collateral attack on that basis. He possessed all of the information necessary to discover and pursue this claim in a timely fashion. Matthews has not established cause to excuse his failure to timely raise his ineffective-assistance-of-counsel claim in the state courts. Because Matthews cannot establish cause to excuse this claim, the court will not analyze the prejudice element. *Id.*

388) Finally, Matthews cannot show that a fundamental miscarriage of justice will occur if the court does not review his *Brady* and ineffective-assistance-of-counsel claims. "Fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.' " *Lundgren,* 440 F.3d at 763–64 (quoting *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639). Matthews has not shown that he is actually innocent of the charges. Nor could he, given his concession of guilt at trial and the other overwhelming evidence against him. This court is, therefore, precluded from reviewing the merits of Matthews' *Brady* and ineffective-assistance-of-counsel claims based on his usage of Mellaril and other anxiety medication prior to his trial because those claims have been procedurally defaulted.

389) Even if the claims were not procedurally defaulted, however, Matthews could still not prevail because the Kentucky Supreme Court's decision to reject them was not an unreasonable application of clearly established federal law. The Kentucky Supreme Court rejected Matthews' *Brady* claim because it determined that the prosecution was not in possession of the jail records, and, in the alternative, that the records were not material because Matthews was not medicated at the time of his trial, and because the records did not reflect on his mental state at the time of the killings. *Matthews III* at 3–5. Based on *Brady* and its progeny, these determinations are not unreasonable.[106]

---

106. The court notes that the Kentucky Supreme Court's decision is not inconsistent with *United States v. Spagnoulo,* 960 F.2d 990, 994 (11th Cir.1992), cited by Matthews numerous times in his amended petition. In *Spagnoulo,* the Eleventh Circuit found that a psychological report conducted by the FBI as a result of a prison altercation by the defendant should have been turned over to the defendant prior to trial and that the prosecution's failure to do so required that the defendant's sentence be vacated. Several facts distinguish *Spagnoulo* from the present case. First, the Eleventh Circuit presumed that the defendant did not have the mental capacity to know that the report existed. Here, no such

390) The Kentucky Supreme Court also rejected Matthews' ineffective-assistance-of-counsel claim, finding that the evidence lacked probative value "in that did not set out the mental condition of the accused at the time he killed the two victims." *Matthews III* at 6. Again, the Kentucky Supreme Court's determination on this issue is not an unreasonable application of *Strickland* and its progeny. Specifically, the court notes that Matthews' case is easily distinguishable from *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), upon which Matthews relies. In *Riggins*, the defendant was forced against his will to take Mellaril during his trial. The United States Supreme Court held that because the record contained no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy, there was no basis for saying that the substantial probability of trial prejudice (outward appearance due to side effects, content of defendant's testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel) was justified. *Id.* Unlike *Riggins*, Matthews requested to be placed on medication for his nerves, and the medication was discontinued long before trial.

391) The court should deny Matthews' relief on these claims because they are procedurally defaulted, and, in the alternative, because the Kentucky Supreme Court's decision to reject them was not an unreasonable application of clearly established federal law.

### Q. Length of Confinement is Unconstitutional [107]

392) Matthews claims that his sentence of death violates the Eighth and Fourteenth Amendments to the United States Constitution because "there is solid empirical psychological evidence of the intense pain caused by a prolonged confinement expected to end in execution." Am. Pet. at 41, DN 31. Matthews raised this argument in state court for the first time as part of his second RCr 11.42 motion and CR 60.02 motion. Although the Kentucky Supreme Court reviewed the merits of the claim, it found the claim untimely because it could have, but was not, asserted within the time limits of RCr 11.42 and CR 60.02. *Matthews III* at 7. Although the Kentucky Supreme Court briefly considered the merits, the claim is still procedurally defaulted. *Harris*, 489 U.S. at 260, 109 S.Ct. 1038.

393) Absent either cause and prejudice or a finding of actual innocence, this court may not reach the merits of claims that have been procedurally defaulted in state court. *Id.* Mathews failed to establish "cause and prejudice" for his procedural default on this claim. He has also failed to establish factual innocence to excuse his procedural default.

394) Even if this claim were not procedurally defaulted, it would fail because Matthews has failed to show that the delay in his execution has been attributable to

---

presumption can be made as Matthews' January 1982 letter to Carol Engle plainly indicates that he knew he was being medicated. Second, the report in *Spagnoulo* indicated that the defendant suffered from a serious, pre-existing mental illness and strongly suggested he might not be competent to stand trial. In Matthews' case, the jail's notes reflect only that Matthews was experiencing anxiety about his upcoming trial. They do

not diagnose him with any pre-existing mental condition that was present at the time of the killings. Additionally, they support Dr. Chutkow's determination that Matthews was competent to stand trial, indicating that he spoke rationally about the charges and his upcoming trial.

107. Matthews raised this claim at pages 41–42 of his amended petition. DN 31.

anything other than his own conduct. Matthews was convicted and sentenced in 1982 and his direct appeal was completed in 1986 when the United States Supreme Court denied his petition for a writ of certiorari. Thus, Matthews' mandatory direct appeal was concluded in approximately four years. The resulting time he has spent on death row is solely attributable to his discretionary appeals and writs. As such, there has been no Eighth Amendment violation. *See, e.g., Free v. Peters,* 50 F.3d 1362 (7th Cir.1995) ("Free's mandatory direct appeal ... was disposed of in about three and one half years in 1983. The remaining years since then have resulted from Free's pursuit of his discretionary appeals in both state and federal court. We agree with the district court that any inordinate delay in the execution of Free's sentence is directly attributable to his own conduct."); *McKenzie v. Day,* 57 F.3d 1461 (9th Cir.1995). For the reasons set forth above, this claim should be denied.

## IV. CERTIFICATE OF APPEALABILITY

395) In the event that the district court adopts this recommendation and Matthews wishes to appeal any aspect of this court's decisions, he is required to obtain a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(a); FED. R.APP. P. 22(b). A district court must issue or deny a COA and can do so even though the petitioner has yet to make a request for such a certificate. *Castro v. United States,* 310 F.3d 900, 903 (6th Cir.2002) ("Whether the district court judge determines to issue a COA along with the denial of a writ of habeas corpus or upon the filing of a notice of appeal, the district judge is always required to comply with § 2253(c)(2) & (3) by 'indicat[ing] which specific issue or issues satisfy the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

396) A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2); *Slack,* 529 U.S. at 483, 120 S.Ct. 1595. The Supreme Court has recognized that the current version of § 2253 codified the standard set forth in *Barefoot v. Estelle,* 463 U.S. 880, 894, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) and stated:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot,* includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were " 'adequate to deserve encouragement to proceed further.' " *Barefoot, supra,* at 893, and n. 4, 103 S.Ct. 3383 ... ("sum[ming] up" the " 'substantial showing' " standard).

*Slack,* 529 U.S. at 483–84, 120 S.Ct. 1595. The Supreme Court further noted that the standard used to govern the COA analysis depended upon whether the lower court dismissed the petition after a substantive review of the merits, or merely dismissed the petition on procedural grounds. In the case of the former, the Court held "the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595. When a district court denies such a motion on procedural grounds without addressing the merits of the motion, a certificate of appealability should issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* When a plain

procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the court erred in dismissing the petition or that the petitioner should be allowed to proceed further. *Id.* at 484–85, 120 S.Ct. 1595. In such a case, no appeal is warranted. *Id.* at 485, 120 S.Ct. 1595.

397) Where this court ruled upon the merits of Matthews' arguments, it has reexamined the merits of the issue in light of *Slack*'s more "straightforward" analysis to determine whether reasonable jurists could find its analyses with respect to these grounds debatable or wrong. With the exception of Matthews' claim that the prosecutor engaged in prosecutorial misconduct during closing statements in the guilt phase by denigrating the defense of extreme emotional disturbance thereby denying Matthews a fundamentally fair trial, as more fully discussed below, it finds that none of the issues merits a COA. The claims presented in the petition were clear-cut, easily addressed, and provided no bases for granting federal habeas relief. The court is persuaded that reasonable jurists would not debate the correctness of its assessment of these claims.

398) The issue that this court believes warrants further review and merits a COA arises from the prosecutor's closing statements in the guilt phase regarding the fact that Matthews colluded with his counsel and Dr. Chutkow to manufacture the EED defense, a defense of "last resort." While these statements were undoubtedly improper, in light of the *Carter* factors, this court concluded that they did not so infect the trial with unfairness as to make the resulting convictions a denial of due process. Nevertheless, in light of the Sixth Circuit's analysis in *Gall II,* the court believes that reasonable jurists could find its analysis to be debatable or wrong.

399) With respect to those claims dismissed as procedurally defaulted, this court has reexamined its decision in light of *Slack*'s two-part test governing procedural dismissals and concludes that there is no question that Matthews failed to show cause and prejudice for his failure to raise or preserve these issues. It is equally clear that he did not establish manifest injustice to excuse compliance with the cause and prejudice test. Because there was a plain procedural bar present in this case, the court is satisfied that no jurists of reason could find its procedural rulings to be debatable. Thus, no certificate of appealability should issue with respect to those claims.

## V. RECOMMENDATION

For the foregoing reasons, the court recommends that Matthews' petition for a writ of habeas corpus be **GRANTED IN PART and DENIED WITH PREJUDICE IN PART.** It is recommended that the petition be **GRANTED** as to Matthews' claims that: (1) his Fourteenth Amendment due process rights were violated by the trial court's failure to grant a directed verdict on the murder counts where the Commonwealth did not prove the absence of extreme emotional disturbance beyond a reasonable doubt as required by the then-applicable Kentucky murder statute; and 2) he was denied effective assistance of appellate counsel in violation of his rights under the Sixth Amendment because his appellate counsel failed to argue on direct appeal that the term "extreme emotional disturbance" should have been, but was not, defined in the jury instructions in either the guilt or penalty phase of Matthews' trial. The court recommends that the petition be **DENIED** in all other respects.

It is further recommended that Matthews' sentence of death be **VACATED,**

his convictions for the murders of Marlene Matthews and Magdalene Cruse be **REVERSED,** his conviction for burglary **AFFIRMED,** and that this matter be **REMANDED** to the state trial court for further proceedings.

The court further recommends that a certificate of appealability be issued with respect to Matthews' claim that the prosecutor engaged in prosecutorial misconduct during closing statements in the guilt phase by denigrating the defense of extreme emotional disturbance thereby denying Matthews a fundamentally fair trial.

Date: April 21, 2008